Nos. 2023-1983, 2023-1985, 2023-1988, 2023-2028

# In The
# United States Court of Appeals
# for the Federal Circuit

---

XEROX CORP.,

*Appellant,*

v.

SNAP INC.,

*Cross-Appellant,*

FACEBOOK, INC., X CORP.,

*Appellees.*

---

Appeals from the United States Patent and Trademark Office, Patent Trial and
Appeal Board in Nos. IPR2021-00987, IPR2021-01294, IPR2021-01458.

---

## BRIEF FOR XEROX CORPORATION

---

Joel L. Thollander
James E. Quigley
Kyle N. Ryman
MCKOOL SMITH, P.C.
303 Colorado Street, Ste. 2100
Austin, TX 78701
(512) 692-8700

Kevin L. Burgess
*Principal Attorney*
MCKOOL SMITH, P.C.
104 East Houston Street, Ste. 300
Marshall, TX 75670
(903) 923-9000

*Attorneys for Appellant
Xerox Corporation*

November 17, 2023

**U.S. Patent No. 8,489,599 B2 (the '599 Patent)**

What is claimed is:

**1.** A method for delivering context-based content to a first user, the method comprising:

> receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;
>
> receiving a set of contextual information with respect to the first user;
>
> processing the contextual information to determine a current context for the first user;
>
> determining whether the current context satisfies the trigger condition;
>
> in response to the trigger condition being satisfied, presenting the content piece to the first user;
>
> receiving a response from the first user corresponding to the presented content piece;
>
> determining whether the received response matches the expected response; and
>
> performing an action based on an outcome of the determination.

**2.** The method of claim **1**, wherein the method further comprises creating the content package for the first user, wherein creating the content package involves:

> recording the content piece that is provided by the first user;
>
> creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions; and
>
> associating the one or more trigger conditions for the entry with a user-defined context; and

> wherein the method further comprises:

> continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user; and
>
> in response to the one or more trigger conditions being met, retrieving the content piece, and presenting the retrieved content piece to the first user.

**3.** The method of claim **2**, wherein the method further comprises creating a shareable content piece for the first user, wherein creating the sharable content piece involves:

recording the sharable content piece that is provided by the first user; and

creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;

wherein the content package allows a recipient of the content package to insert, modify, and/or remove content or trigger conditions from the content package.

**4.** The method of claim **1**, wherein the method further comprises defining a context by:

creating one or more context entries in a context manager; and

associating a respective context entry with a set of contextual information.

**5.** The method of claim **4**, wherein the method further comprises updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user.

**6.** The method of claim **1**, wherein the context is defined as a combination of at least a high-level abstraction which corresponds to one or more low-level contextual information values, wherein the low-level contextual information values can correspond to one or more measurable parameters.

**7.** The method of claim **1**, wherein a respective rule is defined with one or more high-level abstractions.

**8.** The method of claim **7**, further comprising allowing the first user to share the rules with a second user, wherein the second user can redefine the shared rules based on the second user's low-level contextual parameters.

**9.** The method of claim **1**, wherein presenting the content piece comprises sharing the content piece with a remote device.

**10.** The method of claim **1**, wherein the contextual information includes one or more of time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature,

pressure, humidity, sound, luminous intensity, camera image, and video stream.

**11.** The method of claim **1**, wherein the content piece includes one or more of audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

**12.** A computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method for delivering context-based content to a first user, the method comprising:

    receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;

    receiving a set of contextual information with respect to the first user;

    processing the contextual information to determine a current context for the first user;

    determining whether the current context satisfies the trigger condition;

    in response to the trigger condition being satisfied, presenting the content piece to the first user;

    receiving a response from the first user corresponding to the presented content piece;

    determining whether the received response matches the expected response; and

    performing an action based on an outcome of the determination.

**13.** The computer-readable storage medium of claim **12**, wherein the method further comprises creating the content package for the first user, wherein creating the content package involves:

    recording the content piece that is provided by the first user;

    creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions; and

    associating the one or more trigger conditions for the entry with a user-defined context; and

    wherein the method further comprises:

    continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user; and

in response to the one or more trigger conditions being met, retrieving the content piece and presenting the retrieved content piece to the first user.

**14.** The computer-readable storage medium of claim **13**, wherein the method further comprises creating a shareable content piece for the first user, wherein creating the sharable content piece involves:

recording the sharable content piece that is provided by the first user; and

creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;

wherein the content package allows a recipient of the content package to insert, modify, and/or remove content and/or trigger conditions from the content package.

**15.** The computer-readable storage medium of claim **12**, wherein the method further comprises defining a context by:

creating one or more context entries in a context manager; and

associating a respective context entry with a set of contextual information.

**16.** The computer-readable storage medium of claim **15**, wherein the method further comprises updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user.

**17.** The computer-readable storage medium of claim **12**, wherein the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.

**18.** The computer-readable storage medium of claim **12**, wherein the content piece includes one or more of audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

**19.** An apparatus for delivering context-based content to a first user, comprising:

a processor;

an input mechanism configured to receive a set of contextual information with respect to the first user;

a receiving mechanism configured to receive at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;

a content delivery mechanism configured to present the context-based content to a first user; and

a context manager configured to process the contextual information to determine a current context for the first user, and to determine whether the current context satisfies the trigger condition;

wherein in response to the trigger condition being satisfied, the content delivery mechanism is configured to present the content piece to the first user and

wherein while presenting the content piece to the first user, the content delivery mechanism is further configured to:

receive a response from the first user corresponding to the presented content piece,

determine whether the received response matches the expected response, and

perform an action based on an outcome of the determination.

**20.** The apparatus of claim **19**, wherein the apparatus further comprises a content management mechanism configured to create the content package for the first user, wherein creating the content package involves:

recording the content piece that is provided by the first user;

creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions;

associating the one or more trigger conditions for the entry with a user-defined context;

continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user; and

in response to the one or more trigger conditions being met, retrieving the content piece and presenting the retrieved content piece to the first user.

**21.** The apparatus of claim **20**, wherein the content management mechanism is further configured to create a shareable content piece for the first user, wherein creating the sharable content piece involves:

    recording the sharable content piece that is provided by the first user; and

    creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;

    wherein the content package allows a recipient of the content package to insert, modify, and/or remove content or trigger conditions from the content package.

**22.** The apparatus of claim **19**, wherein the context manager defines a context by:

    creating one or more context entries for the context; and

    associating a respective context entry with a set of contextual information.

**23.** The apparatus of claim **22**, wherein the apparatus is further configured to update entries in the content database and update the user-defined context entries in the context manager responsive to actions performed by the first user.

**24.** The apparatus of claim **19**, wherein the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.

**25.** The apparatus of claim **19**, wherein the content piece includes one or more of audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1983, 2023-1985, 2023-1988, 2023-2028 |
| **Short Case Caption** | Xerox Corp. v. Snap Inc. |
| **Filing Party/Entity** | Xerox Corporation |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: November 17, 2023        Signature: <u>/s/ *Joel L. Thollander*</u>

                                Name:      <u>Joel L. Thollander</u>

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. <br><br> ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. <br><br> ☐ None/Not Applicable |
| Xerox Corporation | | Xerox Holdings Corporation (wholly owns Xerox Corporation) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ ADDITIONAL PAGES ATTACHED

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| **McKool Smith, P.C.** | Kevin L. Burgess, David Sochia, Joel L. Thollander, James E. Quigley, Alexandra F. Easley, George T. Fishback, Jr., Kyle N. Ryman, Carra Rentie, Ashley Moore (no longer with the firm) |
|---|---|

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE................................................................3

I.      Preliminary Statement. ..................................................3

II.     Background..................................................................5

    A.      It took an extraordinarily talented researcher to arrive at the '599 patent........................................5

    B.      Snap, Facebook, and X Corp. infringed the '599 patent and then filed serial petitions for *inter partes* review. ..................................................8

    C.      Only some of the Accused Infringers' prior art is relevant to this appeal..................................10

    D.      The Board found Xerox's claims unpatentable..................................13

SUMMARY OF THE ARGUMENT ....................................................15

STANDARD OF REVIEW ...................................................................20

ARGUMENT ........................................................................................21

I.      The Board misconstrued the claims—which require the possibility of both *expected* and *unexpected* responses being the received *response*—by elevating a hyperliteral reading of the claims over the claim language, specification, and file history..........................................21

    A.      The claim language requires the possibility that a *response* be *expected* or *unexpected*. ..................................22

        1.      Xerox's claims expressly distinguish *response* from *expected response*, meaning a *response* must include the possibility of more than just *expected responses*..........................23

2.    A *response* must include the possibility of unexpected *responses* to give meaning to claim limitations.................................................23

3.    The Board improperly confined Xerox's claims to a single unhelpful embodiment. ...............................27

B.    The specification also supports the possibility that a *response* be *expected* or *unexpected*.................................28

1.    The specification teaches the possibility of unexpected *responses*...............................................29

2.    The Board's only basis for rejecting the possibility of unexpected *responses* is its meritless-and-unsupported distinction between an "unexpected response" and a "not . . . expected response."......................................30

C.    The file history supports that both *expected* and unexpected *responses* must be possible. ...........................32

1.    The Board failed to give weight to amendments during prosecution showing the possibility of an unexpected *response*. ....................33

2.    The Board failed to give weight to statements by Applicant to the examiner showing the possibility of an unexpected *response*. ...............................................................33

II.    The Board failed to give a reasoned basis for finding that the Accused Infringers' prior art teaches every limitation of the '599 patent. ..........................................................34

A.    No reasonable fact finder would agree that the Accused Infringers' prior art teaches the possibility of both *expected* and *unexpected* responses, rendering Xerox's claims not anticipated or obvious. ............................................................34

1.    No reasonable fact finder would agree that Rosenberg teaches a properly construed *response*. ....................................................35

2.    No reasonable fact finder would agree that a Lamont-Wolfe combination teaches a properly construed *response*. ....................................36

3.    No reasonable fact finder would agree that PALLAS teaches a properly construed *response*. ....................................................38

B.    No reasonable fact finder would agree that a PALLAS-Yau combination teaches *receiving* a properly structured *content package*—one with a *set of rules* that *includes an expected response*................................39

1.    The Board failed to explain how a PALLAS-Yau combination teaches *receiving* a properly structured *content package*. ....................................................40

2.    No reasonable fact finder would agree that PALLAS teaches a *set of rules* that *includes an expected response*. ...............................40

3.    No reasonable fact finder would agree that PALLAS teaches a *content package* that *includes an expected response* within a *set of rules* or not. ....................................................41

C.    Substantial evidence does not support that a Lamont-Wang combination teaches the tripartite structure Xerox's claims require. .......................................43

1.    *Context* must describe an event or environmental factor as a whole. .............................44

2.    Single-bit, Boolean values do not teach *context* as claimed because they do not describe an event or environmental factor as a whole. ....................................................47

3. The Board also erred in collapsing the tripartite structure of Xerox's claims into a bipartite structure. .......................................................49

III. Xerox's claims are not obvious. ....................................................51

A. No reasonable fact finder would agree that a skilled artisan would be motivated to combine Wolfe with Lamont. ............................................51

1. Lamont teaches away from Wolfe, precluding a combination.............................................52

2. Substantial evidence does not support the theories the Board credited as providing a motivation to combine Wolfe with Lamont.............................53

3. Facebook also failed to show that a skilled artisan would be motivated to combine Lamont and Wolfe to teach the claimed *content piece*. ...................................................55

B. No reasonable fact finder would agree that a skilled artisan would combine Yau with PALLAS to trigger the presentation of the *content piece*. ...................................57

1. The Board's finding on whether PALLAS teaches *presenting the content piece* is too unclear to be reasonably discerned, and no reasonable fact finder would make such a finding anyway.........................................................57

2. No reasonable fact finder would find that Yau teaches *presenting the content piece*. ................................58

3. No reasonable fact finder would find that a skilled artisan would be motivated to combine Yau with PALLAS. ....................................62

CONCLUSION .................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arendi S.A.R.L. v. Apple Inc.*,
 832 F.3d 1355 (Fed. Cir. 2016) ..........................................................42

*BASF Corp. v. Enthone, Inc.*,
 749 F. App'x 978 (Fed. Cir. 2018) (unpublished) ..............................26

*Corning v. Fast Felt Corp.*,
 873 F.3d 896 (Fed. Cir. 2017) ....................................................60, 63

*Fenner Invs., Ltd. v. Cellco P'ship*,
 778 F.3d 1320 (Fed. Cir. 2015) ..........................................................32

*Intel Corp. v. Qualcomm Inc.*,
 21 F.4th 801 (Fed. Cir. 2021) .............................................................34

*KCJ Corp. v. Kinetic Concepts, Inc.*,
 223 F.3d 1351 (Fed. Cir. 2000) ..........................................................27

*In re Magnum Oil Tools Int'l, Ltd.*,
 829 F.3d 1364 (Fed. Cir. 2016) ..........................................................64

*In re Nuvasive*,
 842 F.3d 1376 (Fed. Cir. 2016) ...................................................passim

*Panduit Corp. v. Dennison Mfg. Co.*,
 810 F.2d 1561 (Fed. Cir. 1987) .........................................20, 21, 59

*Pers. Web Techs., LLC v. Apple, Inc.*,
 848 F.3d 987 (Fed. Cir. 2017). ...................................................passim

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................passim

*Purdue Pharma L.P. v. Depomed, Inc.*,
 643 F. App'x  960 (Fed. Cir. 2016) (unpublished) ......................passim

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
  856 F.3d 1019 (Fed. Cir. 2017) ...........................................................20

*S.-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*,
  748 F. App'x 1003 (Fed. Cir. 2018) (unpublished) .........................51, 53, 56, 57

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ...........................................................................20

*Sequoia Tech., LLC v. Dell, Inc.*,
  66 F.4th 1317 (Fed. Cir. 2023) ........................................29, 45, 46, 48

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,
  192 F.3d 1353 (Fed. Cir. 1999) ...........................................18, 51, 63

*Trintec Indus., Inc. v Top-U.S.A. Corp.*,
  295 F.3d 1292 (Fed. Cir. 2002) .....................................20, 35, 36, 37

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
  17 F.4th 155 (Fed. Cir. 2021) ....................................................*passim*

*In re Varna*,
  816 F.3d 1352 (Fed. Cir. 2016) ........................................................47

*Volvo Penta of Ams., LLC v. Brunswick Corp.*,
  81 F.4th 1202 (Fed. Cir. 2023) ..................................................*passim*

*Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) .....................................15, 24, 47, 50

*In re Wesslau*,
  353 F.2d 238 (CCPA 1965) .............................................................59

*Z4 Techs., Inc. v. Microsoft Corp.*,
  507 F.3d 1340 (Fed. Cir. 2007) ........................................................27

## Statutes

35 U.S.C. § 102 ....................................................................................1

35 U.S.C. § 103 ....................................................................................1

35 U.S.C. § 142 ....................................................................................1

xv

## Other Authorities

37 C.F.R. § 90.3 ...................................................................1

Consolidated Trial Practice Guide (Nov. 2019)...............................................25

Fed. Cir. R. 15 ...................................................................1

## STATEMENT OF RELATED CASES

Pursuant to FED. CIR. R. 47.5, Appellant provides as follows:

(a) There have been no other previous appeals in these cases; and

(b) The following cases are related and may be directly affected by this Court's decision in the pending appeal:

- Case No. 2:20-cv-10753 AB, *Xerox Corp. v. Meta Platforms, Inc.* (C.D. Cal.);

- Case No. 2:20-cv-10754-AB, *Xerox Corp. v. X Corp., F/K/A Twitter, Inc.* (C.D. Cal.); and

- Case No. 2:20-cv-10755-AB, *Xerox Corp. v. Snap, Inc.* (C.D. Cal.).

# STATEMENT OF JURISDICTION

On March 24, 2023, the Patent Trial and Appeal Board (the Board) issued its consolidated final written decision in IPR2021-00987, IPR2021-01294, and IPR2021-01458. Appx1. The Board found the '599 patent's claims 1-25 unpatentable as anticipated or obvious under 35 U.S.C. §§ 102 and 103. On May 24, 2023, Xerox Corporation (Xerox) timely filed its Notices of Appeal in this Court. 37 C.F.R. § 90.3(a)(1); 35 U.S.C. § 142; FED. CIR. R. 15(a)(1). Dkt. 1-2. The Court has exclusive jurisdiction. 35 U.S.C. § 141(c).[1]

---

[1] After the Board issued its final written decision, then-patent owner Palo Alto Research Center LLC (PARC) assigned all of its interest in the '599 patent to Xerox. Xerox then donated PARC to another research institute.

**STATEMENT OF THE ISSUES**

1. Whether the Board properly applies the *Phillips* claim construction standard—which turns on claim language, the specification, and the file history—when the Board finds the claimed *response* does not include the possibility of an *un*expected *response* despite (a) the claims expressly distinguishing between a *response* and an *expected response*, (b) the specification and file history supporting the possibility of an unexpected *response*, and (c) the Board finding that a *response* includes the possibility of a "not . . . expected response"?

2. Whether the Board erred in finding Xerox's claims anticipated and obvious despite the patent challengers' prior art not teaching every claimed limitation?

3. Whether the Board may find claims obvious when no reasonable fact finder would agree that a person of ordinary skill in the art (skilled artisan) would have combined the patent challenger's references?

## STATEMENT OF THE CASE

### I.    Preliminary Statement.

The Board's decision should not stand. It lacks a reasoned basis, suffering from the erroneous application of standard claim construction principles, conclusory reasoning, and factual findings that no reasonable fact finder would agree with. The Court should reverse.

Xerox is an innovative company. Over the years, thousands of patents have been issued to Xerox and its former subsidiary PARC. One of those was the '599 patent, which Xerox now owns. *See supra* note 1. The '599 patent claims new and useful techniques for "determin[ing] when and how to best provide [mobile-device] users with information or suitable entertainment content." Appx171 (1:43-45). Xerox's claims are the product of an extraordinarily talented researcher, Dr. Victoria Bellotti, who had spent nearly 20 years in the industry by the time she applied for the '599 patent—including at companies like Apple and PARC. *See* Appx5168-Appx5169.

The "Accused Infringers"—Snap, Facebook, and X Corp.—all derive value from those improvements. Yet they refuse to compensate Xerox for them, leaving Xerox with no other choice but to sue the Accused Infringers for infringing the '599 patent. Over the course of just under four months, the Accused Infringers responded with an avalanche of petitions for *inter partes* review, collectively

requesting that the Board cancel the '599 patent's claims. The Board mistakenly obliged. It instituted four out of five of the Accused Infringers' petitions and found all Xerox's claims unpatentable. Because the Board failed to give a reasoned basis for its findings, its determinations should be reversed.

First, the Board rejected the plain meaning of the claims, which require the possibility of the claimed *response* being either *expected* or *un*expected. The Board did so by drawing a hyperliteral (and unsupported) distinction between an *un*expected *response* and a "not . . . expected response." According to the Board, Xerox's claims—which expressly distinguish between a *response* and an *expected response*—do not require the possibility of an unexpected *response*, but do require the possibility of a "not . . . expected response." This reasoning makes no sense at all: the Board has no support for a distinction so fine. And the Board made no effort to assert otherwise. Simply put, the claim language, specification, and file history all support that the claims require that the received *response* could be either an unexpected (or "not . . . expected") or *expected response*.

Second, applying a proper claim construction resolves this appeal: Xerox's claims are neither anticipated nor obvious. No reasonable fact finder would agree with the Board that Facebook's and X Corp.'s combinations teach a properly construed *response*. The Court should stop there.

4

The prior art identified by Facebook and X Corp. suffers from other problems, too. The Board's explanation for why PALLAS (X Corp.) teaches the claimed *content package* is speculative at best. And the Board's reasoning for why Facebook's prior art teaches the claimed tripartite structure, including its claimed intermediate *context* is just as problematic.

Third, no reasonable fact finder could agree with the Board that a skilled artisan would make either Facebook's or X Corp.'s combinations. All the Board pointed to in support of either combination was conclusory expert testimony untethered from the prior art. And the Board failed to adequately reconcile and, sometimes, flat-out ignored evidence contradicting a motivation to combine.

The Board lacked a reasoned basis to cancel Dr. Bellotti's invention. The Court should correct the Board's errors and reverse.

## II.    Background.

### A.    It took an extraordinarily talented researcher to arrive at the '599 patent.

Xerox believes in "solving problems—constantly questioning the world around you to find new answers to old challenges." *See, e.g.*, *Xerox Recognized in Derwent Top 100 Global Innovators List, 2018 – 2019*, XEROX, xerox.com/en-us/innovation/derwent-top-100 (last visited Nov. 8, 2023). In 1970, Xerox "assemble[d] a team of world-class experts in information and physical sciences to become what is known as 'The Architects of Information.'" *A Legacy of Inventing*

*the Future*, PARC, parc.com/about-parc/parc-history (last visited Nov. 8, 2023).
That team became Xerox PARC; later simply PARC, a Xerox subsidiary. *Id.* In the
decades between Xerox founding PARC in 1970 and Xerox donating PARC to SRI
International in 2023, PARC solved countless, real-world problems in new and
useful ways, earning thousands of patents along the way.

One of the problems PARC solved was how to "determine when and how to
best provide [mobile-device] users with information or suitable entertainment
content." Appx171 (1:43-45). The mobile devices of late 2008 were "not effective
in helping working professionals accommodate their responsibilities around their
busy schedule." *Id.* (1:39-41). That was a problem: those "users often need[ed] to
continue advancing their skills, but their work and social schedules [did] not allow
much free time for extended study." *Id.* (1:35-38). At the center of that problem
was a capability gap: then-existing mobile devices were "not capable of learning
and understanding the behavior of their users," or "tak[ing] into account the
activities that their users are involved in." *Id.*  (1:41-46). Systems and methods
focusing on that were needed.

PARC's inventor filled this need. Dr. Bellotti claimed a new-and-useful
invention that "delivers personally-defined context-based content to a user" in the
'599 patent. Appx166 (Abstract). Claim 1, for example, recites "[a] method for
delivering context-based content to a first user." Appx182 (23:20-21). That method

starts by "receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associates with the content package." *Id.* (23:22-24). The *set of rules* further "includes a trigger condition and an expected response," with the *trigger condition* "specif[ying] a context that triggers a presentation of the content piece." *Id.* (23:25-27).

Next came the claimed tripartite structure. The invention "receiv[es] a set of contextual information with respect to the first user," then "process[es] [it] to determine a current context for the first user," before finally "determining whether the current context satisfies the trigger condition." *Id.* (23:28-33). That tripartite structure helps enable the '599 patent to fill the capability gap left open by prior art. "[I]n response to the trigger condition being satisfied," the invention "present[s] the content piece to the first user." *Id.* (23:34-35). Once the user responds, the invention "receiv[es] a response from the first user corresponding to the presented content piece" and then "determin[es] whether the received response matches the expected response." *Id.* (23:36-39). Finally, the invention "perform[s] an action based on an outcome of the determination." *Id.* (23:40-41).

**B.     Snap, Facebook, and X Corp. infringed the '599 patent and then filed serial petitions for *inter partes* review.**

Compared to Xerox, the Accused Infringers are all young companies. After experiencing explosive growth in their user bases, the Accused Infringers needed to monetize those users through targeted advertisements based on specific audiences, including based on location and device type. This monetization came with infringement of the '599 patent. Xerox (through its predecessor in interest, PARC, *see supra* note 1) then sued the Accused Infringers in the Central District of California in November 2020, alleging infringement of the '599 and other patents. Complaint, *Xerox Corp. v. Snap Inc.*, No. 2:20-cv-10755, 12-16 (C.D. Cal. Nov. 25, 2020) (Dkt.1); Complaint, *Xerox Corp. v. Meta Platforms, Inc.*, No. 2:20-cv-10753, 12-16 (C.D. Cal. Nov. 25, 2020) (Dkt.1); Complaint, *Xerox Corp. v. X Corp.*, No. 2:20-cv-10755, 12-17 (C.D. Cal. Nov. 25, 2020) (Dkt.1).

The cruciality of the '599 invention to the Accused Infringers' businesses quickly became clear. From May 2021 to September 2021, the Accused Infringers petitioned the Board five times for *inter partes* review of the '599 patent, asserting 19 grounds for its unpatentability. Snap asked the Board to institute all Xerox's claims based on three grounds, including anticipation by Rosenberg, obviousness over Rosenberg, and obviousness over Rosenberg in view of Suzuki. Appx201. The Board instituted on all three grounds. Appx361.

Facebook filed sixty days later. It asked the Board to institute on four other grounds, including obviousness over Lamont in view of Wolfe and Wang, obviousness over Lamont in view of Wolfe, Wang, and Belimpasakis, obviousness over Lamont in view of Wolfe, Wang, and Meyers, and obviousness over Lamont in view of Wolfe, Wang, Belimpasakis, and Meyers. Appx1164. The Board instituted on all four grounds. Appx1336.

Then came X Corp. Filing forty-two days after Facebook, X Corp. could not stay under the Board's word-count limit. So X Corp. filed two petitions for *inter partes* review simultaneously. The first asked the Board to institute on four grounds, including obviousness over PALLAS, obviousness over PALLAS in view of Yau, obviousness over PALLAS in view of Kim, and obviousness over PALLAS in view of Yau and Kim. Appx2124. The second asked the Board to institute on another four grounds, including obviousness over PALLAS, obviousness over PALLAS in view of Yau, obviousness over PALLAS in view of Kim, and obviousness over PALLAS in view of Yau and Kim. Appx2408. The

Board instituted on all grounds across both petitions (Appx2331; Appx2389), and

consolidated X Corp.'s petitions. Appx2335.[2]

## C.    Only some of the Accused Infringers' prior art is relevant to this appeal.

While the Board instituted on essentially all the Accused Infringers'

grounds, Xerox has focused this appeal on only a handful of issues. The relevant

prior art is Rosenberg, Lamont, Wolfe, Wang, PALLAS, and Yau.

Rosenberg is Snap's primary reference. It discloses a system for creating

reminders that are triggered when a user enters or leaves a specific geographic

location. Appx3851 (Abstract). Once Rosenberg displays a reminder to the user,

the user has four options: (a) engage with a user interface to "clear[] the displayed

reminder," Appx3878 (27:29-31); (b) "reset[] the personal reminder," *id.* (27:33-

35); (c) "terminat[e] the personal reminder," *id.* (27:39-41); or (d) "instruct[] the

portable computing device to alert the user again to the reminder content after a

defer delay time has elapsed," *id.* (27:43-46).

Lamont is Facebook's primary reference. It discloses a system and methods

to "create, edit, manage, and organize" points plotted on a digital map. Appx5654

(Abstract). Lamont allows a designer to design and publish "tour scripts," which a

---

[2] Twenty days after X Corp.'s filings Facebook filed a second petition, asking the
Board to institute on four additional grounds based on alternative arguments.
*Facebook, Inc. v. Palo Alto Research Ctr. Inc.*, IPR2021-01536, 3-6 (P.T.A.B.
Sept. 20, 2021) (Paper No. 3). The Board denied institution on all grounds.
Institution Decision, *Facebook, Inc. v. Palo Alto Research Ctr. Inc.*, IPR2021-
01536, 7 (P.T.A.B. Mar. 29, 2022) (Paper No. 10).

user can then use to tour a geographic location and view location-sensitive information. Appx5664 (1:16-19). The system can associate content with the disclosed points. That enables, in some embodiments, playing content for the user if certain conditions are met. Appx5665 (3:39-47).

Wolfe is Facebook's secondary reference. It discloses a "location-based mobile phone application" that allows the user to play a treasure-hunt game. Appx5694 (1:13-16). As the user approaches pre-determined locations along the set route, the system presents the user with "items in the list pertaining to [the user's] location." Appx5696 (5:4-5:5; 5:28-35). Those items can include puzzles, bulletins from other users conveying information about the site, or audio clips. *Id.* (5:28-58). Upon interaction with the item at one location, the user is prompted to proceed to the next stop on the route. *Id.* (5:59-65). Sometimes the system prompts the user to solve a riddle or puzzle. *Id.* (5:47-57).

Wang is Facebook's tertiary reference. It is a selection from the reference book "Beginning Programming for Dummies." Appx5726. Relevant are Chapter 9's pages on Boolean expressions. Appx5748-Appx5754. Wang discusses coding Boolean expressions, Boolean operators, and truth tables, all at a general level. *Id.*

PALLAS is X Corp.'s primary reference. It is a white paper disclosing a system for "providing personalised and contextualised access to learning resources," the "main focus" of which is described as the "personalisation of

11

learning resources [] provided to a mobile language learner. Appx9933-Appx9934. PALLAS achieves that contextualisation "using the profile of the learner and environmental parameters—*e.g.*, accounting for "the learner's age, skill level, native language, interests and courses taken" for the profile, and "location, time and day and the mobile device used" for the environmental parameters. Appx9935. PALLAS distinguishes between notifications and tests/exercises. Appx12615-Appx12619 ¶¶ 83-88. PALLAS teaches using a "context trigger" to initiate a notification, but not to initiate "tests" or "exercises." *Id.* That is because learners "may have small time slots to engage in learning," and that learning should be "unobtrusive." Appx9935.

Yau is X Corp.'s secondary reference. It discloses a "Context-aware and Adaptive Learning Schedule (CALS) framework." Appx9942. Yau's "goal" for CALS was for it to become the foundation of a "learning application to be used on a mobile handheld device," which "adapts [] learning activities to [] learners according to their learning styles and is also capable of detecting the users' current learning context, and recommends appropriate activities for them based on these two criteria." Appx9943. Yau does not discuss "emit[ting] a recommendation without being prompted by a user." Appx12659-Appx12660 ¶¶ 163-166.

12

**D.    The Board found Xerox's claims unpatentable.**

The Board issued a 165-page, consolidated Final Written Decision addressing all three IPRs. Appx1-Appx165. Pages 132-161 relate to conditional substitute claims Xerox is not appealing. Appx132-Appx161.

Relevant here, the Board found that claim 1 was illustrative for the Snap and Facebook IPRs (Appx9; Appx47), and claim 12 was illustrative for the X Corp. IPR. Appx94. For the issues raised in this appeal, claim 1 is illustrative, including of claim 12. The Court should thus focus on claim 1, which recites:

> **1.** A method for delivering context-based content to a first user, the method comprising:
>> receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;
>> receiving a set of contextual information with respect to the first user;
>> processing the contextual information to determine a current context for the first user;
>> determining whether the current context satisfies the trigger condition;
>> in response to the trigger condition being satisfied, presenting the content piece to the first user;
>> receiving a response from the first user corresponding to the presented content piece;
>> determining whether the received response matches the expected response; and
>> performing an action based on an outcome of the determination.

Appx182 (23:20-41).

Claim construction played a central role below. Xerox argued that its claims required the possibility of both an *expected* and unexpected *response*—that the *response* must be able to be either *expected* or unexpected. The Board disagreed. It rested its analysis on finding a dispositive distinction between an "unexpected response" and a "not . . . expected response." Appx17-Appx18. "[N]either the claims nor the Specification use the *term* 'unexpected response,'" explained the Board, but a *response* "may or may not be the expected response." *Id.* (emphasis added).

The Board also found that Rosenberg (Snap) anticipated Xerox's independent claims. Appx31-Appx32. The Board alternatively found that a Lamont-Wolfe combination (Facebook) and PALLAS (X Corp.) teach an unexpected *response*. Appx78-Appx79; Appx126-Appx127.

Xerox further disputed that X Corp.'s and Facebook's prior art taught other claim limitations. The Board again disagreed. It found that a PALLAS-Yau combination teaches receiving the claimed, specially structured *content package*. Appx120-Appx121. The Board also found that a Lamont-Wang combination teaches Xerox's claimed tripartite structure, including its required *context*. Appx69-Appx77.

Xerox also disputed that a skilled artisan would combine Facebook and X Corp.'s prior art. But the Board found that a skilled artisan would be motivated to

14

combine Wolfe with Lamont based on a purported "enhancement of gameplay." Appx82. The Board likewise found that a skilled artisan would be motivated to combine Yau with PALLAS to trigger presentation of the claimed *content piece to the first user*. Appx112-Appx118; Appx122; Appx124-Appx125.

Xerox timely and separately appealed. No. 2023-1983 (Dkt.1-2); No. 2023-1985 (Dkt.1-2); No. 2023-1988 (Dkt.1-2). Snap cross appealed. No. 2023-2028 (Dkt.1). The Court ordered all three appeals and the cross appeal consolidated. No. 2023-1983 (Dkts.2, 5).

## SUMMARY OF THE ARGUMENT

1. The Board misconstrued the claims. Properly construed, the claims require the possibility of the received *response* being either an *expected* or unexpected *response*. Here Xerox's claims expressly distinguish between a *response* and an *expected response*, which "strongly implies" that a *response* includes more than *expected responses*. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). And finding Xerox's claims do not require the possibility of an unexpected *response* renders limitations superfluous, which is "highly disfavored." *E.g.*, *Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017).

Other intrinsic evidence supports Xerox's claim construction. The specification illustrates *presenting* "audio clips" of foreign words to the *user* for

"practicing pronunciations"—*e.g.*, to practice mimicking foreign words for "goodnight." Appx176 (11:1-15, 11:25). The user's *response* could be both *expected* (a correct pronunciation) or *unexpected* (an incorrect pronunciation not anticipated by the system). Appx415. Claim amendments and statements during prosecution further support the possibility of an unexpected *response*. Appx411

To reject Xerox's construction the Board embraced hyperliteralism and engaged in linguistic summersaults. The Board emphasized—again and again— that "neither the claims nor the Specification use the *term* 'unexpected response.'" *E.g.*, Appx18 (emphasis added); *see also* Appx17, Appx56, Appx103. But the Board fully embraced that "the received response may or may not be the expected response." Appx17. So what is the difference between an *un*expected response and a "not . . . expected response"? The Board gave no explanation whatsoever. Nor did the Board adequately explain why limitations like *determining whether the received response matches the expected response*—which requires the possibility of an unexpected *response*—are not rendered superfluous under the Board's construction. The Board's reasoning conflicts with *Phillips*.

2. The Board also failed to give a reasoned basis for finding that the Accused Infringers' prior art teaches every limitation of the '599 patent. Rosenberg does not anticipate because Snap never demonstrated how Rosenberg teaches the possibility of unexpected responses—*i.e.*, a properly construed *response*. Nor do Lamont-

Wolfe or PALLAS-Yau—Facebook's and X Corp.'s combinations that a skilled artisan would not be motivated to combine—teach a properly construed *response*. Thus, Xerox's claims are not obvious either.

X Corp.'s prior art fails to teach other critical limitations. The Board found that "the combination of PALLAS and Yau teaches receiving a content package that includes a set of rules that includes an expected response." Appx122. No reasonable fact finder would agree. The Board gave no explanation for why the disclosures it pointed to in PALLAS teach *receiving* a properly structured *content package*. Similarly, the Board's explanation for why PALLAS teaches *a set of rules that includes an expected response* is speculative, which is not substantial evidence. Appx119. *See In re Nuvasive*, 842 F.3d 1376, 1379 (Fed. Cir. 2016). The same is true for the Board's reasoning explaining why PALLAS teaches the claimed structure of a *content package*. Appx120-Appx121.

The Board's reasoning for why Xerox's claims are purportedly obvious over Facebook's prior art is also problematic. The Board construed the claimed *context* as including single-bit, Boolean values like TRUE or FALSE. Appx70. The plain meaning of Xerox's claims shows otherwise. The Board and Xerox agree that, as claimed, "[a] *context* is a set of data that describes an event or environmental factor associated with a user or the operational environment of the content management system." Appx174 (7:36-39) (emphasis added). But the Board erred by rejecting

that, to meet that standard, *context* must describe the events or environmental factors associated with a user or the operational environment "as a whole," Appx7728 ¶ 100—*e.g.*, with descriptions of a user's activity, like "commuting to work" or similar. Appx175 (10:42-44).

Single-bit, Boolean values like TRUE or FALSE do not meet that standard. That is reason enough to reverse that Lamont-Wang teaches *context*. But the Board's reasoning also collapses Xerox's claimed tripartite structure into a bipartite structure. Once *contextual information* is *received*, Xerox's claims expressly require an intermediate *processing* to *determine a current context for the first user* before finally *determining whether the current context satisfies the trigger condition*. The Board's reasoning would combine that intermediate step with the final, creating a non-existent limitation of *determining whether the contextual information satisfies the trigger condition*. Appx182 (23:28-23:39)

3. Further, no reasonable fact finder would agree with the Board that a skilled artisan would be motivated to combine Wolfe with Lamont (Facebook) or Yau with PALLAS (X Corp.). Lamont teaches away from Wolfe, which precludes their combination. *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999). And leaving that aside, the Board's finding that a skilled artisan would be motivated by "the enhancement of game play of Lamont [by] Wolfe [that] would provide greater enjoyment to tour customers" is supported by nothing

but an expert's conclusory testimony. Appx82. That is not enough to support a motivation to combine. *Nuvasive*, 842 F.3d at 1383.

The Board's reasoning to support a PALLAS-Yau combination fares no better. The Board found that (1) Yau teaches *presenting the content piece* in *response to the trigger condition being satisfied*, and (2) that a skilled artisan would be motivated to combine Yau with PALLAS. Appx112-Appx118; Appx122; Appx124-Appx125. But the Board's finding on (1) lacks supporting explanation, Appx114, and ignores contradictory evidence, Appx12659-Appx12660 ¶¶ 163-166. The Board must explain its findings, *Nuvasive*, 842 F.3d at 1383, while not ignoring contradictory evidence, *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017).

As for (2), a skilled artisan would understand that Yau and PALLAS teach away from each other. PALLAS teaches only "unobtrusive" learning activities, while Yau allows for obtrusive learning activities when users request them. Appx12648-Appx12649 ¶¶ 143-144. Between that, and the Board's failure to support its affirmative finding of a motivation to combine with substantial evidence, no reasonable fact finder would agree that a skilled artisan would combine Yau with PALLAS to *present the content piece*.

## STANDARD OF REVIEW

The Court's review of agency actions is rigorous. While a district court may be affirmed so long as its "result is correct," that is not so for an agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). An agency action must be sustained on "the grounds upon which the [agency] itself based its action." *Id.* Thus the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," but will not "supply a reasoned basis for the agency's action that the agency itself has not given." *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017) (citation omitted).

Here the Board construed key claim terms within the '599 patent and found Xerox's claims both obvious and anticipated. "Claim construction is a legal issue reviewed de novo, based on underlying factual findings that are reviewed for substantial evidence." *Pers. Web*, 848 F.3d at 990. Similarly, the Court "review[s] the Board's ultimate determination of obviousness de novo and its underlying factual determinations for substantial evidence." *Id.* at 991. Anticipation is a fact question subject to substantial evidence review. *See Trintec Indus., Inc. v Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002) ("Novelty, or anticipation, is a question of fact."). What a reference teaches is a fact question answered by reading the reference "as a whole." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566, 1568 (Fed. Cir. 1987).

Substantial evidence is no toothless standard. The Court "examin[es] the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.* (citation and internal quotation marks omitted). In doing so, the Court asks "whether a reasonable fact finder could have arrived at the agency's decision." *Id.* (citation omitted). The Board lacks substantial evidence support when its reasoning is "conclusory." *Nuvasive*, 842 F.3d at 1376. Nor does speculative evidence amount to substantial evidence. *See id.* at 1379 (defining substantial evidence as "more than a mere scintilla of evidence" (citation omitted)).

## ARGUMENT

I.    **The Board misconstrued the claims—which require the possibility of both *expected* and *unexpected* responses being the received *response*—by elevating a hyperliteral reading of the claims over the claim language, specification, and file history.**

The Board rejected Xerox's argument that the claims require the possibility of both *expected* and *unexpected* responses be the received *response*. Why? Hyperliteralism: "[N]either the claims nor the Specification use the term 'unexpected response.'" Appx18. *But see* Appx141-Appx142 (finding that the application that became the '599 patent specification disclosed possibility of unexpected responses). That is not the *Phillips* standard. Among other things, Xerox's claims expressly distinguish between a *response* and an *expected response*. *E.g.*, Appx182 (23:38-39). Thus, a *response* "may or may not be the

expected response," which even the Board at one point agreed is true. Appx17. So how, then, does a *response* not include the possibility of an unexpected *response*?

In the Board's view, the answer is that there is a meaningful distinction between a "not . . . expected *response*" and an *un*expected *response*. Not so. Claim construction is not based on linguistic summersaults, but on the claim language, specification, and file history. *Phillips*, 415 F.3d at 1312-17. Applying those principles here leads to one conclusion: the claims require the possibility of both *expected* and *unexpected* responses as the received *response*.

## A.   The claim language requires the possibility that a *response* be *expected* or *unexpected*.

The language of Xerox's claims alone demonstrates the Board's erroneous construction. Xerox's claims require "receiving a response," "determining whether the received response matches the expected response," and then "performing an action based on an outcome of the determination." Appx182 (23:35-41). The express distinction between a *response* and an *expected response*, as well as the claim structure—which uses the *response*'s status as *expected* or unexpected— support that a *response* requires the possibility of an *un*expected response. The Board's reasoning to the contrary is improper and flawed.

22

1. **Xerox's claims expressly distinguish *response* from *expected response*, meaning a *response* must include the possibility of more than just *expected responses*.**

Under *Phillips*, the Board should have looked at the "claims themselves" and "the context in which [*response*] is used" to inform that term's meaning. 415 F.3d at 1314. Xerox's independent claims require a *response* and also an *expected response*. Appx182-Appx183 (23:38-39, 24:58-61, 26:10-13). Modifying *response* with *expected* "strongly implies that the term [*response*] does not inherently mean" *expected response*. *Phillips*, 415 F.3d at 1314. Put another way, a *response* and *expected response* are not co-extensive. Thus, a *response* includes both the possibility of *expected responses* and not *expected*—or, *un*expected—*responses*. *Id.*

2. **A *response* must include the possibility of unexpected *responses* to give meaning to claim limitations.**

Other claim language "enlighten[s]" by reinforcing that conclusion. *Id.* Xerox's claims require *determining whether the received response matches the expected response*, and then *performing an action based on an outcome of the determination*. *E.g.*, Appx182 (23:38-41). Those limitations require the possibility of an unexpected *response*. As Dr. Martin, Xerox's expert, explained, "[d]etermining *whether* a condition holds has two possible outcomes: either it holds, or it does not hold." Appx5137 ¶ 75; Appx7715 ¶ 76; Appx12636 ¶ 119. Dr. Martin continued: "[T]he system must determine whether the received

response matches the expected response, or . . . that the received response is unexpected." Appx5137 ¶ 75; Appx7715-Appx7716 ¶ 76; Appx12636 ¶ 119. From there, the "performing" limitation takes an "action" that "depends at least on whether the condition of matching the expected response was satisfied or not." Appx5138 ¶ 76; Appx7716 ¶ 77; Appx12636 ¶ 120. That the *determining whether* and *performing* limitations require the possibility of an unexpected *response* supports Xerox's construction. *Phillips*, 415 F.3d at 1314.

Without the possibility of an unexpected *response* "the 'determining' limitation would be read out of the claim completely . . . because there is nothing to 'determine.'" Appx5138 ¶ 77; Appx7716 ¶ 78; Appx12636 ¶ 121. Both the *determining whether* and *performing* limitations would lack "adequate meaning." Appx5138 ¶ 78; Appx7716 ¶ 79; Appx12637 ¶ 122. Such a construction is "highly disfavored." *E.g.*, *Wasica*, 853 F.3d at 1288 n.10.

Still, the Board rejected that the possibility of unexpected responses are "required to give meaning to the claim." Appx15; Appx53; Appx100. But the Board gave no explanation at all for discrediting Dr. Martin's contrary testimony. Appx15. Such a "conclusory" rejection does not give the Board a reasoned basis for rejecting Dr. Martin's opinion. *Nuvasive*, 842 F.3d at 1383.

Nor did the Board permissibly give meaning to the *determining whether* limitation. The Board found the possibility of unexpected responses is not required

24

because each *content package* includes *an expected response*, and there "can be more than one content package." Appx19-Appx20; *see also* Appx56 (addressing Facebook's similar theory). Thus, according to the Board, "'unexpected responses' are not required to give meaning to the limitation because an expected response associated with a different content package does not necessarily match the expected response associated with another content package and the presented content piece." Appx19-Appx20; Appx56.

Snap waited until its reply to raise that theory. Appx520; *see also* Appx20 (citing Snap's reply and a declaration made a year after the petition was filed). Same for Facebook. Appx1567; Appx56 (citing Facebook's reply and its supporting declaration). So Snap and Facebook waived the theory, and the Board should not have considered it. *See, e.g.*, CONSOLIDATED TRIAL PRACTICE GUIDE at 73 [hereinafter CTPG] ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g., to make out a prima facie case of unpatentability.").

The theory is also meritless. Claim 1's language makes plain that a pre-defined *expected response* is specific to a *content package*'s *content piece*, meaning a *received response* is not compared to all *expected responses* across all *content packages*. Appx182 (23:20-39). The Board said as much in the context of Xerox's proposed substitute claims: "the determining is confined to comparing

expected/predetermined responses to received responses *only for the specific content presented*, not for all possible content." Appx599. Xerox's claims and substitute claims are no different in that way. Xerox's claims require a *content package* that includes *an expected response*, and also *determining whether the received response matches the expected response*. Appx182 (23:22-39). Xerox's substitute claims require a *content package* that includes *at least one predefined response*, and also:

> determining whether the received response ~~matches the expected response~~ <u>is expected or unexpected, wherein the received response is expected if the received response matches one or more of the at least one predefined response, and wherein the received response is unexpected if the received response does not match any of the at least one predefined response.</u>

Appx474-Appx475 (deleted language ~~struck~~, and added <u>underlined</u>).

Despite Xerox pointing out the Board's earlier finding, Appx599; Appx1631; Appx2777; Appx639; Appx1689; Appx2842, the Board ignored the issue in Snap, Appx20-Appx21, and responded with conclusory reasoning in Facebook: "[W]e do not agree . . . based on the evaluation of the claim language and Specification disclosures, as discussed above," Appx56. The Board cannot make contradictory findings, *BASF Corp. v. Enthone, Inc.*, 749 F. App'x 978, 985 (Fed. Cir. 2018) (unpublished), ignore contrary evidence, *Pers. Web*, 848 F.3d at 993-94, or use conclusory reasoning, *Nuvasive*, 842 F.3d at 1383. Thus, the Board

lacked a reasoned basis to find that the *determining whether* limitation compares all *expected responses* across all *content packages*.

### 3.    The Board improperly confined Xerox's claims to a single unhelpful embodiment.

The Board's theory that *expected responses* are compared across *content packages* also falls apart for embodiments including only a single *content package* with a single *content piece* and related *expected response*. Those embodiments are within Xerox's claims' scope. Claim 1 requires "*at least one* content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes . . . *an* expected response." Appx182 (23:22-26) (emphasis added). And as the Court has held, *at least one* includes "only one," *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1349 (Fed. Cir. 2007), and so does "an," *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). For those embodiments, the *determining whether* and *performing* limitations have no meaning under the Board's theory because there are no other *expected responses* to compare to. Thus, the Board improperly confined Xerox's claims to a single embodiment (embodiments with more than one *expected response*), which the Court has "repeatedly warned against." *Phillips*, 415 F.3d at 1323.

Similarly, the Board's complaints that Xerox's claims do not require pre-defining unexpected responses are not dispositive. True, the *content package*

limitation makes "no mention [of] an unexpected response as part of the content package." Appx15; Appx53; Appx100. And it is also true that the claims do not "require[] determining whether a received response *matches* an unexpected response." Appx15; Appx53; Appx100 (emphasis added). But Xerox's claims need not do either. Again, the *content package* requires an *expected response*. This does not conflict with, but supports, the possibility of unexpected responses. *See* Argument § I(A)(1)-(2).

**B.    The specification also supports the possibility that a *response* be *expected* or *unexpected*.**

Claims "do not stand alone," but "must be read in view of the specification." *Phillips*, 415 F.3d at at 1315 (citation omitted). Claim 1 recites *presenting* a *content piece to the first user* and then *receiving a response from the first user corresponding to the presented content piece*. Appx182 (23:34-37). The specification both enables that claim language and teaches the possibility of unexpected *responses*. Yet the Board rejected what the specification enables based on a meritless-and-unsupported distinction between a "not . . . expected response," which the Board correctly found the specification discloses, and an unexpected *response*, which the Board erroneously found the specification does not disclose. The two are the same in the context of Xerox's claims. The Court should hold as much.

**1.      The specification teaches the possibility of unexpected *responses*.**

"A claim construction exclud[ing] a preferred embodiment is rarely, if ever correct." *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023) (citation omitted). One preferred embodiment teaches *presenting* "audio clips" of foreign words to the *user* for "practicing pronunciations." Appx176 (11:14-15). A user learning Japanese may be *presented* with the *content piece* JpGoodnight.mp3 to prompt mimicking the Japanese word for "goodnight." *Id.* (11:1-10, 11:25).

"Plainly," Dr. Martin noted, "there are a very small number of ways to correctly mimic a phrase, as compared to the number of ways to speak it incorrectly." Appx5140 ¶ 81; Appx7718 ¶ 82; Appx12638 ¶ 125. Yet the claims require *determining whether the received response matches the expected response*. Appx182 (23:38-39). To do that, explained Dr. Martin, "[a] person of ordinary skill in the art would understand that the system being described contains an expected response (i.e., a recording of 'Good night' spoken in Japanese) *and uses that as the basis* for determining whether the response actually received is correct or incorrect (due to not matching the expected response, i.e., being unexpected) and in turn invoking the corresponding action." Appx5140 ¶ 81 (emphasis added); Appx7718 ¶ 82; Appx12638 ¶ 125.

**2.      The Board's only basis for rejecting the possibility of unexpected *responses* is its meritless-and-unsupported distinction between an "unexpected response" and a "not . . . expected response."**

Even still, the Board rejected that the specification supports that a *response* includes the possibility of unexpected *responses*. The Board emphasized that "neither the claims nor the Specification use the term 'unexpected response.'" Appx18; *see also* Appx17 ("We . . . note that the Specification only discloses determining whether a received response is *expected*."); *id.* ("[W]e do [not] discern[] any disclosure of determining whether a received response is an '*unexpected* response.'"); Appx56 (distinguishing between a *received response* that does not match the *expected response* and an unexpected *response*); Appx103 (same).

But what about a "not . . . expected response"? Appx17. The Board agreed the specification discloses those: "[T]he received response may or may not be the expected response." *Id.* Indeed, Table 1 "illustrates an exemplary set of rules for presenting [a] content package . . . to a user in accordance with an embodiment of the present invention":

30

TABLE 1

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---------|------|----------|-------|----------|----------------|------------------|
| JpI.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHello.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHowDoYouDo.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |

TABLE 1-continued

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---------|------|----------|-------|----------|----------------|------------------|
| JpGoodnight.mp3 | >21:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpGoodmorning.mp3 | <10:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |

Appx175-Appx176 (10:57-11:13). And "an *action incorrect column entry* can obtain a value that specifies an action to be performed by [the] content management system . . . on the occasion that the user does not provide an expected response." Appx177 (13:4-7) (emphasis added). The Board thus properly recognized that the specification discloses receiving "not . . . the expected response." Appx17.

So what is the difference between an "unexpected response" and a "not . . . expected response"? The Board could not say. Rather, the Final Written Decision performs linguistic summersaults to avoid comparing unexpected responses to not expected responses. Appx17-Appx18; Appx55-Appx56; Appx102-Appx103; *see also* Appx103 (explaining that what "the Specification

31

discloses and what is claimed" is for the "*received response*" to be "checked to determine if it matches the '*expected response*,'" but rejecting that process requires the possibility of an "unexpected" response). The Board cannot draw unsupported, conclusory distinctions. *Nuvasive*, 842 F.3d at 1383.

The Board also faulted Xerox for not "identify[ing] in the Specification . . . any disclosure of determining whether a received response is an *unexpected* response." Appx17; Appx56; Appx102. But Xerox's response in each IPR pointed to Table 1 and its discussion in the specification to support that its claims require the possibility of unexpected *responses* and that a "not . . . expected response" is equivalent to an unexpected *response*. Appx426-Appx427; Appx1391-Appx1392; Appx2649-Appx2650.

## C. The file history supports that both *expected* and unexpected *responses* must be possible.

"Any explanation, elaboration or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015). Here such evidence exists and shows that Xerox's claims require that *expected* and unexpected *responses* must be possible.

### 1. The Board failed to give weight to amendments during prosecution showing the possibility of an unexpected *response*.

The Board rejected that prosecution amendments supported that both *expected* and unexpected *responses* must be possible. Appx21; Appx57; Appx103. Applicant added the *determining whether the received response matches the expected response* limitation during prosecution to overcome anticipation and obviousness rejections. *E.g.*, Appx3725, Appx3735. The Board accepted that. Appx21; Appx57; Appx103. Yet the Board rejected that the amendment mattered because "there is no mention or suggestion of an 'unexpected response.'" Appx21; Appx57; Appx103. The Board's focus on terminology remains erroneous. *See supra* Argument § I(A)(1)-(2).

### 2. The Board failed to give weight to statements by Applicant to the examiner showing the possibility of an unexpected *response*.

The Board also rejected that statements by Applicant to the examiner mattered. Appx21; Appx57; Appx104. Applicant specifically called out handling unexpected *responses* when discussing the *determination* limitation as a point of novelty over prior art: "For example, if the user fails to mimic the played audio signal correctly, the system replays the audio file for the user." *E.g.*, Appx3722. Yet the Board rejected the relevance of this statement because it "does not mention any consideration or determination of an unexpected response, but rather identifies an action taken based only on a determination of whether there is a match of the

received response and the expected response." Appx21; Appx57; Appx104. That reasoning merely repackages the Board's erroneous reasoning that a not *expected response* is different from an unexpected response. *See* Argument § I(A)(2).

## II.    The Board failed to give a reasoned basis for finding that the Accused Infringers' prior art teaches every limitation of the '599 patent.

The Board misconstrued *response*. Thus, vacatur and remand are required. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 812 (Fed. Cir. 2021).

That the Board alternatively found that the Accused Infringers' prior art teaches a properly construed *response* does not change this conclusion, because no reasonable fact finder would agree. And so the Court can (and should) also reverse because the Accused Infringers' prior art does not teach every limitation of Xerox's claims. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 165-66 (Fed. Cir. 2021). The Court should also find against X Corp. and Facebook because no reasonable fact finder would agree that a PALLAS-Yau combination (X Corp.) teaches a *received* and properly structured *content package*, or that a Lamont-Wang combination (Facebook) teaches the claimed tripartite structure. *Id.*

## A.    No reasonable fact finder would agree that the Accused Infringers' prior art teaches the possibility of both *expected* and *unexpected* responses, rendering Xerox's claims not anticipated or obvious.

Snap and Facebook focused on independent claim 1 while X Corp. focused on independent claim 12. No matter. Both claims identically require a *response* for three limitations:

34

> receiving a *response* from the first user corresponding to the presented content piece;
>
> determining whether the received *response* matches the expected response; and
>
> performing an action based on an outcome of the determination.

Appx182 (23:36-41, 24:58-63) (emphases added). No reasonable fact finder would agree that Rosenberg (Snap), Lamont-Wolfe (Facebook), or PALLAS (X Corp.) teach a *response* under properly construed claims—where the possibility of an unexpected *response* is required. Thus, Rosenberg cannot anticipate because it does not teach "each and every limitation set forth in the patent claim." *Trintec*, 295 F.3d at 1295. Neither do Lamont-Wolfe nor PALLAS render Xerox's claims obvious because they, too, fail to disclose "all claimed limitations." *Strathclyde*, 17 F.4th at 160 (citation omitted).

### 1. No reasonable fact finder would agree that Rosenberg teaches a properly construed *response*.

Under Snap's reading, Rosenberg teaches receiving solely *expected responses*. Appx5147-Appx5149 ¶¶ 93-97. The Board recognized that Rosenberg's Figure 5 teaches a portable computing device 111 that includes enumerated reminder options 501. Appx26; Appx3861 Fig.5. No unexpected *response* is possible under Snap's articulation. Appx5148 ¶ 95. No wonder the Board acknowledged at institution that "Rosenberg's system



determines whether the received response matches one of a plurality of *expected responses*." Appx355-356 (emphasis added).

Properly construed, Xerox's claims are not anticipated by Rosenberg. Rosenberg does not teach: (1) *receiving a response from the first user corresponding to the presented content piece* because no unexpected *response* is possible; (2) *determining whether the received response matches the expected response* because the response is always *expected*; and (3) *performing an action based on an outcome of the determination* because no such *determination* is ever made. Because no reasonable fact finder would disagree, the Court should reverse that Rosenberg anticipates. *Trintec*, 295 F.3d at 1295.

### 2. No reasonable fact finder would agree that a Lamont-Wolfe combination teaches a properly construed *response*.

The Board found that a Lamont-Wolfe combination teaches the possibility of unexpected *responses*. Appx78-Appx79. Lamont teaches receiving solely *expected responses*. Appx7747 ¶ 134. The "user feedback monitor" in Lamont that Facebook pointed to teaches enumerating inputs; inputs to "replay[]" media, or "return to the rental location." Appx5673 (20:59-61); Appx7746-7747 ¶¶ 132-134. Enumerated inputs do not allow for the unexpected *responses* that Xerox's claims require. Appx7746-7747 ¶¶ 132-134. Facebook effectively admitted that Lamont does not teach the possibility of an unexpected *response* because its petition argued that Wolfe—not Lamont—teaches "determin[ing] if the answer was correct."

Appx1200. So, too, did the Board. It rejected that Xerox's claims require the possibility of unexpected *responses*. Appx79. But then the Board turned to Wolfe to alternatively find a reference teaching determining whether a correct or incorrect response has been received. *Id.*

The Board erroneously relied on Wolfe. A skilled artisan would not have been motivated to combine Lamont with Wolfe. *See* Argument § III(B). Without Wolfe, no evidence—let alone substantial evidence—supports that Facebook's prior art teaches the properly construed claims' *response*, where there is the possibility of an unexpected *response*.

For those reasons, Xerox's properly construed claims are not obvious over Lamont in view of Wolfe. Lamont does not teach *receiving a response from the first user corresponding to the presented content piece* because no unexpected *response* is possible. Lamont does not teach *determining whether the received response matches the expected response* because the response is always *expected*. And Lamont does not teach *performing an action based on an outcome of the determination* because no such *determination* is ever made. Because no reasonable fact finder would disagree, or disagree that a skilled artisan would reject combining Wolfe with Lamont, the Court should reverse that Xerox's claims are obvious over Lamont in view of Wolf. *Strathclyde*, 17 F.4th at 160 (citation omitted).

### 3. No reasonable fact finder would agree that PALLAS teaches a properly construed *response*.

Without relying on Yau, the Board found that PALLAS teaches the possibility of unexpected *responses*. Appx126. No reasonable fact finder would agree. Unlike the Board, a skilled artisan would not conflate the "correct" and "incorrect" response that PALLAS teaches with the *expected* and unexpected *responses* Xerox's claims require. Appx126. Nor does the Board provide any explanation for conflating the terms. *Id.* That alone is reversible. *Nuvasive*, 842 F.3d at 1383.

The Board's determination is also reversible because PALLAS does not contemplate the possibility of unexpected responses—whether correct or incorrect. PALLAS does teach prompting users to "practice more" based on learning performance. Appx9935. But PALLAS largely omits any discussion of how to present inputs from users. Appx9935; *see also* Appx9936 ("A description of the learning content and how this is created and composed are beyond the scope of this paper.").

Where PALLAS does illustrate presenting inputs during a learning sequence it teaches enumerated inputs. PALLAS teaches that "the Mobile Adaptive CALL (MOC) system . . . ask[s] [learners] to *select* the correct word from a *list of written words*." Appx9939 (emphasis added). That list of written words consists of enumerated responses. Teaching enumerated inputs does not teach the possibility

38

of an unexpected *response*—they are enumerated and therefore *expected*. *See supra* II(A)(1)-(2); Appx12653-Appx12656 ¶¶ 152-156.

Properly construed, Xerox's claims are not obvious over PALLAS. PALLAS does not teach *receiving a response from the first user corresponding to the presented content piece* because no unexpected *response* is possible. PALLAS does not teach *determining whether the received response matches the expected response* because the response is always *expected*. And PALLAS does not teach *performing an action based on an outcome of the determination* because no such *determination* is ever made. Because no reasonable fact finder would disagree, the Court should reverse that Xerox's claims are obvious over PALLAS. *Strathclyde*, 17 F.4th at 160 (citation omitted).

**B.     No reasonable fact finder would agree that a PALLAS-Yau combination teaches *receiving* a properly structured *content package*— one with a *set of rules* that *includes an expected response*.**

Xerox's claims also require "receiving at least one content package" of a particular structure. Appx182 (23:22). The *content package* "includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response." *Id.* (23:23-26). The Board found that "the combination of PALLAS and Yau teaches receiving a content package that includes a set of rules that includes an expected response." Appx122. No reasonable fact finder would agree.

1. **The Board failed to explain how a PALLAS-Yau combination teaches *receiving* a properly structured *content package*.**

Substantial evidence does not support the Board when it makes a finding and "fail[s] to provide any explanation for [its] conclusion." *Volvo Penta of Ams., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1215 (Fed. Cir. 2023). The Board supported its finding that X Corp.'s prior art teaches the *receiving* limitations with two disclosures from PALLAS: (a) "PALLAS discloses that '[t]he learner's skill level is automatically updated every time the learner completes an exercise and the learning content delivered to a learner at any time is matched against the learner's current personal data," and (b) "mobile learners engage in small chunks of learning and are likely to do this often, it is important that the personalisation data is updated after every time." Appx121. Because the Board provided no explanation for why those disclosures teach *receiving* a properly structured *content package*, substantial evidence does not support the Board's finding. *Volvo*, 81 F.4th at 1215.

2. **No reasonable fact finder would agree that PALLAS teaches a *set of rules* that *includes an expected response*.**

Xerox's claims require that the claimed *set of rules includes an expected response*. Appx182 (23:25-26). The Board found PALLAS teaches that structure by (a) comparing student-provided "answers" on a "Glossary Test" to "expected responses," and then (b) notifying the student "she should practice more" to support that finding. Appx120-Appx121 (quoting Appx9935). According to the

40

Board, "[t]his notification indicates that PALLAS's program evaluated the expected responses compared to the answers provided and presents the assessment of the test to the student, therefore 'expected responses' would be part of the set of rules." Appx121.

Finding that PALLAS implicitly teaches the claimed structure of *a set of rules* from those disclosures is speculative at best and that is *not* substantial evidence. *Nuvasive*, 842 F.3d at 1379. Nor is the Board's speculation correct. Dr. Martin testified that there are many "possible location[s]" for including *expected responses* within PALLAS. Appx12650 ¶ 146. The Board's failure to address Dr. Martin's countervailing testimony shows the Board's finding lacks substantial evidence support. *Pers. Web*, 848 F.3d at 993-94.

### 3. No reasonable fact finder would agree that PALLAS teaches a *content package* that *includes an expected response* within a *set of rules* or not.

No reasonable fact finder would agree that a skilled artisan would have found the *content package* structure "obvious." Appx121. According to the Board, "the need for caching and importance of providing data updates" would have led a skilled artisan to find it "obvious to 'combine and send the content piece (exercise/test/quiz, etc.), expected responses (correct answers), and set of rules (including the trigger condition) together to the mobile device as a content package." Appx121.

41

The Board thus concedes that PALLAS does not teach the claimed *content package* structure and sought to fill that gap with a skilled artisan's general knowledge or common sense. The Court's review is "searching" when the Board invokes "general knowledge" or "common sense" to "supply a missing limitation." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1363 (Fed. Cir. 2016). The Board's finding must "be supported by evidence and a reasoned explanation." *Id.* That standard is not met by "a conclusory assertion from a third party about general knowledge in the art *without evidence in the record*." *Id.* at 1364 (emphasis added).

Here all the Board had were conclusory assertions. It could point only to a statement by X Corp.'s expert that was buried hundreds of pages deep in a claim chart attached to his declaration. Appx121; Appx9748-Appx9749. And nowhere in that statement did Dr. Turnbull provide any record support for his conclusion that the requirements of mobile devices would have caused a skilled artisan to include the *expected response* within the *content package*. *Id.*

Dr. Martin also explained that a skilled artisan would not have to use the claimed *content package* structure. Appx12650 ¶ 146. Yet again the Board did not address Dr. Martin's countervailing testimony, meaning its reasoning lacks substantial evidence support. *Pers. Web*, 848 F.3d at 993-94.

Dr. Turnbull's testimony about mobile devices "receiv[ing] correct answers in order to be able to, *e.g.*, respond to learner responses to exercises/tests/quizzes

and update skill levels" also adds only speculative support on this issue. Appx122. X Corp. waited until its reply brief to make this argument. *See id.* (citing X Corp.'s reply, Appx2711). So the Board should not have even considered it, let alone credited it. CTPG at 73. The Board also failed to explain why responding to learner responses and updating skill levels requires the claimed *content package* structure. Appx122. Such a structure is not required, which Dr. Martin explained, Appx12650 ¶ 146, and the Board failed to address, Appx122. Speculation is not substantial evidence, *Nuvasive*, 842 F.3d at 1379, and the Board erred when it failed to even address the significant countervailing evidence in the record, *Pers. Web*, 848 F.3d at 993-94.

**C.    Substantial evidence does not support that a Lamont-Wang combination teaches the tripartite structure Xerox's claims require.**

Xerox's claims require a tripartite structure:

> receiving a set of contextual information to determine a current *context* for the first user;
> processing the contextual information to determine a current *context* for the first user;
> determining whether the current *context* satisfies the trigger condition.

Appx182 (23:28-33, 24:50-55) (emphases added). The tripartite structure permits both scalability and the ability to share content packages. Appx178 (16:49-67) (discussing "Content Sharing and Delivery Infrastructure"). Central to the tripartite structure is intermediate *context*, which is determined based on received *contextual information*. The Board found that Lamont-Wang teaches *context*. Appx71-

43

Appx77. But, in doing so, the Board erroneously found that single-bit, Boolean values—like TRUE or FALSE—count as *context*, collapsing Xerox's tripartite structure into a bipartite structure.

### 1. *Context* must describe an event or environmental factor as a whole.

In distinguishing *context* from *contextual information*, Xerox argued that "[a] context is a set of data that described an event or environmental factor associated with a user or the operational environment of content management system." Appx1402 (quoting Appx174 (7:36-39) (emphasis removed)). The Board agreed, and also agreed that *context* and *contextual information* are different. Appx70-Appx72.

But Xerox also explained that the "plain and ordinary meaning of the claim language as understood by a POSITA," Appx1401 & n.7, means that *context* must describe the events or environmental factors associated with a user or the operational environment "as a whole," Appx1403-Appx1404 (quoting Appx7728 ¶ 100). The Board disagreed with this. Appx72. While Xerox did not initially "believe there [was] a claim construction dispute" over *context*, the Board's disagreement with Xerox's construction means the Court should now decide the issue. Appx1401 & n.7. *Context*, as claimed, requires describing an event or environmental factor as a whole. Appx1403-Appx1404 (quoting Appx7728 ¶ 100).

That conclusion follows from the language of Xerox's claims. Claim terms themselves inform their own meaning. *Phillips*, 415 F.3d at 1312-13. Here the claim term is *context*. A skilled artisan would understand that *context* is not satisfied by mere "GPS coordinates or other 'basic information'"—*i.e.*, the distinguishable claim term *contextual information*—"but rather characterizations of events or environments of the user or operational environment as a whole." Appx7728 ¶ 100. The surrounding claim language also helps clarify meaning. *Phillips*, 415 F.3d at 1314-15. Xerox's claims require *determining whether the current context satisfies the trigger condition*, which shows that *context* is what is used to identify a matching *trigger condition*, Appx182 (23:32-33), and not mere *contextual information*, which must first be *processed to determine a current context*, *id.* (23:30-31).

The specification also shows that *context* must describe an event or environmental factor as a whole. The Court recently held in *Sequoia Technology v. Dell* that the kinds of enumerated examples given for a term in the specification define the term's scope. *See* 66 F.4th at 1323 ("computer readable medium" includes only non-transitory media when "every example" in the specification "is hardware"). The specification defines *context* as including "the user is sitting down, watching TV, asleep, alert, talking, typing at the computer in the home study or at the office, walking around the house, walking outside the house,

driving, or performing a household activity (e.g., cooking, or getting ready for work)." Appx174 (7:49-53). Each example describes an event, environment of the user, or operational environment "as a whole." Appx7728 ¶ 100. They "us[e] human-meaningful terms (e.g., 'walking to work,' or 'walking around the mall')," "gardening," "concentrating," "receptive," or "active." Appx172 (4:16-22). They are "high-level abstractions, such as 'commuting to work,'" that describe as a whole. Appx175 (10:42-44).

Still, the Board found Xerox's construction requires "too much." Appx72. Pointing to the specification, the Board explained that *context* merely requires "a set of data that describes an event or environmental factor associated with a user." *Id.* But as just explained, every example the specification gives of *context* describes an event, environment of the user, or operational environment as a whole. Under *Sequoia*, those examples limit *context*'s scope. 66 F.4th at 1323.

The Board also found that the required "set of data" for *context* includes a set of one. Appx72-Appx73. Xerox disagrees, but the Court need not wade into this dispute because the Board's finding does not eliminate that the *context* must still describe an event or environmental factor as a whole.

The very evidence the Board relied on to make its set-of-data finding makes that point. The Board leaned on claim 6 requiring "context . . . defined as . . . a high-level abstraction which corresponds to one or more low-level contextual

information values." Appx72 (quoting Appx182 (24:15-19) (emphasis removed)). But the specification defines *a high-level abstraction* with examples like "commuting to work" or "play while commuting to work and whole comminuting from work," showing that the term describes an event or environmental factor as a whole. Appx175 (10:43-44, 10:51-52). And both the Board's findings and the Court's case law show that a *context/high-level abstraction* remain distinct from a *low-level contextual information value. See* Appx70-Appx71 (agreeing *contextual information* and *context* are different); *In re Varna*, 816 F.3d 1352, 1362-63 (Fed. Cir. 2016) (illustrating that *correspond to* does not mean *equivalent to*); *see also Wasica*, 853 F.3d at 1288 n.10 (explaining that a claim construction rendering a claim term superfluous is "highly disfavored").

### 2. Single-bit, Boolean values do not teach *context* as claimed because they do not describe an event or environmental factor as a whole.

Properly construed, no reasonable fact finder would agree with the Board that Lamont-Wang's single-bit, Boolean values (like TRUE or FALSE) teach *context*. Appx70.

First, Xerox's claims say when they require a Boolean value and do not require one for *context*. When Xerox's claims require a Boolean value they recite *determining whether* some condition exists. Appx182 (23:32-35, 23:38-41); *see also* Appx179 (18:58-60) ("[T]he context management system determines whether the context satisfies a trigger condition (operation **330**)."); Appx169 (Sheet 3,

Fig.3) (showing **330** as asking "[d]oes context satisfy trigger condition?" and returning a "Yes" or "No" value); Appx7737 ¶ 114 ("[A] Boolean expression is anything that represents one of two values, such as true/false or zero/non-zero."). Xerox's claims do not *determine whether* in *determining a current context*. Appx182 (23:30-31).

Second, a skilled artisan would not understand *context* as including single-bit, Boolean values alone or combined with others. Appx7737 ¶¶ 113-114. As Dr. Martin explained, "[w]hile a single bit of information is enough information for Lamont to decide whether to 'trigger now' or 'don't trigger now,' it is not a set of data that describes an event or environmental factor associated with a user or operational environment as used in the '599 Patent." *See* Appx7737-Appx7738 ¶ 114. Indeed, none of the enumerated examples in the specification for *context* include single-bit, Boolean values like TRUE or FALSE. *See* Argument § II(C)(1). Thus, a skilled artisan would understand that single-bit, Boolean values are not *context*. *Sequoia*, 66 F.4th at 1323.

Third, the Board's own reasoning shows that Booleans are divorced from *context*. To find that TRUE or FALSE could provide *context* the Board had to describe—as a whole—the very events or environmental factors the Booleans were supposed to: "[I]n Lamont, the results of the three component Boolean expressions are further processed using the AND/OR operators to determine user context, *that*

48

*is, the user is travelling slower or faster than 30 miles per hour and is or is not travelling in a certain direction.*" Appx75 (emphasis added). The Board's difficulties prove Xerox's point—a Boolean gives no *context*. Appx7737-Appx7739 ¶¶ 114-116 (explaining that a Boolean expression, with one step or many, only describes "whether [a] value is considered to be true or false," and that "it is not a set of data that describes an event or environmental factor associated with a user or operational environment as used in the '599 Patent"); Appx7738 ¶ 115 (discussing why historical records of Boolean values would not be kept).

### 3.    The Board also erred in collapsing the tripartite structure of Xerox's claims into a bipartite structure.

The sole basis the Board gave for Lamont-Wang teaching *context* was its finding that Lamont-Wang teaches *processing the contextual information to determine a current context for the first user* by resolving *contextual information*, like "T1 Speed>30mph," into Boolean values, like TRUE or FALSE. Appx70. In other words, the Board found that Boolean values, TRUE or FALSE, "describe the presence (or absence) of a current activity or event associated with that user," satisfying the claims requirement for *context. Id.* Because such Boolean values do not satisfy the claimed *context*, as discussed, no evidence, let alone substantial evidence, supports the Board's finding that a Lamont-Wang combination teaches *context. See Nuvasive*, 842 F.3d at 1379 (requiring "more than a mere scintilla of evidence").

Nor can the Board's collapsing the tripartite structure of Xerox's claims into a bipartite structure stand. Again, that tripartite structure requires *receiving a set of contextual information*, *processing* it *to determine a current context*, and then *determining whether the current context satisfies the trigger condition*. Appx182 (23:28-33). Yet the Board found that "Lamont determines context by Boolean operations, which is that the user is or is not travelling at some speed and direction." Appx77.

That finding renders the *determining whether the current context satisfies the trigger condition* superfluous—turning the tripartite structure into a bipartite one—because whether the *trigger condition* is *satisfied* was already resolved by Boolean operation in *determining* the *current context*. Essentially, the Board re-wrote *determining whether the current context satisfies the trigger condition* to be *determining whether the <u>contextual information</u> satisfies the trigger condition*. Thus, a reasonable fact finder would not agree with the Board. *Wasica*, 853 F.3d at 1288 n.10 (rendering claim limitations superfluous is "highly disfavored"). And while the Board also found that "there is also a [separate] determination as to whether a trigger condition is met," the Board gave no explanation where that determination is made, and at best rested it on conclusory expert testimony. Appx77. Neither provides the Board with substantial evidence for its finding. *Nuvasive*, 842 F.3d at 1383.

### III.    Xerox's claims are not obvious.

"[A] patent . . . is not proven obvious merely by demonstrating that each of its elements was, independently, known in the art." *Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 965 (Fed. Cir. 2016) (unpublished) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). The petitioner in an IPR must still "identify a *reason* that would have prompted a person of ordinary skill in the relevant field to combine the elements *in the way* the claimed invention does." *Id.* The Board found that a skilled artisan would have been motivated to combine Wolfe with Lamont, and Yau with PALLAS. No reasonable fact finder would agree.

### A.    No reasonable fact finder would agree that a skilled artisan would be motivated to combine Wolfe with Lamont.

The Board cannot combine references that teach away from each other. *Tec Air*, 192 F.3d at 1360. A reference teaches away if it would merely "discourage[]" a skilled artisan reading it from following the "path" laid out in another reference. *Id.* That includes when the combination would produce a "seemingly inoperative device," *id.*, or would be filled with "redundant functions," *S.-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*, 748 F. App'x 1003, 1007 (Fed. Cir. 2018) (unpublished).

Moreover, "a patent challenger must demonstrate that a skilled artisan would have had *reason* to combine the teachings of the prior art references to achieve the

claimed invention." *Purdue*, 643 F. App'x at 965. Expert testimony that "opine[s] generally on the interrelated teaching of [the] references" is not enough. *Id.* While a "problem to be solved" may "supply the reason," the patent challenger must still show that "problem was known in the art." *Id.* The same is true about purported "improvements"—"conclusory expert testimony" is not enough. *Volvo*, 81 F.4th at 1209. The patent challenger must point to evidence showing a motivation to make such an improvement. *See id.* ("Here, the prospect of increased speed and efficiency has the support of an express statement in one of the asserted prior art references.").

The Board's reasoning for combining Wolfe with Lamont violates these principles.

### 1.    Lamont teaches away from Wolfe, precluding a combination.

A Lamont-Wolfe combination would be filled with redundant features. Xerox explained that "Lamont and Wolfe provide *complete* and *fully independent* disclosures of their own *different systems*." Appx1544 (quoting Appx7749-Appx7750 ¶ 140). Both "fully enable[] a 'treasure hunt.'" *Id.* And the Board agreed: "Lamont discloses that its system can be used in location-based treasure hunts . . . and Wolfe is directed to treasure hunt games with puzzles presented specific physical locations [*sic*]." Appx82. Thus, the Board's own findings show a

skilled artisan would have been discouraged from combining Wolfe with Lamont given the systems' redundant features. *S.-Tek*, 748 F. App'x at 1007.

### 2. Substantial evidence does not support the theories the Board credited as providing a motivation to combine Wolfe with Lamont.

The Board credited that "the enhancement of game play of Lamont in Wolfe would provide greater enjoyment to tour customers." Appx82 (citing Appx5562 ¶ 99). Yet nothing other than the conclusory testimony of Facebook's expert supports that such a generic motivation as enhancing game play would have motived a skilled artisan to combine Lamont with Wolfe. Appx5562. Thus, the Board should not have credited it. *Volvo*, 81 F.4th at 1209; *Purdue*, 643 F. App'x at 965.

The Board further credited Facebook's expert that "Lamont offers that advantage of an 'indication that the user has reached a particular point in the tour – and that the user is aware of this fact.'" Appx82 (quoting Appx5562 ¶ 99); *see also id.* (agreeing that those features "offer[] the potential advantage of specific user knowledge to a tour operator"). Yet again, though, Facebook's expert failed to explain with record evidence why those features were advantages that would have motivated a skilled artisan to combine Lamont with Wolfe.

Rather, Facebook's expert merely showed those features existed in Wolfe and its provisional, and again offered conclusory testimony that those features

"would have provided a benefit to the system of Lamont." Appx5562. The mere existence of features does not provide a motivation to combine them. *See Pers. Web*, 848 F.3d at 993-94 (rejecting that the mere possibility of a combination implies a motivation to combine); *Purdue*, 643 F. App'x at 965 (requiring the patent challenger to demonstrate a "reason to combine the teachings"). Thus, the Board should not have credited this conclusory theory of a motivation to combine either. *Volvo*, 81 F.4th at 1209; *Purdue*, 643 F. App'x at 965.

The Board then compounded its error. It credited an argument Facebook made in reply as showing a motivation to combine. Appx83 (citing Appx1584). As the Board recounted, knowing that a user has reached a tour destination and is aware of that fact is an "advantage[] offered by Wolfe to Lamont [to] support the rationale to combine the references" because "GPS information alone may not be indicative of user awareness, as a user may be facing away from a landmark or may not have noticed it." *Id.*

Facebook waived this theory by not including it in its petition. CTPG at 73. All its petition relevantly argued was that "*direct* user feedback would have provided a more reliable indicator of the user's current status than status information *inferred* by the device using GPS or other information." Appx1182-Appx1183. Facebook's point is irrelevant because Lamont's purpose is delivering *location*-specific content—there is "no need for Lamont to confirm that a 'user is

aware' that it has" reached a certain location. Appx7750-Appx7751 ¶ 142. Nor does the petition point to purported problems of users facing away from landmarks or failing to notice them. Appx1182-Appx1183. And it does not point to any purported evidence other than its expert's testimony. *Id.* Not only did Facebook's expert fail to mention the specific facing-away/failure-to-notice problems, but the supporting testimony is—again—conclusory, failing to cite anything in the record in support. Appx5562-Appx5563 ¶ 99.

Thus it does not matter, as the Board pointed out, that "if a technique has been used to improve one device," then it is "obvious" if "a person of ordinary skill in the art would recognize that it would improve similar devices in the same way." Appx83 (quoting *KSR*, 550 U.S. at 417). Here no properly considered evidence, let alone prior art evidence, supports that speculative problems with GPS information would have motivated a skilled artisan to combine Wolfe with Lamont. So the Board should not have credited this theory either. *Volvo*, 81 F.4th at 1209; *Purdue*, 643 F. App'x at 965.

### 3. Facebook also failed to show that a skilled artisan would be motivated to combine Lamont and Wolfe to teach the claimed *content piece*.

The Board found that Lamont's "media clip" is the claimed *content piece*, and then combined that media clip with Wolfe's purported teachings of an "expected response." Appx84. But a skilled artisan would recognize that

"combination is senseless." Appx7756 ¶ 153. Why? Because the Board cannot combine references that would produce a "seemingly inoperative device." *S.-Tek*, 748 F. App'x at 1007.

Combining Wolfe with Lamont would do just that. Each has a different intended purpose. Lamont teaches treasure hunts *for* a location. Wolfe teaches treasure-hunt games *at* a location. Appx7753-Appx7756 ¶¶ 150-153. So Lamont's media clips, which provide "acknowledgement/congratulation and further direction" after a user finds a hunted for location, but "*do not prompt for* any 'expected response' that is an answer to some 'puzzle,'" which Facebook uses Wolfe for. Appx7755 ¶ 152.

Indeed, Facebook concedes that Lamont's media clips are just an "audio or video file that can be played during the tour." Appx1586. There is simply no place within those for a user to insert <u>any response</u>, much less the claimed *expected response*, which Xerox's claims require and the Board found Wolfe teaches. Thus, a skilled artisan would recognize that combining Wolfe with Lamont would create a seemingly inoperative device, precluding the combination, *S.-Tek*, 748 F. App'x at 1007; Appx7755 ¶ 153.

**B.    No reasonable fact finder would agree that a skilled artisan would combine Yau with PALLAS to trigger the presentation of the *content piece*.**

Xerox's claims require *presenting the content piece to the first user*. Appx182 (23:34-35, 24:56-57). When to *present the content piece* is *determined* by a *trigger condition* also included within the *content package*. *Id.* (23:22-35, 24:44-57). It cannot reasonably be discerned whether the Board found that PALLAS teaches, *in response to the trigger condition being satisfied, presenting the content piece to the first user. Id.* (23:34-35, 24:56-57). What can be discerned is that the Board found that (1) Yau teaches *presenting the content piece* in *response to the trigger condition being satisfied*, and (2) that a skilled artisan would be motivated to combine Yau with PALLAS. Appx112-Appx118; Appx122; Appx124-Appx125. Because no reasonable fact finder would agree, the Court should reverse this finding. *Strathclyde*, 17 F.4th at 165-66.

**1.    The Board's finding on whether PALLAS teaches *presenting the content piece* is too unclear to be reasonably discerned, and no reasonable fact finder would make such a finding anyway.**

The Board did not say if it found that PALLAS teaches *presenting the content piece* in *response to a trigger condition being satisfied*. X Corp. argued as much, and the Board summarized that argument. Appx124-Appx125. But summarizing a party's arguments is not substantial evidence. *Nuvasive*, 842 F.3d at 1383. Nor in rejecting Xerox's arguments for why PALLAS does not teach

*presenting the content piece* did the Board point to PALLAS. Rather, it pointed to Yau as teaching to "output" learning activities. Appx125.

Such unclear reasoning does not allow the Court to "exercise its duty to review the [Board's] decision[.]" *Nuvasive*, 842 F.3d at 1382; *see also id.* at 1383 (explaining the Board lacks "a reasoned basis for [its] action" when its reasoning is so unclear that "the agency's path may [not] reasonably be discerned"). Thus, the Court should not hold that PALLAS teaches *presenting the content piece* for that reason alone. *Id.* The Court should also hold the same for the reasons discussed below. *See* Argument § III(B)(1)-(2).

### 2. No reasonable fact finder would find that Yau teaches *presenting the content piece*.

The Board relied on a "sample scenario" in Yau illustrating its "adaption process" to find that Yau discloses *presenting the content piece* in *response to a trigger condition being satisfied*. Appx113-Appx114. The Board block-quoted the relevant disclosure:

> Four users are considered in our sample scenario to illustrate our adaptation process: John – an active learner, Peter – a reflective learner, Sarah – a visual learner and Amy – a verbal learner. The activities will be adapted to the different learning styles, where appropriate. Some of the activities defined in our system are as follows –
>
> A. Formal assessments
>
> B. Un-assessed exercises
>
> C. Pre-lecture notes
>
> D. Learning from examples

E. Review activity

F. Discussion about work

> It is an hour prior to their lecture. John is commuting on a quiet train for an hour; Peter is commuting on a noisy bus also for an hour; Sarah is in the library whilst Amy is in the computer lab. They all would like to undertake some learning activities based on their current learning situation. B has been selected for John as it is considered quiet enough for John to concentrate on the quiet train; C has been selected for Peter; and A has been selected for Sarah and Amy. In addition, a visual version of A has been selected for Sarah whereas a verbal version has been selected for Amy.

Appx113-Appx114 (quoting Appx9943-Appx9944).

According to the Board, this sample scenario "discloses that the presentation of exercises/tests/quizzes, such as Yau's formal assessments, are triggered based on context." Appx114. That does not explain where in the sample scenario the Board found formal assessments, etc. were *presented* to a *user* in *response to a trigger condition being satisfied*. Conclusory reasoning is not enough. *Nuvasive*, 842 F.3d at 1383.

Further, the sample scenario expressly teaches that *users* are the ones deciding "to undertake some learning activities based on their current learning situation." Appx114. The Board attempted to minimize this disclosure by calling it a mere "general statement." Appx114. But that characterization does not change that references must be considered "*as a whole*" to determine what they teach. *Panduit*, 810 F.2d at 1566, 1568; *see also In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965) (prohibiting "pick[ing] and choos[ing] from any one reference only so much

59

of it as will support a given position"). And Dr. Martin explained what Yau teaches as a whole: "Yau has no discussion of a contextual scenario that causes its CALS system to emit a recommendation without being prompted by a user." Appx12659-Appx12660 ¶¶ 163-166.

The Board added that the sample scenario "indicates that the presentation of the learning exercise is prompted by the student's context, that is, where they are at a certain time such as Amy being in the computer lab in the hour prior to a lecture." Appx114. But *who* is prompted is what matters under the claims. And the sample scenario is clear that the answer is the user: "They"—John, Peter, Sarah, and Amy—"all *would like to undertake* some learning activities *based on their current learning situation*." Appx9944 (emphases added). The Board cannot ignore what the reference discloses. *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 903 (Fed. Cir. 2017) (holding findings unsupported by substantial evidence when they "plainly contradict[] the record"); *Pers. Web*, 848 F.3d at 993-94 (requiring the Board to adequately address arguments detracting from its reasoning).

The Board also pointed to Yau's disclosure that "[w]hen the context has been identified and a context pattern is inferred, this information is combined with the filtered learning activities according to the learner's preferred learning styles, and context-aware learning activities are output." Appx9945; Appx114. But what

Yau outputs is not the problem. The problem is that Yau does not teach *presenting* context-aware learning activities in *response to a trigger condition being satisfied*.

Finding that a skilled artisan would understand Yau as teaching those limitations based solely on the disclosure of context-aware learning activities being output is not a reasoned basis—it is speculation. And speculation is not substantial evidence. *Nuvasive*, 842 F.3d at 1379. Indeed, Dr. Martin explained that "[a] person of skill in the art would not have understood this discussion to have related to an automatic triggering of learning activities, but instead to choosing the activities when requested by a user." Appx12627 ¶ 100. Yet rather than address Dr. Martin's testimony, the Board chose to ignore it. Appx114. It may not do that. *Pers. Web*, 848 F.3d at 993-94.

Simply put, none of the disclosures from Yau that the Board relied upon on this issue actually teach *presenting the content piece* in *response to a trigger condition being satisfied*. Nor does the mere summarizing of X Corp.'s arguments, *e.g.*, Appx114-Appx115, provide a reasoned basis either, *Nuvasive*, 842 F.3d at 1383. Because nothing else in Yau teaches those limitations either, Appx12659-Appx12660 ¶¶ 163-166, the Court should reverse the Board's finding that Yau teaches *presenting the content piece*, *Strathclyde*, 17 F.4th at 165-66.

### 3. No reasonable fact finder would find that a skilled artisan would be motivated to combine Yau with PALLAS.

PALLAS teaches away from *presenting the content piece* in *response to a trigger condition being satisfied*. While PALLAS teaches automatically triggering alerts, like notifying a user that she is "currently in the vicinity of the French art exhibit," Appx9937 & Fig.6, PALLAS does not teach triggering learning activities, like an exercise, test, or quiz, Appx12648-Appx12649 ¶¶ 143-144. Why? Because PALLAS teaches that learning systems should be "unobtrusive" as users may only "have small time slots to engage in learning." Appx9935; Appx12648-Appx12649 ¶¶ 143-144. As Dr. Martin explained, "[m]odifying PALLAS's design to launch tests or exercises rather than send notifications would make PALLAS obtrusive, in opposition to its stated goals." Appx12649 ¶ 144. Thus, a POSITA would not modify PALLAS to *present the content piece*. *Id.*

In rejecting Xerox's argument the Board made Xerox's point for it. According to the Board, "learning resources" would be "present[ed]" only when doing so "is not obtrusive" given the "context[]"—*e.g.*, by "tailoring presentation of learning content to a user's context, including 'location,' 'date and time,' and 'leisure time,' by, e.g., only presenting content when the learner has sufficient 'time' to engage with it." Appx117 (quoting Appx10577 ¶ 38). But the Board was quoting X Corp.'s expert, who was in turn quoting PALLAS, and not Yau. *Id.* (quoting Appx10577 ¶ 38). Thus, the Board—which seems to have depended on

Yau as teaching *presenting the content piece*, *see* Argument § III(C)(1)—implicitly found that (a) PALLAS teaches presenting learning resources unobtrusively, and (b) that Yau teaches presenting learning resources obtrusively, requiring modification of Yau to make the systems compatible. That is teaching away, and would discourage a skilled artisan from making the combination. *Tec Air*, 192 F.3d at 1360.

Nor do the Board's cherry-picked quotations from Dr. Martin's testimony support a motivation to combine. True, Dr. Martin testified that "[a] person of skill in the art would understand that PALLAS + Yau may send different or *improved* notifications than PALLAS alone, as the choice of notification would consider aspects such as the user's learning style or *schedule*." Appx117 (quoting Appx12658 ¶ 162) (emphases added by Board). But the key word in that testimony is neither *improved* nor *schedule*, which the Board emphasized, but *notification*. Dr. Martin continued: "[T]he different or improved *notifications* based on PALLAS combined with Yau *would still be notifications* and not obtrusive tests, alerts, quizzes, or other sorts of 'assessments.'" Appx12658. The Board cannot mischaracterize the record to support its reasoning. *Corning*, 873 F.3d at 903. Here Dr. Martin distinguished notifications from tests, alerts, quizzes, or other sorts of assessments. Thus, Dr. Martin does not "concur[] that the combination allows recognition of a user's schedule," Appx117, in *presenting the content piece*.

The Board also had to do more than just reject Xerox's arguments to find a motivation to combine. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1378 (Fed. Cir. 2016) (holding that finding a motivation to combine based solely on rejecting patent owner's arguments constitutes "improper shifting of the burden" on patentability). The Board credited X Corp.'s expert that a PALLAS-Yau combination "offers advantages that would have motivated a person of ordinary skill in the art to use PALLAS's context-trigger-based content display with Yau's teachings of displaying assessments/questions based on context pattern triggers." Appx116. What are those advantages? According to the Board, only one: "optimization for quiz taking." *Id.*

Nothing in the prior art supports that idea. Prior-art support is required for showing a purported improvement would have motivated a skilled artisan to make a combination. *Volvo*, 81 F.4th at 1209. "[C]onclusory expert testimony" is not enough. *Id.* Here the Board pointed to both X Corp.'s petition and expert's testimony to support that Yau improves quiz taking. Appx116 (citing Appx2155; Appx9461-Appx9462 ¶ 179). Yet X Corp. and its expert offered merely unsupported, conclusory assertions that Yau improves quiz taking. Appx2155; Appx9461-Appx9462 ¶ 179. That is not the kind of record evidence, grounded in the prior art, that is required to support a motivation to combine. *Volvo*, 81 F.4th at 1209.

Nor did Dr. Martin's testimony support a motivation to combine. Dr. Martin testified to the unremarkable proposition that "[a] person of ordinary skill in the art combining PALLAS with Yau would see that Yau allows for a more informed decision as to what to *recommend* to a user than PALLAS alone." Appx12658 (emphasis added). The Board failed to explain how improving recommendations supports a motivation to combine Yau with PALLAS to improve quiz taking, let alone by enabling its trigger-based presentation to users. Appx116. Thus substantial evidence does not support that finding. *See Volvo*, 81 F.4th at 1215 ("The Board fails to provide any explanation for that conclusion.").

## CONCLUSION

For these reasons, the final written decision should be reversed or vacated and remanded for further proceedings.

Respectfully submitted,

*/s/  Joel L. Thollander*
Joel L. Thollander
James E. Quigley
Kyle N. Ryman
MCKOOL SMITH, P.C.
303 Colorado Street, Ste. 2100
Austin, TX 78701
(512) 692-8700
(903) 923-9000

David Sochia
Alexandra F. Easley
MCKOOL SMITH, P.C.
300 Crescent Court, Ste. 1500
Dallas, TX 75201
(214) 978-4000

Kevin L. Burgess
MCKOOL SMITH, P.C.
104 East Houston Street, Ste. 300
Marshall, TX 75670

*Attorneys for Appellant*
*Xerox Corporation*

# ADDENDUM

# XEROX CORPORATION V. SNAP INC., FACEBOOK, INC., X CORP.

No. 23-1983, 23-1985, 23-1988, 23-2028

## APPELLANT'S ADDENDUM

## TABLE OF CONTENTS

**Judgment and Order**

Final Written Decision
(March 24, 2023) (Paper 54)..................................................................Appx1

**Patents**

Ex. 1001: U.S. Patent No. 8,489,599 ...........................................Appx166

Trials@uspto.gov                                                    Paper: 54
571-272-7822                                        Entered: March 24, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SNAP INC.,
Petitioner,

v.

PALO ALTO RESEARCH CENTER LLC,
Patent Owner.

————————

IPR2021-00987
Patent 8,489,599 B2

————————

————————

FACEBOOK, INC.,
Petitioner,

v.

PALO ALTO RESEARCH CENTER LLC,
Patent Owner.

————————

IPR2021-01294
Patent 8,489,599 B2

————————

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

_____

TWITTER, INC.,
Petitioner,

v.

PALO ALTO RESEARCH CENTER LLC,
Patent Owner.

_____

IPR2021-01458
Patent 8,489,599 B2

_____

Before KARL D. EASTHOM, SHEILA F. McSHANE, and
CHRISTOPHER L. OGDEN, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying Patent Owner's Motions to Amend
Consolidating IPR2021-00987, IPR2021-01294, and IPR2021-01458
*35 U.S.C. §§ 315(d), 318(a); 37 C.F.R. §§ 42.121, 42.122(a)*

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

# I. BACKGROUND

We have jurisdiction to hear these *inter partes* reviews under
35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C.
§ 318(a).  As discussed in more detail below, this Final Written Decision
addresses challenges to U.S. Patent No. 8,489,599 B2 (Ex. 1001, "the '599
patent") raised in three different proceedings: *Snap Inc. v. Palo Alto
Research Center LLC[1]*, IPR2021-00987 ("Snap IPR" or "987 IPR");
*Facebook, Inc. v. Palo Alto Research Center LLC,* IPR2021-01294
("Facebook IPR" or "1294 IPR"), and *Twitter, Inc. v. Palo Alto Research
Center LLC*, IPR2021-01458 ("Twitter IPR" or "1458 IPR").

On November 23, 2021, we instituted trial in the Snap IPR, in which
Snap Inc. ("Snap") challenges claims 1–25 of the '599 patent, assigned to
Patent Owner, Palo Alto Research Center LLC ("Patent Owner" or
"PARC").  *See* Snap IPR, Papers 1, 13.  Approximately two months later, on
January 25, 2022, we instituted trial in the Facebook IPR in which
Facebook, Inc. ("Facebook") challenges claims 1, 4, 6, 7, 9–12, 15, 17–19,
22, 24, and 25 of the '599 patent.  *See* Facebook IPR, Papers 2, 13.
Approximately three months later, on April 6, 2022, we instituted trial in the
Twitter IPR in which Twitter, Inc. ("Twitter") challenges claims 1, 4, 6, 7,
9–12, 15, 17, and 18 of the '599 patent, and consolidated the 1458 IPR with
IPR2021-01459 ("1459 IPR"), which challenges claims 19, 22, 24, and 25 of
the '599 patent.[2]  *See* Twitter IPR, Papers 3, 11, 12, 14.  In each case, the
different petitioners use different prior art as the basis for the invalidity

---

[1] Palo Alto Research Center LLC is formerly Palo Alto Research Center Inc.
Snap IPR, Paper 48.
[2] The 1459 IPR was terminated upon consolidation with the 1458 IPR.
Twitter IPR, Paper 12.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

challenges to the '599 patent claims in the respective petitions.  987 IPR,
Paper 1, 2; 1294 IPR, Paper 2, 3; 1458 IPR, Paper 3, 12; 1459 IPR, Paper 3.

On February 25, 2022, in the Snap IPR, Patent Owner filed a
Contingent Motion to Amend to substitute claims 26–40 to replace original
claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of the '599 patent.  Snap
IPR, Paper 22.  Patent Owner filed similar Contingent Motions to Amend in
the Facebook and Twitter IPRs that seek to substitute the same proposed
substitute claims as those proposed in this case.  That is, on April 15, 2022,
in the Facebook IPR, Patent Owner filed a Contingent Motion to Amend to
substitute claims 26–40 to replace claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24,
and 25 of the '599 patent.  Facebook IPR, Paper 20.  On July 7, 2022, in the
Twitter IPR, Patent Owner filed a Contingent Motion to Amend to substitute
claims 26–40 to replace claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of
the '599 patent.  Twitter IPR, Paper 24.  The proposed substitute claims in
each of the cases are identical.  *See* Snap IPR, Paper 22; Facebook IPR,
Paper 20; Twitter IPR, Paper 24.

The Chief Administrative Patent Judge determined that good cause
existed to extend the one-year period for issuing a Final Written Decision in
the Snap and Facebook IPRs.  *See* Snap IPR, Paper 47; Facebook IPR, Paper
40.

## II. CONSOLIDATION OF IPR2021-00987, IPR2021-01294, AND IPR2021-01458

"Where another matter *involving the patent* is before the Office, the
Board may during the pendency of the inter partes review enter any
appropriate order regarding the additional matter including providing for the
stay, transfer, consolidation, or termination of any such matter."  37 C.F.R.
§ 42.122(a) (2019) (emphasis added); *see also* 35 U.S.C. § 315(d).  Under

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

this Rule, the Board has the authority to consolidate proceedings, even absent a motion from the parties. *See id.*

As discussed *supra* Section I, the respective petitioners challenge many of the same claims of the '599 patent, including all of the patent's independent claims, in each of the respective cases. Additionally, Patent Owner's Contingent Motions to Amend seek to substitute the *same proposed substitute claims* for the *same original claims* of the '599 patent.

In view of the same proposed substitute claims being at issue in all the cases, we find that good cause exists for the consolidation of 987, 1294, and 1458 IPRs. Consolidation of the cases allows the Board to more efficiently and consistently address issues in a consolidated Final Written Decision. Thus, we order the consolidation of the 987, 1294, and 1458 IPRs.

Petitioners should continue to file any future papers in each of Petitioner's respective IPR. The respective Petitioner's challenges to the original claims remain specific to the Petitioner bringing the challenge.

Accordingly, we address the petitioners' respective challenges to the original claims separately and, in view of the overlap of issues, we will address Patent Owner's Contingent Motions to Amend in a combined manner.

## III.  SNAP'S CHALLENGES TO CLAIMS 1–25 OF THE '599 PATENT

### A. Procedural Background

Snap filed a Petition for *inter partes* review of claims 1–25 of the '599 patent, along with the Declaration of Steve Smoot. Snap IPR, Paper 1 ("Snap Pet."); Snap IPR, Ex. 1002. Patent Owner filed a Preliminary Response. Snap IPR, Paper 11 ("Snap Prelim. Resp."). Pursuant to

5

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

35 U.S.C. § 314(a), on November 23, 2021, we instituted *inter partes* review

on the following grounds:

| Claim(s) Challenged | 35 U.S.C § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4–7, 10–13, 17–20, 22–25 | 102(e)[3] | Rosenberg[4] |
| 4, 5, 15, 16, 19, 20, 22–25 | 103(a) | Rosenberg |
| 3, 8, 9, 14, 21 | 103(a) | Rosenberg, Suzuki[5] |

Snap Pet. 2; Snap IPR, Paper 13 ("Snap Inst. Dec." or "Snap Dec.").

Patent Owner filed a Patent Owner Response ("Snap PO Resp.").

Snap IPR, Paper 28. Patent Owner also filed a Declaration of David Martin,

Ph.D., with the Response to support its positions. Snap IPR, Ex. 2003.

Petitioner filed a Reply ("Snap Pet. Reply") to the Patent Owner Response,

along with the Declaration of Kevin Almeroth, Ph.D. Snap IPR, Paper 25;

Ex. 1022. Patent Owner filed a Sur-reply to Petitioner's Reply ("Snap PO

Sur-reply"). Snap IPR, Paper 34.

An oral hearing was held on August 24, 2022. A transcript of the

hearing is included in the record. Snap IPR, Paper 44 ("Snap Tr.").

---

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. § 103, and was effective on March 16,
2013. Because the '599 patent has a filing date before the effective date of
the applicable AIA amendments, we refer to the pre-AIA versions of
35 U.S.C. §§ 102 and 103.

[4] US 7,577,522 B2, filed June 28, 2006, issued August 18, 2009 (Snap IPR,
Ex. 1005, "Rosenberg").

[5] US 6,680,675 B1, filed June 21, 2000, issued January 20, 2004 (Snap IPR,
Ex. 1006, "Suzuki").

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

### B.  Related Matters

The parties indicate this Petition is related to the district court litigations, *Palo Alto Research Center Inc. v. Snap Inc.*, No. 2:20-CV-10755-AB-MRW (C.D. Cal.), *Palo Alto Research Center Inc. v. Twitter, Inc.*, No. 2:20-CV-10754-AB-MRW (C.D. Cal.) and *Palo Alto Research Center Inc. v. Facebook, Inc.*, No. 2:20-CV-10753-AB-MRW (C.D. Cal.). Snap Pet. 1; Snap IPR, Paper 4, 2–3.

As discussed above, claims of the '599 patent are also challenged in the Facebook and Twitter IPRs.

### C.  The '599 Patent

The '599 patent is titled "Context And Activity-Driven Content Delivery And Interaction" and issued on July 16, 2013, from an application filed on December 2, 2008.  Snap IPR, Ex. 1001, codes (22), (45), (54).

The '599 patent is directed to "a computing device that delivers personally-defined context-based content to a user."  Snap IPR, Ex. 1001, code (57).  The '599 patent states that

> [t]his computing device receives a set of contextual information with respect to the user, and processes the contextual information to determine whether some aspect of the current context can be associated with a probable activity being performed by the user.  The computing device then determines whether either or both the context and current activity of the user satisfy a trigger condition which has been previously defined by the user.  If so, the computing device selects content from a content database, based on the context or activity, to present to the user, and presents the selected content.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Snap IPR, Ex. 1001, 1:52–62. Figure 1, reproduced below, illustrates a

content management system in accordance with the invention. *Id.* at 2:54–

55.



**FIG. 1**

As depicted in Figure 1, above, content management system 100 presents

content 112 to a user. Snap IPR, Ex. 1001, 5:18–19. Content 112 can be

presented in response to actions being performed by the user, or in

accordance with other information associated with the user. *Id.* at 5:18–21.

Content management system 100 allows a user to create and store content,

and associate the content with a given user-defined context. *Id.* at 5:21–23.

For instance, content management system 100 can remind a user to buy

groceries as the user is driving past a grocery store after work or can read

specific items on a grocery list to a user when walking across a specific

grocery store aisle. *Id.* at 5:28–32. Input mechanism 102 receives user

input 101, content manager 104 controls how content 112 is stored in

content database 106 and how it is selected for playback, and content

delivery mechanism 108 controls how content 112 is presented to a user. *Id.*

at 5:36–57.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

### D. Illustrative Claim

Snap challenges claims 1–25 of the '599 patent. Claims 1, 12, and 19 are the only independent claims, and claim 1, which is illustrative, is reproduced below, with bracketed letters added to the limitations for reference purposes.

> 1. [a] A method for delivering context-based content to a first user, the method comprising:
>
>> [b] receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;
>>
>> [c] receiving a set of contextual information with respect to the first user;
>>
>> [d] processing the contextual information to determine a current context for the first user;
>>
>> [e] determining whether the current context satisfies the trigger condition;
>>
>> [f] in response to the trigger condition being satisfied, presenting the content piece to the first user;
>>
>> [g] receiving a response from the first user corresponding to the presented content piece;
>>
>> [h] determining whether the received response matches the expected response; and
>>
>> [i] performing an action based on an outcome of the determination.

Snap IPR, Ex. 1001, 23:20–41.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

E. Analysis

1. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and evidence advanced by Snap demonstrated a reasonable likelihood that claims 1–25 of the '599 patent would have been unpatentable as anticipated under 35 U.S.C. § 102 or rendered obvious under 35 U.S.C. § 103. Snap Inst. Dec. 9–24. Here, we determine whether Snap has established by a preponderance of the evidence that the challenged claims are anticipated or obvious. 35 U.S.C. § 316(e). We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived." Snap IPR, Paper 14, 9; see also 37 C.F.R. § 42.23(a) ("Any material fact not specifically denied may be considered admitted."); In re NuVasive, Inc., 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising the same argument in the patent owner response). Additionally, the Board's Trial Practice Guide states that the patent owner response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Consolidated Trial Practice Guide, 66 (November, 2019).[6]

On the record before us, we note that we have reviewed arguments and evidence advanced by Snap to support its unpatentability contentions, whereas Patent Owner chose not to address certain limitations in its Patent Owner Response. In this regard, the record contains persuasive arguments and evidence presented by Snap regarding the manner in which the prior art

---

[6] Available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

discloses or teaches the corresponding limitations of claims 1–25 of the '599 patent, as well as a rationale to combine the prior art references.

### 2. Level of Ordinary Skill in the Art

Snap proposes that a person of ordinary skill in the art at the time of the '599 patent would have possessed "an undergraduate degree in electrical engineering, computer engineering, computer science or a related field along with at least two years of work experience in the field of content presentation and context-based systems/processes." Snap Pet. 3 (citing Snap IPR, Ex. 1002 ¶¶ 30–32); Snap IPR, Ex. 1022 ¶ 32. Snap further asserts that additional "education can supplement practical experience and vice versa." *Id*. In the Decision on Institution, we determined that Snap's proposed description of the qualifications of a person of ordinary skill in the art aligned with the technology and claims of the '599 patent. Snap Inst. Dec. 6–7. For this proceeding, Patent Owner and Dr. Martin apply this level of skill in the art. Snap PO Resp. 11–12; Snap IPR, Ex. 2003 ¶¶ 48–50. Accordingly, for the reasons given in the Decision on Institution, we adopt Snap's proposed level of ordinary skill in the art. Snap Inst. Dec. 6–7.

Patent Owner asserted that "it is unclear if Petitioner's [Snap's] expert . . . is a person of ordinary skill in the art." Snap PO Resp. 12. We note that this comment was directed to Snap's expert, Mr. Smoot (*see* Snap IPR, Ex. 1002). Snap also relies upon the Declaration provided by Dr. Almeroth, who reviewed the Declaration of Mr. Smoot and agreed with Mr. Smoot's assertions and opinions. Snap IPR, Ex. 1022. Patent Owner presents no arguments relating to the qualifications of Dr. Almeroth as a person of ordinary skill in the art. *See generally* Snap PO Sur-reply.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

### 3. *Claim Construction*

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the principles set forth by our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Patent Owner asserts that the limitation "determining whether the received response matches the expected response," recited in independent claims 1, 12, and 19, requires the possibility of expected and unexpected responses in view of the claim terms, Specification, and prosecution history. Snap PO Resp. 13–26. More specifically, Patent Owner asserts that "each independent claim requires an ability to determine whether a received response is an expected response (e.g., correct or desired) or an unexpected response (e.g., incorrect or undesired)." *Id.* at 13. Patent Owner argues that the Board's determination in the Decision on Institution that "there is no

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

recited limitation requiring that there be a determination made for an *unexpected* response" is in error. *Id.* at 14 (citing Snap Inst. Dec. 18).

Patent Owner relies on the claim language itself and, more specifically, the language in limitations 1[b] and 1[g]–1[i], stating that these recitations mean that "a content package must include content and a set of rules, and the set of rules must include at least one expected response related to the content," and "requires receiving a response to presented content, determining [] that [the] response matches at least one expected response, and then performing some action based on the determination." Snap PO Resp. 16. Patent Owner argues that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to presented content must be possible. There would be no need for the determination limitation if no unexpected responses were possible; the claim would simply require performing an action associated with the received (and expected) response." *Id.* Patent Owner cites to cases law in support of its assertion that interpretation of terms that render parts of claims superfluous is disfavored. *Id.* at 16–17 (citing *e.g.*, *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1375 (Fed. Cir. 2005)). Patent Owner further contends that the claim language dictates that the determining step "requires the possibility of an unexpected (e.g., incorrect or undesired) response being received—to give meaning to the 'determin[e/ing] whether' language." *Id.* at 17 (citing Snap IPR, Ex. 2003 ¶¶ 72–78). Dr. Martin testifies that "the system must determine whether the received response matches the expected response, or as the alternative demanded by the 'determining whether' clause, that the received response is unexpected." Snap IPR, Ex. 2003 ¶ 75.

Patent Owner asserts that the Specification of the '599 patent requires the possibility of expected and unexpected responses. Snap IPR, PO Resp.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

17–20.  Patent Owner refers to Tables 1 and 2 of the Specification in support
of the contention that there are actions specified "when a user response is
expected or correct" or "when a user response is unexpected or incorrect."
*Id*. at 18–19 (citing Snap IPR, Ex. 1001, 13:1–7, Tables 1, 2).

     Patent Owner additionally refers to the prosecution file history of the
'599 patent.  Snap PO Resp. 21–26.  Patent Owner contends that the original
claims do not refer to expected responses, determining if responses matched
expected responses, or performing actions based on that determination.  *Id.*
at 21 (citing Snap IPR, Ex. 1004, 56–64).  After continued prosecution,
including further amendments, a May 23, 2012, amendment was submitted
that included limitations directed to determining if responses matched
expected responses, or performing actions based on that determination,
which are the same as those in the issued '599 patent.  *Id*. at 22–24 (citing
Snap IPR, Ex. 1004, 348–362).  Patent Owner refers to an agenda for
applicant's May 9, 2012, interview with the examiner that states:

> the system receives a response from the user corresponding to
> the presented content, determines whether the response matches
> the pre-defined expected response, and performs an action based
> on the outcome of the determination (see instant application,
> pars. [0062]- [0064]). For example, ***if the user fails to mimic the
> played audio signal correctly***, the system replays the audio file
> for the user (see instant application, par. [0056]).

Snap IPR, Ex. 1004, 346 (quoted Snap PO Resp. 24–25).  Patent Owner
contends that because the "applicant specifically called out handling
unexpected responses (failure to mimic an audio signal) when discussing the
relevance of the determination limitation," a person of skill in the art would
have understood this to require the possibility of both expected and

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

unexpected responses.  Snap PO Resp. 25 (citing Snap IPR, Ex. 2003 ¶¶ 87–90).

We do not agree with Patent Owner's assertion that the claim language requires an ability to determine whether a received response is an expected response or an unexpected response.  Limitation 1[h] does not recite this restriction, nor is the limitation required to give meaning to the claim.  Patent Owner's view is inconsistent with limitation 1[b], which recites that the content package with a set of rules includes "an expected response," with no mention that an unexpected response as part of the content package.  Patent Owner's expert, Dr. Martin, testifies that the plain meaning of the claim language requires that there be a determination that a received response matches an expected response, which "requires the system being able to determine whether the received response does not match the expected response."  Snap IPR, Ex. 1021, 31:19–32:2.  We agree that the claim requires making a determination, but this determination is only as to "the expected response."  Patent Owner asserts that the claim also requires determining whether a received response matches an unexpected response—but that is not recited or implied by the claim language itself.  *See* Snap PO Resp. 16–17; Snap IPR, Ex. 2003 ¶ 75.  In sum, the claim language requires determining whether there is a match of a received response with the expected response; however, the claim does not require determining whether there is a match of a received response with an unexpected response.

Turning to the Specification, Table 1 of the '599 patent is instructive and is reproduced below.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

## TABLE 1

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpI.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHello.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHowDoYouDo.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |

## TABLE 1-continued

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpGoodnight.mp3 | >21:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpGoodmorning.mp3 | <10:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |

Snap IPR, Ex. 1001, 10:57–11:9.  The '599 patent explains that Table 1, above, presents an exemplary set of rules that correspond to a number of audio clips in Japanese for practicing pronunciations of a number of words. *Id*. at 11:11–15.  The time column allows a user to specify a time of day when content can be presented, the location column to specify a location for where content can be presented, and the state column to specify an action that the user can be performing when content is presented.  *Id*. at 11:15–21. As an example, a user learning Japanese can program the content management system 240 to play "good morning" in Japanese when the user is moving around the bedroom before 10 AM, and to play "goodnight" in

Japanese when the user is entering or moving around the bedroom after

9 PM. Of note, the '599 patent explains that

> [t]he response column *allows a user to specify an expected response* to the presentation of content 253. The action correct column allows a user to specify actions that content management system 240 can perform if the user provides a correct response. The action incorrect column allows a user to specify actions that content management system 240 can perform if the user does not provide a correct response (Ex. 1001, 11:27–33 (emphasis added)).

> An *action correct column entry* can obtain a value that specifies an action to be performed by content management system 240 in the event that the *user provides an expected response.* Furthermore, an *action incorrect column entry* can obtain a value that specifies an action to be performed by content management system 240 on the occasion that t*he user does not provide an expected response. (id.* at 13:1–7 (emphasis added)).

These descriptions are consistent with the language of limitations 1[b] and 1[h] as recited, and as discussed above. We further note that the Specification only discloses determining whether a received response is *expected* — and the received response may or may not be the expected response. *See* Snap IPR, Ex. 1001, 11:27–33; 12:50–13:10; 13:67–14:11. Patent Owner does not identify in the Specification, nor do we discern, any disclosure of determining whether a received response is an "*unexpected* response." *See generally* Snap PO Resp.; Snap PO Sur-Reply.

As Dr. Almeroth testifies, "a person of ordinary skill in the art would have understood that the 'action correct column entry' specifies an action to be performed when the user's response matches the expected response, whereas the 'action incorrect column entry' specifies an action to be performed when the user's response does not match the expected response, consistent with the plain language of the claims." Snap IPR, Ex. 1022 ¶ 54.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Dr. Martin also provides consistent testimony on this issue. Snap IPR,
Ex. 2003 ¶¶ 81–82. Put simply, the Specification's disclosure is that the set
of rules for multiple content packages includes an expected response, and
actions are then performed based on whether an expected response is or is
not provided. Moreover, as Dr. Almeroth testifies, neither the claims nor the
Specification use the term "unexpected response"—rather the Specification
only identifies an "expected response." Snap IPR, Ex. 1022 ¶ 42.
Accordingly, the disclosures in Table 1 and the Specification support Dr.
Almeroth's testimony that a person of ordinary skill would have understood
that "the claimed 'determin[e/ing]' limitation requires what it plainly recites:
'determin[e/ing] whether the received response matches the expected
response[]'. . . . [i]t does not require an unexpected response not known to
the system." Snap IPR, Ex. 1022 ¶ 51.

    Although Patent Owner asserts that there is support in the
Specification for its interpretation of the "determining" limitation, we are not
persuaded. More specifically, Patent Owner contends that Tables 1 and 2 of
the Specification "show actions to be taken when a user response is
correct/expected and incorrect/unexpected." Snap PO Resp. 18–19. Dr.
Martin testifies Table 2 presents an example "where an expected response of
'OK' is considered correct and other responses are unexpected and
considered incorrect." Snap IPR, Ex. 2003 ¶ 83. We do not agree with
Patent Owner's contentions on this issue because they are premised on the
characterization of the claimed "received response" as either "expected
response" or "unexpected" which is "considered incorrect." This is not what
is claimed—instead, as discussed above, the "*received response*" is checked

18

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

to determine if it matches the "*expected response*," and an action is performed based upon that determination.

Patent Owner also asserts that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to presented content must be possible," otherwise, "[t]here would be no need for the determination limitation if no unexpected responses were possible." Snap PO Resp. 16. In opposition, Snap contends that the claim recites receiving "at least one content package" which "includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes . . . an expected response." *See* Snap Pet. Reply 4. Dr. Almeroth testifies that, according to the claim language, there are "a plurality of 'expected response[s]' – one expected response for each content package, where multiple content packages are possible." Snap IPR, Ex. 1022 ¶ 48. Dr. Almeroth further testifies that the claim language explains that the determining limitation requires a determination as to "whether 'the received response matches *the* expected response' included in the set of rules associated with a particular content package, and not whether the received response matches *any* of a plurality of expected responses." *Id*. In further support, Dr. Almeroth testifies, and we agree, that in view of Table 1 and the Specification an expected response of mimicking the content presented (e.g., "good morning" or "good night" in Japanese) is specific to the context, so that a received response could match the expected response for one content piece, but nonetheless would not match the expected response for different content presented to the user (e.g., mimicking "good morning" in Japanese in response to being presented "good night" in Japanese). *Id*. ¶ 50 (citing Snap IPR, Ex. 1001, 11:11–41, Table 1). Snap then asserts, and we agree, that "unexpected responses" are not required to

19

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

give meaning to the limitation because an expected response associated with a different content package does not necessarily match the expected response associated with another content package and the presented content piece. Snap Pet. Reply 5; Snap IPR, Ex. 1022 ¶¶ 49–50.

In response to Snap's assertions on this issue, Patent Owner argues that Snap's view that there is only one expected response allowed per content package is incorrect under a proper reading of the claim language, the '599 patent Specification, and Dr. Martin's testimony that there is more than one way to mimic a phrase. Snap PO Sur-reply 7–11. But this does not address Snap's assertion that these can be more than one content package which has rules which include an expected response. This situation is reflected in Table 1, wherein, as Dr. Almeroth testifies, "a content piece of a content package is presented to a user (e.g., Table 1 JPGoodnight.mp3), and the system determines whether a received response to that presented content piece . . matches an expected response for the presented content piece (e.g., Table 1 'Mimic' Goodnight in Japanese), even when the received response could be a response that is known to the system for another content piece in another set of rules of a content package." Snap IPR, Ex. 1022 ¶ 52. This evidence supports that there may be a different "expected response" for different content packages with different rules, triggers, and a presented content piece, where an "expected response" for different content would be determined not to match the expected response for content presented to a user. Whether there may be multiple "expected responses," as Patent Owner contends, does not undermine Snap's demonstration that there can be different expected responses for different contents which requires the

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

determination of a match of the received response with the expected

response *for the content piece presented to a user*.

Patent Owner additionally argues that the prosecution history supports

the inclusion of "unexpected response" into the claim.   We do not agree.

During prosecution of the '599 patent, the independent claims were amended

to add "determining whether the received message matches the expected

response."  Snap IPR, Ex. 1004, 348–362.  The amendments are directed to

a limitation of matching the "expected response" — there is no mention or

suggestion of an "unexpected response" that is considered or determined.

Patent Owner also refers to applicant's statement that "the system receives a

response from the user corresponding to the presented content, [and]

determines whether the response matches the *defined expected response*,"

and then "if the user fails to mimic the played audio signal correctly, the

system replays the audio file for the user."  Snap IPR, Ex. 1004, 346.  This

statement does not mention any consideration or determination of an

unexpected response, but rather only identifies an action taken based only on

a determination of whether there is a match of the received response and the

expected response.  *See id.* ("the system receives a response from the user

corresponding to the presented content, determines whether the response

matches the predefined expected response, and performs an action based on

the outcome of the determination.").

In view of the evidence and arguments as discussed above, Patent

Owner's assertions that "unexpected response" should be included in the

clam term amounts to impermissibly attempting to write a limitation into the

claim.  Accordingly, we decline to adopt Patent Owner's proposed

interpretation of the "determin[e/ing ] whether the received response

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

matches the expected response " to require the possibility of expected and unexpected response and instead adopt the plain meaning of the claim term.

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes on the current record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### 4. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate, a claim a prior art reference must disclose every limitation of the claimed invention;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

factual determinations including  (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of ordinary skill in the art; and (4) when in evidence, objective
indicia of obviousness or nonobviousness.[7] *Graham v. John Deere Co.*, 383
U.S. 1, 17–18 (1966).

### 5. *Asserted Anticipation of Claims 1, 2, 4–7, 10–13, 17–20, and 22–25 by Rosenberg*

Snap contends that claims 1, 2, 4–7, 10–13, 17–20, and 22–25 are
unpatentable under 35 U.S.C. § 102 as anticipated by Rosenberg.  Pet. 5–50.
Patent Owner argues that Rosenberg does not teach all the limitations of
claim 1.  Snap PO Resp. 26–30.

We begin our discussion with summary of Rosenberg, and then
address the evidence and arguments presented.

### a. *Rosenberg (Snap IPR, Ex. 1005)*

Rosenberg is directed to a system and method for users to create
spatially associated personal reminders.  Snap IPR, Ex. 1005, code (57).
Rosenberg discloses providing a location-based personal reminder system
with features, such as triggering a reminder upon the user entering or exiting
a specific area associated with that reminder (*id*. at 2:4–12, 2:18–22) or
providing users with options to choose when a spatially-associated reminder
is triggered (*id*. at 2:32–49).

In Rosenberg's system, users may create personal digital reminders
that include "information such as text, audio, images, graphics, and/or video,
that describes or otherwise indicates one or more pending tasks that the user

---

[7] The parties present no evidence relating to objective indicia of
nonobviousness.

intends to perform in the future." Snap IPR, Ex. 1005, 5:16–20. The
personal digital reminders include "a relational association to one or more
physical areas in the real physical world" called "trigger areas" (*id*. at 5:41–
50), and can also include other "parameters such as flags and variables that
describe how and when the reminder should be triggered as well as the
current status of the reminder" (*id*. at 5:62–65). In Rosenberg, a user can
author a personal digital reminder either on a portable computing device,
which is any mobile computing device that may be carried about or on
another device, such as a personal computer, and a portable computing
device can download the reminder. *Id*. at 8:4–11, 9:5–19. An example
portable computing device, with personal digital reminders displayed, is
depicted in Figure 3, reproduced below.



**FIG. 3**

As shown in Figure 3, above, portable computing device 111 includes user
interface 103, with display 101 and user input devices 105. Snap IPR,
Ex. 1005, 15:18–20. The portable computing device 111 also includes a

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

"locative sensor," such as a GPS transducer, that provides locative sensor data that indicates the current physical location of portable computing device 111 within the physical world. *Id.* at 8:29–40. The reminder circuitry of portable computing device 111 reads locative sensor data, accesses a reminder database, and determines whether the user is entering or exiting a trigger area associated with any active personal digital reminders. *Id.* at 13:50–54, 21:38–50, 21:47–22:2. Rosenberg discloses that the determination on whether a user is entering a trigger area may be made by comparing the boundary of the trigger area with the user's current and prior location (*id.* at 21:57–67), or by an enhanced method where a different boundary can be used for entry that is different from the exit boundary of a trigger area (*id.* at 7:47–59). If a trigger event occurs, the portable computing device display will show the associated reminder to the user. *Id.* at 8:19–23.

Rosenberg discloses that personal digital reminders may be presented alongside "reminder option[s]," which are response options presented to a user with the reminder. Snap IPR, Ex. 1005, 6:65–7:28. Figure 5 of Rosenberg, reproduced below, illustrates a portable computing device with reminders and reminder options displayed.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2



## FIG. 5

As depicted in Figure 5, above, portable computing device 111 may display various reminder options, including a "terminate reminder option," a "defer reminder option," a "last chance reminder option," and an "edit reminder option." Snap IPR, Ex. 1005, 17:58–18:28, 19:24–21:27.

### b. Discussion

#### i. Claim 1

Snap's Petition asserts that Rosenberg discloses all the limitations of claim 1. Snap Pet. 5–17. Below we consider the claim 1 limitations in turn.

##### (1) Preamble 1[a] and Limitation 1[b]

Snap asserts that Rosenberg discloses a method for delivering context-based content to a first user because Rosenberg discloses a method for delivering personal digital reminders to a user based on a user satisfying a location-based trigger event. Snap Pet. 5 (citing Snap IPR, Ex. 1005, code (57), 2:59–3:32, 4:45–6:4; Ex. 1002 ¶¶ 51–56). Snap contends that in the '599 patent "content" includes digital reminders, similar to those

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

described in Rosenberg, and "context" includes "user activity" informed by "contextual information," such as location. *Id*. (citing Snap IPR, Ex. 1001, 3:60–64, 5:63–65, 20:30–34, 2:47–50, 8:45–46, 13:25–28, 13:59–14:16, 4:7–11, 6:23–39). Snap argues that Rosenberg's "trigger events" include a "user physically entering the trigger area [and/or] exiting the trigger area" and are user activities informed by user location, and, thus, Rosenberg discloses delivering context-based content, that is, a reminder delivered when a user enters or exits a trigger area. *Id*. at 5–6 (citing Snap IPR, Ex. 1005, 5:62–6:3; Snap IPR, Ex. 1002 ¶¶ 57–66).

Snap further contends that Rosenberg discloses the use of reminders which contain reminder content, the associated trigger area, and other parameters, including flags and variables associated with how and when a reminder should be triggered and status information about the reminder. Snap Pet. 6. Snap asserts that when a user creates a reminder, it includes this collection of information, and is a "content package." *Id*. at 7. More specifically, Snap contends that in Rosenberg a reminder includes content and rules associated with the package, where trigger area and trigger event parameters specifies a context (entering and/or exiting a trigger area) that triggers the reminder associated with the event. *Id*. (citing Snap IPR, Ex. 1002 ¶¶ 61–65). Snap argues that the trigger event and trigger area define the claimed trigger condition rule associated with the content piece. *Id*. (citing Snap IPR, Ex. 1002 ¶ 62). Snap also asserts that Rosenberg discloses that reminders may be presented with reminder options that allow a user to provide responses related to the reminder, and this provides the claimed "expected response." *Id*. at 7–8.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Patent Owner provides no arguments specifically related to the preamble or limitation 1[b]. *See generally* Snap PO Resp.; Snap PO Sur-reply.

We have reviewed the record and determine that Petitioner has demonstrated that Rosenberg discloses the preamble and limitation 1[b] of claim 1.[8]

### (2)  Limitations 1[c]–1[g]

Snap asserts that Rosenberg discloses receiving a set of contextual information for a first user, as recited in limitation 1[c]. Snap Pet. 9 (citing Snap IPR, Ex. 1002 ¶¶ 67–71). Snap relies upon Rosenberg's disclosure of a portable computing device reading locative sensor data indicating "spatial coordinates representing where within the physical environment the user is currently residing." *Id*. (citing Snap IPR, Ex. 1005, 21:39–45).

Snap asserts that Rosenberg discloses processing the contextual information to determine a current context for a user as recited in limitation 1[d]. Snap Pet. 9–10 (citing Snap IPR, Ex. 1002 ¶¶ 72–78). For support, Snap refers to Rosenberg disclosure that the device processes the received user contextual information, that is, the location information, to determine whether the user is currently entering/exiting a trigger area. *Id*. at 10 (citing Snap IPR, Ex. 1005, 6:34–47, 3:16–27, 7:47–59).

Snap contends that Rosenberg discloses determining whether a current context satisfies the trigger condition as recited in limitation 1[e]. Snap Pet. 10–11 (citing Snap IPR, Ex. 1002 ¶¶ 79–83). Snap argues that Rosenberg discloses determining whether the current context of the user (user's

---

[8] We need not determine whether the preamble of claim 1 is limiting because Snap has shown that Rosenberg discloses the preamble. *See Nidec*, 868 F.3d at 1017.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

location) satisfies the trigger condition, that is, whether user is entering/exiting a trigger area. *Id*. at 11.

Snap contends that Rosenberg discloses that in response to the trigger condition being satisfied, the content piece is presented to a user, as recited in limitation 1[f]. Snap Pet. 11–13 (citing Snap IPR, Ex. 1002 ¶¶ 79–88). Snap asserts that Rosenberg discloses that the device includes "software adapted to automatically trigger the personal reminder based upon the defined parameters such that the reminder is displayed to the user when the user enters and/or exits the trigger area." *Id*. at 11 (citing Snap IPR, Ex. 1005, 6:58–61).

Snap contends that Rosenberg discloses receiving a response from a user corresponding to the presented content piece as recited in limitation 1[g]. Snap Pet. 13–14 (citing Snap IPR, Ex. 1002 ¶¶ 89–94). Snap argues that Rosenberg discloses reminder options to a user along with the presented reminder content, that is, a content piece. *Id*. at 13. Snap asserts that the reminder options, such as terminate, defer, last chance, and edit, are presented to a user, and the user provides input through the user interface to respond. *Id*. at 14; *see* Snap IPR, Ex. 1005, Fig. 5.

Patent Owner presents no arguments specifically related to these claim limitations. *See generally* Snap PO Resp.; Snap PO Sur-reply.

We have reviewed the evidence and argument and on this record we determine that Snap has demonstrated that Rosenberg discloses limitations 1[c]–1[g] of claim 1.

### (3) Limitations 1[h] and 1[i]

Snap asserts that Rosenberg discloses determining whether the received response matches the expected response as recited in limitation 1[h]. Snap Pet. 14–15 (citing Snap IPR, Ex. 1002 ¶¶ 95–100).

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Snap contends that Rosenberg discloses receiving a response from a user via a selection of a reminder option button and the device determines whether, for instance, a user response matches an expected response of the "defer reminder" response button. *Id.* (citing Snap IPR, Ex. 1005, 19:34–41, 19:61–20:48; Snap IPR, Ex. 1002 ¶¶ 96–98). Snap further contends that Rosenberg states that that "[d]epending upon what reminder options are selected by the user," actions occur, including updating the reminder database "to reflect any terminations, edits, resets, or deferments, of reminders." *Id.* at 15 (citing Snap IPR, Ex. 1005, 22:20–23, 22:65–23:1, Fig. 6).

Snap argues that Rosenberg discloses performing an action based on an outcome of the determination as recited in limitation 1[i]. Snap Pet. 16–17 (citing Snap IPR, Ex. 1002 ¶¶ 101–106). Snap asserts that Rosenberg discloses whether a user has chosen a "defer reminder" response or not and taking different actions responsive to this determination. *Id.* at 16. For instance, "[i]f a user selects the 'defer reminder' response, 'the reminder circuitry clears the screen of the displayed reminder and sets a flag such that the reminder will be displayed again after a certain amount of time has elapsed.'" *Id.* (citing Snap IPR, Ex. 1005, 19:61–65).

Patent Owner argues that Rosenburg fails to disclose limitations 1[h] and [i] because the claim requires "an ability to determine whether the response is an 'expected response,' which necessarily requires the option for a user to provide an unexpected (e.g., incorrect or undesired) response." Snap PO Resp. 26–27. Patent Owner asserts that Rosenberg does not teach a method or system that allows for unexpected responses because it only discloses receiving expected responses. *Id.* at 27 (citing Snap IPR, Ex. 2003 ¶¶ 93–97). Patent Owner contends that Petitioner never suggests that any of

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Rosenberg's reminder options are unexpected so that a determination is necessary. *Id.* at 28. Patent Owner argues that because Rosenberg fails to teach limitation 1[h], it also does not teach the "perform[ing] an action based on an outcome of the determination" limitation. *Id.* at 29.

We do not agree with Patent Owner's arguments because all of these arguments rely on Patent Owner's proposed claim construction related to the term "expected response" (*supra* Section III.D.3), and we have not adopted that proposed construction.

We have reviewed the evidence and argument and on this record we determine that Snap has demonstrated that Rosenberg discloses limitations 1[h] and 1[i] of claim 1.

### *(4) Conclusion*

Accordingly, having considered Snap's and Patent Owner's arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg anticipates claim 1 of the '599 patent.

### *ii. Independent Claims 12 and 19*

Claim 12 claims a computer-readable storage medium storing instructions that when executed by a computer performs the method with the same steps as those recited in claim 1. Snap IPR, Ex. 1001, 24:40–63. Claim 19 claims an apparatus with components that perform similar steps to those recited for claim 1. *Id.* at 25:52–26:14. For the challenges to claims 12 and 19, Snap relies on similar evidence and argument to that presented for claim 1. Snap Pet. 33–44.

Patent Owner does not present any arguments specific to these claims. *See generally* Snap PO Resp.; Snap PO Sur-reply.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Having considered the arguments and evidence, and for the reasons
we discuss above for claim 1, we determine that Snap has shown by a
preponderance of the evidence that Rosenberg anticipates claims 12 and 19
of the '599 patent.

### iii. Dependent Claims 2, 13, and 20

Claim 2 recites:

2. The method of claim 1, wherein the method further comprises
creating the content package for the first user, wherein creating the
content package involves:

> recording the content piece that is provided by the first user;

> creating an entry in a content database for the recorded content
> piece, wherein the entry includes one or more trigger
> conditions; and

> associating the one or more trigger conditions for the entry with
> a user-defined context; and

> wherein the method further comprises:
> > continuously comparing previously defined trigger
> > conditions for the entry with the ongoing context of the
> > first user; and

> > in response to the one or more trigger conditions being
> > met, retrieving the content piece, and presenting the
> > retrieved content piece to the first user.

Snap IPR, Ex. 1001, 23:42–58. Claims 13 and 20 contain similar
limitations.

Snap presents evidence and argument in support of its contentions that
dependent claims 2, 13, and 20 are anticipated by Rosenberg. Snap Pet. 17–
24, 36, 44–45. For claim 2, Snap asserts that Rosenberg discloses creating a
content package for a first user comprising reminder content ("content
piece") and associated trigger event. *Id.* at 17–18. Snap contends that
Rosenberg discloses that creating a reminder containing the content package
involves recording a content piece provided by the first user, with the user

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

recording the reminder content by authoring a text file or recording an audio file or video. *Id*. at 18 (citing Snap IPR, Ex. 1005, 5:16–30, 5:31–40). Snap argues that Rosenberg discloses creating an entry in a reminder database for the personal digital reminder, and the reminder content may also be stored in the reminder database. *Id*. at 18–20 (citing Snap IPR, Ex. 1005, 2:63–3:4, 11:8–18; Ex. 1002 ¶¶ 116–117). Snap further asserts that Rosenberg discloses a trigger condition that includes whether a user enters or exits from an area, which is defined by a trigger event and a trigger area, which is user-defined. *Id*. at 20–21 (referencing Snap Pet., Section IX.A.1; citing Snap IPR, Ex. 1002 ¶¶ 118–121). Snap contends that Rosenberg discloses comparing previously defined trigger conditions with a user's current context. *Id*. at 21–23 (referencing Snap Pet., Sections IX.A.1, IX.A.2; Snap IPR, Ex. 1002 ¶¶ 122–127). Snap argues that Rosenberg discloses continuously comparing previously defined trigger conditions associated with reminder content with the user's context to determine whether the trigger condition has been satisfied, and if it has been satisfied, the reminder content is presented to the user. *Id*. at 23–24 (referencing Snap Pet., Sections IX.A.2, IX.A.1; Snap IPR, Ex. 1002 ¶¶ 128–131).

Patent Owner does not present any arguments specific to these claims. *See generally* Snap PO Resp.; Snap PO Sur-reply.

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg anticipates claims 2, 13, and 20 of the '599 patent.

### *iv. Dependent Claims 4 and 22*

Claim 4 recites:

4. The method of claim 1, wherein the method further comprises defining a context by:

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> creating one or more context entries in a context manager; and
>
> associating a respective context entry with a set of contextual information.

Snap IPR, Ex. 1001, 24:4–9.  Claim 22 contains similar limitations.

Snap presents evidence and argument in support of its contentions that dependent claims 4 and 22 are anticipated by Rosenberg.  Snap Pet. 24–27, 48.  For claim 4, Snap asserts that Rosenberg discloses defining a context by creating a trigger area (context entry) on the graphical user interface of the portable computing device.  *Id*. at 24 (citing Snap IPR, Ex.1005, 24:52–54; Snap IPR, Ex. 1002 ¶ 131).  Snap contends that the user-defined trigger area entries are presented to the user via, for example, by a menu on the device's user interface, which allows a user to select this trigger area to be associated with a reminder.  *Id*. at 24–25 (citing Snap IPR, Ex. 1005, 24:4–23, 24:53–26:20; Snap IPR, Ex. 1002 ¶ 131).

Patent Owner does not present any arguments specific to these claims. *See generally* Snap PO Resp.; Snap PO Sur-reply.

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg anticipates claims 4 and 22 of the '599 patent.

### v. Dependent Claims 5 and 23

Claim 5 depends from claim 4, and further recites "wherein the method further comprises updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user."  Snap IPR, Ex. 1001, 24:10–14.  Claim 23 contains similar limitations.

Snap presents evidence and argument in support of its contentions that dependent claims 5 and 23 are anticipated by Rosenberg.  Snap Pet. 27–29,

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

48–49.  For claim 5, Snap asserts that Rosenberg discloses updating reminder database responsive to actions performed by a user.  *Id.* at 27–28 (citing Snap IPR, Ex.1002 ¶¶ 142–147).  Snap relies on the Rosenberg example where a user may be presented with a reminder and may choose to defer it so it is presented later, and then may terminate it.  *Id.* (citing Snap IPR, Ex. 1005, 20:40–42).  Snap further contends that in response the reminder may be removed from the reminder database or set to an inactive state.  *Id.* at 28 (citing Snap IPR, Ex. 1005, 19:42–46).  Snap asserts that these actions are updates to the entry in the reminder database.

Patent Owner does not present any arguments specific to these claims. *See generally* Snap PO Resp.; Snap PO Sur-reply.

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg anticipates claims 5 and 23 of the '599 patent.

### vi. Dependent Claims 6 and 7

Claim 6 depends from claim 1 and further recites "wherein the context is defined as a combination of at least a high-level abstraction which corresponds to one or more low-level contextual information values, wherein the low-level contextual information values can correspond to one or more measurable parameters."  Snap IPR, Ex. 1001, 24:15–19.  Claim 7 depends from claim 1 and further recites "wherein a respective rule is defined with one or more high-level abstractions."  *Id.* at 24:20–21.

Snap presents evidence and argument in support of its contentions that dependent claims 6 and 7 are anticipated by Rosenberg.  Snap Pet. 29–31. For claim 6, Snap asserts that Rosenberg discloses the claimed context as specified by the trigger conditions that may include trigger areas and trigger events as well as other parameters such as "further restricting the conditions

35

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

under which the reminder will trigger," including a temporal trigger
condition and a directional trigger condition. *Id.* at 30 (citing Snap IPR,
Ex. 1005, 12:12–23, 12:40–60). Snap further contends that the context is a
high-level abstraction, such as a user entering/exiting a trigger area during a
certain time, which corresponds to one or more low-level contextual
information values, such as the time of day or series of GPS traces. *Id.* at
31. For claim 7, Snap relies on the same arguments and evidence as that
presented for claim 6. *Id.*

Patent Owner does not present any arguments specific to these claims.
*See generally* Snap PO Resp.; Snap PO Sur-reply.

Having considered the arguments and evidence, we determine that
Snap has shown by a preponderance of the evidence that Rosenberg
anticipates claims 6 and 7 of the '599 patent.

### vii. Dependent Claims 10, 17, and 24

Claim 10 depends from claim 1 and further recites "wherein the
contextual information includes one or more of: time, date, location,
proximity to a system-detectable tag, device orientation, velocity, direction,
distance, vibration, altitude, temperature, pressure, humidity, sound,
luminous intensity, camera image, and video stream." Snap IPR, Ex. 1001,
24:29–34. Claims 17 and 24 contain similar limitations.

Snap presents evidence and argument in support of its contentions that
Rosenberg anticipates dependent claims 10, 17, and 24. Snap Pet. 32, 36–
37. For claim 10, Snap asserts that Rosenberg discloses the claimed user
contextual information that includes at least GPS location data. *Id.* at 32
(citing Snap IPR, Ex. 1002 ¶¶ 157–158).

Patent Owner does not present any arguments specific to these claims.
*See generally* Snap PO Resp.; Snap PO Sur-reply.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg anticipates claims 10, 17, and 24 of the '599 patent.

*viii. Dependent Claims 11, 18, and 25*

Claim 11 depends from claim 1 and further recites "wherein the content piece includes one or more of: audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog." Snap IPR, Ex. 1001, 24:35–39. Claims 18 and 25 contain similar limitations.

Snap presents evidence and argument in support of its contentions that dependent claims 11, 18, and 25 are anticipated by Rosenberg. Snap Pet. 32–33, 36–37, 49–50. For claim 11, Snap asserts that Rosenberg discloses that the claimed content piece, which is reminder content, may include "text, audio, images, graphics, and/or video." *Id*. at 32 (citing Snap IPR, Ex. 1005, 5:17–20; Figs. 1, 7).

Patent Owner does not present any arguments specific to these claims. *See generally* PO Resp.; PO Sur-reply.

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg anticipates claims 11, 18, and 25 of the '599 patent.

*6. Asserted Obviousness of Claims 4, 5, 15, 16, 19, 20, and 22–25 Over Rosenberg*

Snap contends that claims 4, 5, 15, 16, 19, 20, and 22–25 are unpatentable under 35 U.S.C. § 103(a) as obvious over Rosenberg. Snap Pet. 50–56. Because we have determined that Rosenberg anticipates claims

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

4, 5, 19, 20, and 22–25, we need not reach this other ground for unpatentability of these proposed substitute claims. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (non-precedential) (recognizing that "[t]he Board has the discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

We have not previously addressed claims 15 and 16, which Snap asserts are obvious. Snap Pet. 32–33, 36–37, 49–50.

Claim 15 follows:

> 15. The computer-readable storage medium of claim 12, wherein the method further comprises defining a context by:
>> creating one or more context entries in a context manager; and
>> associating a respective context entry with a set of contextual information.

Snap IPR, Ex. 1001, 25:29–35. Claim 16 depends from claim 15, and further recites "wherein the method further comprises updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user." *Id*. at 25:36–39.

Snap presents evidence and argument in support of its contentions that dependent claims 15 and 16 would have been obvious over Rosenberg. Snap Pet. 32–33, 36–37, 49–50. For claim 15, Snap asserts that Rosenberg teaches the limitations of defining a context and associating a context entry with a set of contextual data for similar reasons to those provided for claim 4. Snap Pet. 52 (referencing Snap Pet., Sections IX.A.9, IX.A.3.a, IX.B.1.a; citing Snap IPR, Ex. 1002 ¶ 239). For claim 16, Snap asserts that

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Rosenberg teaches the limitations of updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user for reasons similar to those provided for claim 5. *Id*. at 52–53 (referencing Snap Pet., Sections IX.A.9, IX.A.4, IX.B.2; citing Ex. 1002 ¶ 241).

Patent Owner does not present any arguments specific to these claims. *See generally* Snap PO Resp.; Snap PO Sur-reply.

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that Rosenberg renders obvious claims 15 and 16 of the '599 patent.

> 7. *Asserted Obviousness of Claims 3, 8, 9, 14, and 21 Over Rosenberg and Suzuki*

Snap contends that claims 3, 8, 9, 14, and 21 are unpatentable under 35 U.S.C. § 103(a) as obvious over Rosenberg and Suzuki. Pet. 56–65. We begin our discussion with a brief summary of Suzuki.

> a. *Suzuki (Snap IPR, Ex. 1006)*

Suzuki describes a "system and method for alerting a user of an item on a to-do list if the user is detected to be close to the item's performance location." Snap IPR, Ex. 1006, code (57). Suzuki discloses that individuals may share the location-based to-do list items. *Id*. at 3:50–53, 4:3–5. The to-do list items are stored with "one or more user IDs" that "indicate the individuals who are responsible for accomplishing the indicated task[s]." *Id*. at 4:21–26. Suzuki discloses that this information is stored in a database, which is depicted in Figure 3, reproduced below. *See id*. at 6:12–16.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

*FIG.3*

| TASK | LOCATION ENTERED | LOCATION ADDRESS | USER ID | STATUS |
|---|---|---|---|---|
| BUY ITEM X | AAA DISCOUNT STORE 111 MAIN STREET LOS ANGELES | 111 MAIN STREET LOS ANGELES | 001 | CONFIRMED |
| BUY ITEM Y | BBB SUPERMARKET FIRST STREET | 222 FIRST STREET LOS ANGELES | 002,003 | COMPLETED |
| PICK-UP DRY-CLEAN | CCC DRY-CLEANERS | 333 STATE STREET LOS ANGELES | 001 | NOT NOTIFIED |

As shown in Figure 3 of Suzuki, above, the to-do list database includes task
30a listings and User ID 30d listing fields.  Snap IPR, Ex. 1006, 6:12–46.  A
user may create the database by user entries on a mobile device.  *Id*. at 6:16–
17.  Figure 7, reproduced below, illustrates a screen display for entering a
to-do list.  *Id*. at 8:1–3.

*FIG.7*



Figure 7, above, depicts an illustration of a screen display for entering a to-
do list to Suzuki's system.  Snap IPR, Ex. 1006, 3:14–15, 8:1–3.

40

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> *b. Discussion*

Claims 3, 8, 9, 14, and 21 include limitations directed to shareable content pieces or rules. *See* Snap IPR, Ex. 1001, 23:60–24:3, 24:20–28, 25:16–29, 26:32–43.

Snap argues that claims 3, 8, 9, 14, and 21 would have been obvious over the combination of Rosenberg and Suzuki. Snap Pet. 56–65. Snap asserts that Suzuki's location-based reminder system discloses reminders that can be shared by multiple users. *Id*. at 56–57 (citing Snap IPR, Ex. 1005, 4:3–5). Snap contends that a person of ordinary skill in the art would have been motivated to configure Rosenberg's system to provide for sharable reminders in view of Suzuki. *Id*. at 57 (citing Snap IPR, Ex. 1002 ¶ 251). Snap contends that a person of ordinary skill in the art would have been motivated to make the modifications because it "would have recognized that sharing reminders among individuals would have increased efficiencies in the use of, and the versatility of, Rosenberg's system." *Id*. (citing Snap IPR, Ex. 1002 ¶ 252).

Claims 3, 14, and 21 contain similar limitations, with Snap asserting that although Rosenberg's reminder content (content piece) is not expressly disclosed as being sharable, it would have been obvious to implement such features in view of Suzuki. Snap Pet. 56. Snap relies on Suzuki's disclosure of a location-based reminder system like Rosenberg's where reminders can be "shared by multiple users," and are stored with IDs reflecting individuals responsible for indicated tasks. *Id*. at 56–57 (citing Snap IPR, Ex. 1006, code (57), 3:22–33, 3:50–53, 4:3–5, 5:8–22, 8:46–11:23, 4:21–26, 4:57–64, 6:12–45, 8:1–30, Figs. 3, 7; Snap IPR, Ex. 1002 ¶ 250). Snap asserts that Rosenberg discloses creating a content package for the recorded content piece, which includes trigger conditions. *Id*. at 59–60. Snap further argues

41

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

that Rosenberg also discloses allowing a recipient of the content package to at least "insert, modify, and/or remove content" from the package. *Id*. at 60 (citing Snap IPR, Ex. 1002 ¶ 258).

For claim 8, which is directed to allowing a first user to share the rules with a second user, Snap asserts that Rosenberg discloses allowing the recipient of a reminder to redefine the rules associated with a reminder, where the user updating the rules is the second user with whom the reminder was shared. Snap Pet. 61–62 (citing Snap IPR, Ex. 1002 ¶ 259). For claim 9, which is directed to sharing the content piece with a remote device, Snap contends it would be obvious to modify Rosenberg, which presents content pieces, with Suzuki, which discloses sharing from a "central host computer 14" to "multiple mobile terminals." *Id*. at 62–63 (citing Snap IPR, Ex. 1002 ¶ 260; Snap IPR, Ex. 1006, 4:3–9).

Patent Owner does not present any arguments specific to these claims. *See generally* Snap PO Resp.; Snap PO Sur-reply.

Having considered the arguments and evidence, we determine that Snap has shown by a preponderance of the evidence that the combination of Rosenberg and Suzuki teaches the limitations of claims 3, 8, 9, 14, and 21 and has presented articulated reasoning with rational underpinning to support the combination of prior art which renders these claims obvious.

*F. Conclusion As To Snap's Challenges To Claims 1–25 of the '599 Patent*

For the foregoing reasons, we conclude that Snap has shown by a preponderance of the evidence that claims 1–25 of the '599 patent are unpatentable. In summary:

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–7, 10–13, 17–20, 22–25 | 102 | Rosenberg | 1, 2, 4–7, 10–13, 17–20, 22–25 | |
| 4, 5, 15, 16, 19, 20, 22–25 | 103(a) | Rosenberg | 15, 16[9] | |
| 3, 8, 9, 14, 21 | 103(a) | Rosenberg, Suzuki | 3, 8, 9, 14, 21 | |
| **Overall Outcome** | | | 1–25 | |

## IV. FACEBOOK'S CHALLENGES TO CLAIMS 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, AND 25 OF THE '599 PATENT

### A. Procedural Background

Facebook filed a Petition for *inter partes* review of claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of the '599 patent, along with the Declaration of Christopher M. Schmandt. Facebook IPR, Paper 2 ("Facebook Pet."); Facebook IPR, Ex. 1002. Patent Owner filed a Preliminary Response. Facebook IPR, Paper 12 ("Facebook Prelim. Resp."). Pursuant to 35 U.S.C. § 314(a), on January 25, 2022, we instituted *inter partes* review on the following grounds:

---

[9] As explained above, because we determine challenged claims 4, 5, 19, 20, and 20–25 are anticipated by Rosenberg, we need not address the obviousness ground for these claims.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

| Claim(s) Challenged | 35 U.S.C § | Reference(s)/Basis |
|---|---|---|
| 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | 103(a) | Lamont[10], Wolfe[11], Wang[12] |
| 9 | 103(a) | Lamont, Wolfe, Wang, Belimpasakis[13] |
| 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | 103(a) | Lamont, Wolfe, Wang, Meyers[14] |
| 9 | 103(a) | Lamont, Wolfe, Wang, Belimpasakis, Meyers |

Facebook Pet. 3; Facebook IPR, Paper 13 ("Facebook Inst. Dec." or "Facebook Dec.").

Patent Owner filed a Patent Owner Response ("Facebook PO Resp."). Facebook IPR, Paper 23.[15] Patent Owner also filed a Declaration of David Martin, Ph.D., with the Response to support its positions. Facebook IPR, Ex. 2010. Facebook filed a Reply ("Facebook Pet. Reply") to the Patent Owner Response, along with the Reply Declaration of Christopher M. Schmandt. Facebook IPR, Paper 25; Ex. 1016. Patent Owner filed a Sur-reply to Petitioner's Reply ("Facebook PO Sur-reply"). Facebook IPR, Paper 31.

---

[10] US 7,652,594 B2, filed April 7, 2006, issued January 26, 2010 (Facebook IPR, Ex. 1003, "Lamont").
[11] US 8,428,614 B2, filed July 10, 2007, issued April 23, 2013 (Facebook IPR, Ex. 1004, "Wolfe").
[12] Wallace Wang, BEGINNING PROGRAMMING FOR DUMMIES, 1999 (Facebook IPR, Ex. 1006, "Wang").
[13] US 9,467,530 B2, filed April 11, 2006, issued October 11, 2016 (Facebook IPR, Ex. 1007, "Belimpasakis").
[14] Scott Meyers, THE DOWNLOADER'S COMPANION FOR WINDOWS, 1995 (Facebook IPR, Ex. 1008, "Meyers").
[15] This is a Corrected Patent Owner Response.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

An oral hearing was held on October 28, 2022.  A transcript of the
hearing is included in the record.  Facebook IPR, Paper 41 ("Facebook Tr.").

## B.  Related Matters

The parties indicate this Petition is related to the district court
litigations  *Palo Alto Research Center Inc. v. Facebook, Inc.*, No. 2:20-CV-
10753-AB-MRW (C.D. Cal.), *Palo Alto Research Center Inc. v. Snap Inc.*,
No. 2:20-CV-10755-AB-MRW (C.D. Cal.), and *Palo Alto Research Center
Inc. v. Twitter, Inc.*, No. 2:20-CV-10754-AB-MRW (C.D. Cal.).  Facebook
Pet. 1; Facebook IPR, Paper 4, 2–3.

As discussed above, claims of the '599 patent are also challenged in
the Snap and Twitter IPRs.

## C.  The '599 Patent

As indicated above in the Snap IPR, the '599 patent is titled "Context
And Activity-Driven Content Delivery And Interaction" and issued on July
16, 2013, from an application filed on December 2, 2008.  Facebook IPR,
Ex. 1001, codes (22), (45), (54).

The '599 patent is directed to "a computing device that delivers
personally-defined context-based content to a user."  Facebook IPR,
Ex. 1001, code (57).  The '599 patent states that

> [t]his computing device receives a set of contextual
> information with respect to the user, and processes
> the contextual information to determine whether
> some aspect of the current context can be associated
> with a probable activity being performed by the
> user.  The computing device then determines
> whether either or both the context and current
> activity of the user satisfy a trigger condition which
> has been previously defined by the user.  If so, the
> computing device selects content from a content

45

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> database, based on the context or activity, to present
> to the user, and presents the selected content.

Facebook IPR, Ex. 1001, 1:52–62. Figure 1, reproduced below, illustrates a

content management system in accordance with the invention. *Id*. at 2:54–

55.



**FIG. 1**

As depicted in Figure 1, above, content management system 100 presents

content 112 to a user. Facebook IPR, Ex. 1001, 5:18–19. Content 112 can

be presented in response to actions being performed by the user, or in

accordance with other information associated with the user. *Id*. at 5:18–21.

Content management system 100 allows a user to create and store content,

and associate the content with a given user-defined context. *Id*. at 5:21–23.

For instance, content management system 100 can remind a user to buy

groceries as the user is driving past a grocery store after work or can read

specific items on a grocery list to a user when walking across a specific

grocery store aisle. *Id*. at 5:28–32. Input mechanism 102 receives user input

101, content manager 104 controls how content 112 is stored in content

database 106 and how it is selected for playback, and content delivery

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

mechanism 108 controls how content 112 is presented to a user. *Id*. at 5:36–57.

### D. Illustrative Claim

Facebook challenges claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of the '599 patent. Claims 1, 12, and 19 are the only independent claims, and claim 1, which is illustrative, is reproduced below, with bracketed letters added to the limitations for reference purposes.[16]

> 1. [a] A method for delivering context-based content to a first user, the method comprising:
>
> > [b] receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;
> >
> > [c] receiving a set of contextual information with respect to the first user;
> > [d] processing the contextual information to determine a current context for the first user;
> >
> > [e] determining whether the current context satisfies the trigger condition;
> >
> > [f] in response to the trigger condition being satisfied, presenting the content piece to the first user;
> >
> > [g] receiving a response from the first user corresponding to the presented content piece;
> >
> > [h] determining whether the received response matches the expected response; and

---

[16] Note that the lettering for the references to the claim limitations varies from that used in the Decision of Institution and from the parties' references to the in the briefing in this case. The lettering has been changed herein to conform the references between the Snap and Facebook cases, which have now been consolidated.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> [i] performing an action based on an outcome of the
> determination.

Facebook IPR, Ex. 1001, 23:20–41.

### E. Analysis

#### 1. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and evidence advanced by Facebook demonstrated a reasonable likelihood that claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of the '599 patent would have been unpatentable as obvious under 35 U.S.C. § 103. Facebook Inst. Dec. 13–30. Here, we determine whether Facebook has established by a preponderance of the evidence that the challenged claims are obvious. 35 U.S.C. § 316(e). We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived." Facebook IPR, Paper 14, 8 *see also* 37 C.F.R. § 42.23(a) ("Any material fact not specifically denied may be considered admitted."); *In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising the same argument in the patent owner response). Additionally, the Board's Trial Practice Guide states that the patent owner response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Consolidated Trial Practice Guide, 66 (November, 2019).[17]

On the record before us, we note that we have reviewed arguments and evidence advanced by Facebook to support its unpatentability

---

[17] Available at https://www.uspto.gov/sites/default/files/documents/ tpgnov.pdf.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

contentions, whereas Patent Owner chose not to address certain limitations in its Patent Owner Response. In this regard, the record contains persuasive arguments and evidence presented by Facebook regarding the manner in which the prior art teaches the corresponding limitations of claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of the '599 patent, as well as a rationale to combine the prior art references.

### 2. Level of Ordinary Skill in the Art

Relying on the testimony of Mr. Schmandt, Petitioner proposes that a person of ordinary skill in the art at the time of the '599 patent would have possessed "at least a bachelor's degree in electrical engineering or computer science, and two years of work experience in multimedia data communications and user interfaces." Facebook Pet. 5 (citing Facebook IPR, Ex. 1002 ¶¶ 17–22). Petitioner further asserts that additional education, but less work experience, and vice versa may also qualify. *Id.* In the Decision on Institution, we determined that Facebook's proposed description of the qualifications of a person of ordinary skill in the art aligned with the technology and claims of the '599 patent. Facebook Inst. Dec. 12. For this proceeding, Patent Owner and Dr. Martin apply this level of skill in the art. Facebook PO Resp. 12; Facebook IPR, Ex. 2003 ¶¶ 48–50. Accordingly, for the reasons given in the Decision on Institution, we adopt Facebook's proposed level of ordinary skill in the art. Facebook Inst. Dec. 12.

### 3. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the principles set forth by our reviewing court, the "words of a claim 'are

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Patent Owner makes similar arguments to those made in the Snap case, discussed above. More specifically, Patent Owner asserts that the limitation "determin[ing/e] whether the received response matches the expected response," recited in independent claims 1, 12, and 19, requires the possibility of expected and unexpected responses in view of the claim terms, Specification, and prosecution history. Facebook PO Resp. 13–26. More specifically, Patent Owner asserts that "each independent claim requires an ability to determine whether a received response is an expected response (e.g., correct or desired) or an unexpected response (e.g., incorrect or undesired)." *Id.* at 14. Patent Owner argues that the Board's determination in the Decision on Institution that "there is no recited limitation requiring that there be a determination made for an *unexpected* response" is in error. *Id.* at 14 (citing Facebook Inst. Dec. 25).

Patent Owner relies on the claim language itself and, more specifically, limitations 1[b] and 1[g]–1[i], stating that these recitations mean that "a content package must include content and a set of rules, and the set of rules must include at least one expected response related to the

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

content," and "requires receiving a response to presented content, determining [] that [the] response matches at least one expected response, and then performing some action based on the determination." Facebook PO Resp. 16. Patent Owner argues that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to [presented] content must be possible. There would be no need for the determination limitation if no unexpected responses were possible; the claim would simply require performing an action associated with the received (and expected) response." *Id*. at 16–17. Patent Owner cites to cases law in support of its assertion that interpretation of terms that render parts of claims superfluous is disfavored. *Id*. at 16–17 (citing e.g., *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1375 (Fed. Cir. 2005)). Patent Owner further contends that the claim language dictates that the determining step "requires the possibility of an unexpected (e.g., incorrect or undesired) response being received—to give meaning to the 'determin[e/ing] whether' language." *Id*. at 17 (citing Facebook IPR, Ex. 2010 ¶¶ 73–79). Dr. Martin testifies that "the system must determine whether the received response matches the expected response or as the alternative demanded by the 'determining whether' clause, that the received response is unexpected" (Facebook IPR, Ex. 2010 ¶ 76).

Patent Owner asserts that the Specification of the '599 patent requires the possibility of expected and unexpected responses. Facebook IPR, PO Resp. 18–21. Patent Owner refers to Tables 1 and 2 of the Specification in support of the contention that there are actions specified "when a user response is expected or correct" or "when a user response is unexpected or

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

incorrect." *Id*. at 18–19 (citing Facebook IPR, Ex. 1001, 13:1–7, Tables 1, 2).

Patent Owner additionally refers to the prosecution file history of the '599 patent. Facebook PO Resp. 21–26. Patent Owner contends that the original claims do not refer to expected responses, determining if responses matched expected responses, or performing actions based on that determination. *Id.* at 22 (citing Facebook IPR, Ex. 2014, 57–65). After continued prosecution, including further amendments, a May 23, 2012 amendment was submitted that included limitations directed to determining if responses matched expected responses, or performing actions based on that determination, which are the same as those in the issued '599 patent. *Id.* at 22–24 (citing Facebook IPR, Ex. 2014, 364–378). Patent Owner refers to an agenda for applicant's May 9, 2012, interview with the examiner that states

> the system receives a response from the user corresponding to the presented content, determines whether the response matches the pre-defined expected response, and performs an action based on the outcome of the determination (see instant application, pars. [0062]-[0064]). For example, ***if the user fails to mimic the played audio signal correctly***, the system replays the audio file for the user (see instant application, par. [0056]).

Facebook IPR, Ex. 2014, 362 (quoted at Facebook PO Resp. 25). Patent Owner contends that because the "applicant specifically called out handling unexpected responses (failure to mimic an audio signal) when discussing the relevance of the determination limitation," that a person of skill in the art would have understood this to require the possibility of both expected and

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

unexpected responses.  Facebook PO Resp. 25–26 (citing Facebook IPR, Ex. 2010 ¶¶ 88–91).

We do not agree with Patent Owner's assertion that the claim language requires an ability to determine whether a received response is an expected response or an unexpected response.  Limitation 1[h] does not recite this restriction, nor is the limitation required to give meaning to the claim.  Patent Owner's view is inconsistent with limitation 1[b], which recites that the content package with a set of rules includes "an expected response," but there is no mention that an unexpected response is part of the content package.  Although Patent Owner asserts that the claim also requires the inclusion of a determination of whether a received response matches an unexpected response, that is not recited or suggested by the claim language itself.  *See* Facebook PO Resp. 15–17; Facebook IPR, Ex. 2010 ¶ 76.  In sum, the claim language indicates it determines whether there is a match of a received response with the expected response; however, the claim does not require determining whether there is a match of a received response with an unexpected response.

Turning to the Specification, Table 1 of the '599 patent is instructive and is reproduced below.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

## TABLE 1

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpI.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHello.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHowDoYouDo.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |

## TABLE 1-continued

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpGoodnight.mp3 | >21:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpGoodmorning.mp3 | <10:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |

Facebook IPR, Ex. 1001, 10:57–11:9. The '599 patent explains that Table 1, above, presents an exemplary set of rules that correspond to a number of audio clips in Japanese for practicing pronunciations to a number of words. *Id*. at 11:11–15. The time column allows a user for specifying a time of day when content can be presented, the location column is for specifying a location for where content can be presented, and the state column is for specifying an action that the user can be performing when content is presented. *Id*. at 11:15–21. As an example, a user learning Japanese can program the content management system 240 to play "good morning" in Japanese when the user is moving around the bedroom before 10 AM, and to

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

play "goodnight" in Japanese when the user is entering or moving around
the bedroom after 9 PM. Of note, the '599 patent explains that

> [t]he response column *allows a user to specify an expected*
> *response* to the presentation of content 253. The action correct
> column allows a user to specify actions that content management
> system 240 can perform if the user provides a correct response.
> The action incorrect column allows a user to specify actions that
> content management system 240 can perform if the user does not
> provide a correct response (Ex. 1001, 11:27–33 (emphasis
> added)).

> An *action correct column entry* can obtain a value that specifies
> an action to be performed by content management system 240 in
> the event that the *user provides an expected response.*
> Furthermore, an *action incorrect column entry* can obtain a value
> that specifies an action to be performed by content management
> system 240 on the occasion that t*he user does not provide an*
> *expected response* (*id*. at 13:1–7 (emphasis added)).

These descriptions are consistent with the language of limitations 1[b]
and 1[h] as recited, and as discussed above. We further note that the
Specification only discloses determining whether a received response is
*expected* — and the received response may or may not be the expected
response. *See* Facebook IPR, Ex. 1001, 11:27–33; 12:50–13:10; 13:67–
14:11. Patent Owner does not identify in the Specification, nor do we
discern, any disclosure of determining whether a received response is an
"*unexpected* response." *See generally* Facebook PO Resp.; Facebook PO
Sur-Reply.

Although Patent Owner asserts that there is support in the
Specification for its interpretation of the "determining" limitation, we are not
persuaded. More specifically, Patent Owner contends that Tables 1 and 2 of
the Specification "show actions to be taken when a user response is
correct/expected and incorrect/unexpected." Facebook PO Resp. 18–20. Dr.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Martin testifies that "references to 'action correct' and 'action incorrect' indicate that the system being described will determine whether the received response is correct or incorrect." Facebook IPR, Ex. 2010 ¶ 81. We do not agree with Patent Owner's assertions because they are premised on the characterization of the claimed "received response" as either "expected response" or "unexpected" which is "considered incorrect." This is not what the Specification discloses and what is claimed—instead, as discussed above, the "*received response*" is checked to determine if it matches the "*expected response*," and an action is performed based upon that determination.

Patent Owner also asserts that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to [presented] content must be possible," otherwise, "[t]here would be no need for the determination limitation if no unexpected responses were possible." Facebook PO Resp. 16. As Facebook points out, however, and we agree, the system, however, may have multiple expected responses, such as expected responses other than those received from the "content package" as claimed. Facebook Pet. Reply 5; Ex. 1016 ¶ 7. Patent Owner further argues Facebook's arguments on expected responses fail under the plain language of the claims because "[a] response that does not match the particular expected response (or one of the expected responses) in the content package for a given content piece is an unexpected response for the claim's purposes." Facebook PO Sur-reply 17. We do not agree with that assertion based on the evaluation of the claim language and Specification disclosures, as discussed above.

Patent Owner additionally argues that the prosecution history supports the inclusion of "unexpected response" into the claim. We do not agree.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

During prosecution of the '599 patent, the independent claims were amended to add "determining whether the received message matches the expected response." *See* Facebook IPR, Ex. 2014, 365. The amendments are directed to matching the "expected response"–there is no mention or suggestion of an "unexpected response" that is considered or determined. Patent Owner also refers to a statement made by the applicant that states that "the system receives a response from the user corresponding to the presented content, [and] determines whether the response matches the *pre-defined expected response*," and then "if the user fails to mimic the played audio signal correctly, the system replays the audio file for the user." Facebook IPR, Ex. 2014, 362 (emphasis added). This discussion does not mention any consideration or determination of an unexpected response, but rather only identifies an action taken based only on the determination of whether there is a match of the received response and the expected response. *See id.* ("the system receives a response from the user corresponding to the presented content, determines whether the response matches the pre-defined expected response, and performs an action based on the outcome of the determination.").

In view of the evidence and argument as discussed above, our view is that Patent Owner's assertions that "unexpected response" should be included in the clam term amounts to impermissibly attempting to write a limitation into the claim. Accordingly, we decline to adopt Patent Owner's proposed interpretation of the "determin[e/ing] whether the received response matches the expected response " to require the possibility of

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

expected and unexpected response and instead adopt the plain meaning of the claim term.

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes on the current record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999))).

### 4. Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness.[18] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 5. Asserted Obviousness of Claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 Over Lamont, Wolfe, and Wang

Petitioner contends that claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 are unpatentable under 35 U.S.C. § 103 as obvious over Lamont,

---

[18] The parties present no evidence relating to objective indicia of nonobviousness.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Wolfe, and Wang. Facebook Pet. 10–56. In support, Petitioner also relies upon the Schmandt Declarations. Facebook IPR, Ex. 1002; Ex. 1016. Patent Owner argues that the prior art does not teach all the limitations of the claims and insufficient rationale to combine the references has been provided. Facebook IPR, PO Resp. 27–61. In support, Patent Owner also relies on the Martin Declaration. Facebook IPR, Ex. 2020.

We begin our discussion with brief summaries of Lamont, Wolfe, and Wang, and then address the evidence and arguments presented.

### a. Lamont (Facebook IPR, Ex. 1003)

Lamont discloses a system to construct a software-based tour "of a village, town, city, region or country employing locationally-sensitive information." Facebook IPR, Ex. 1003, 1:16–19, 1:44–49. Lamont's software architecture enables a designer "to create, edit, manage, and organize a matrix of trigger points that are situated in geographical space and are tagged with dynamic content" which are relay to a mobile device. *Id*. at 1:44–49. More specifically, the "tour script" contains "trigger points," that specify a particular geographical space and the conditions for presenting particular audio and/or visual content to the user. *Id*. at 2:1–6, 3:38–48. The conditions can include, for instance, a user location, direction, and velocity, as well as the time of day. *Id*. at 4:4–13, 14:56-62, 17:15–18. Content, including media clips, are presented to the user if the trigger point conditions are satisfied. *Id*. at 2:24–29, 4:4–13, 5:18–20, 14:29–37. Lamont's system, with its tour guide, may be used, for instance, for "an automated guided tour, a treasure hunt, a real estate tour, architectural overview, a line of approach/instruction for trainee pilots, and distribution of targeted sales and marketing information." *Id*. at 2:27–29.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

### b. *Wolfe (Facebook IPR, Ex. 1004)*

Wolfe is directed to "a location-based mobile phone application for providing a treasure hunt game consisting of puzzles solved at specific physical locations." Facebook IPR, Ex. 1004, 1:14–16.  A mobile phone provides location data to a server, which then may provide puzzle information to a mobile phone based on the mobile phone's location and/or orientation.  *Id*. at 3:35.  For instance, there may be hints or clues provided to assist a user in finding an object or treasure in or around the user's location such as a monument.  *Id*. at 3:35–37.  In Wolfe, the system may provide a puzzle challenge or question to the user to verify that a site, object, or treasure has been found.  *Id*. at 3:32–39.  Figure 4F and 4G, reproduced below, show screenshots of a mobile phone device.



FIG. 4F



FIG. 4G

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

As shown in Figure 4G, above, the mobile phone screen includes a question presented to the user (e.g. "Who am I?") and receiving the user's correct response ("Lincoln"), results in the display shown in Figure 4G. Ex. 1004, 5:50–56.

### c. Wang (Facebook IPR, Ex. 1006)

Wang is a book that is an introductory guide about computer programming. Facebook IPR, Ex. 1006, 14–17. Wang includes a description of how computers evaluate Boolean expressions. *Id.* at 23–40.

### d. Discussion

#### i. Claim 1

The Petition asserts that Lamont, Wolfe, and Wang render claim 1 obvious. Facebook Pet. 10–42. Below we consider the claim 1 limitations in turn.

#### (1) Preamble 1[a]

For the teachings of the preamble 1[a], Facebook asserts that Lamont discloses a method for delivering context-based content to a first user because Lamont discloses a tour script that is used for a guided tour that can deliver context-based content to a user. Facebook Pet. 10–11 (citing Facebook IPR, Ex. 1003, 1:17–19, 2:67–3:6). Facebook asserts that Lamont teaches several types of context information including user location and "direction, temporal state, velocity, rate of incline or decline, or any other variable." *Id.* at 11 (citing Facebook IPR, Ex. 1003, 2:12–14, 4:58–61, 4:66–5:2, 5:18–19).

Patent Owner presents no arguments specifically related to the preamble. *See generally* Facebook PO Resp.; Facebook PO Sur-reply.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

We have reviewed the evidence and argument and on this record we determine that Facebook has demonstrated that Lamont teaches preamble 1[a] of claim 1.[19]

### (2) Limitation 1[b]

For limitation 1[b], Facebook contends that Lamont's "content package" consists of a tour guide and the audio and/or visual content associated with the tour script. Facebook Pet. 12–15. Facebook asserts that Lamont discloses "a set of rules associated with the content package" by its disclosure of trigger points in the tour guide which may contain certain conditions. *Id.* at 15–17. Facebook contends that the claimed trigger condition is a trigger point, with conditions (context) associated with the trigger point "such as direction, time, velocity, as explained, which trigger presentation of the content." *Id.* at 18 (citing Facebook IPR, Ex. 1003, 2:67–3:6, 17:15–18; Facebook IPR, Ex. 1002 ¶ 92). Facebook refers to Lamont's disclosure that trigger points may be grouped together that are assessed using Boolean operators to determine if a preset string of conditions has been met as an example of "rules." *Id.* at 16–17 (citing Facebook IPR, Ex. 1002 ¶ 90; Facebook IPR, Ex. 1003, 3:65–4:13, 17:15–18). Facebook further refers to a "content piece," which include items in a media list such as multimedia items that can be played to the user, which are presented upon a trigger. *Id.* at 14–15 (citing Facebook IPR, Ex. 1003, 5:5–7, 16:53–56).

Facebook further contends that Lamont discloses the ability to receive feedback from the user and to respond to that feedback, but Lamont does not

---

[19] We need not determine whether the preamble of claim 1 is limiting because Facebook has shown that Lamont discloses the preamble. *See Nidec*, 868 F.3d at 1017.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

provide detail regarding the feedback type a user can provide. Facebook Pet. 18 (citing Facebook IPR, Ex. 1003, code (57), 20:56–61). Facebook then refers to Wolfe for the teaching of the limitation "wherein the set of rules includes . . . an expected response." *Id*. Facebook argues that Wolfe discloses prompting a user for a response when it reaches a particular listing for a destination that has been reached, where, for example, the prompt may ask a user to solve a puzzle or answer a question. *Id*. at 18–19 (citing Facebook IPR, Ex. 1002 ¶ 57; Ex. 1004, 5:3–9, 5:28–29, 5:47–58, Fig. 4F). Facebook further refers to Wolfe's disclosure that a user who answers a question correctly may receive textual content or multimedia feedback and, if the response is not correct, the request for input is again repeated. *Id*. at 19–20 (citing Facebook IPR, Ex. 1002 ¶ 96; Facebook IPR, Ex. 1004, 5:56–60, Figs. 3 (steps 311, 315), 4F, 4G).

Facebook asserts that a person of ordinary skill in the art would have been motivated to combine Lamont and Wolfe because the references fall within the same field of endeavor as the claims at issue. Facebook Pet. 20–21. Facebook argues that Lamont discloses that its tour system can be used for treasure hunt games, the use described in Wolfe, and Mr. Schmandt testifies that a person of ordinary skill in the art would have been motivated to include the question/response aspects of Wolfe in Lamont to provide the advantage of enhanced game play. *Id*. at 21; Facebook IPR, Ex. 1002 ¶ 99. Facebook also contends that Wolfe's features would have benefitted Lamont's system because a response provided directly from a user under Wolfe would have "provided a clear and unequivocal indication that the user has reached a particular point in the tour—and that the user is aware of this fact." Facebook Pet. 21. Facebook argues that the combination of Lamont and Wolfe would have been straightforward and a person of ordinary skill

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

would have had a reasonable expectation of success. *Id*. at 22 (citing Facebook IPR, Ex. 1002 ¶ 101). In support, Mr. Schmandt testifies that it would have been trivial to modify Lamont because of its teaching delivery of content which is based on any number of variables and triggers. Facebook IPR, Ex. 1002 ¶ 101 (citing Facebook IPR, Ex. 1003, 2:12–14, 2:67–3:3). Mr. Schmandt also testifies that, although it is not clear in Wolfe whether the server or mobile device is responsible for receiving and processing user input, in the view of one of ordinary skill, the expected response would have been incorporated into the tour script of Lamont and executed locally on the client device. *Id*.

Patent Owner presents no arguments specifically related to limitation 1[b]. *See generally* Facebook PO Resp.; Facebook PO Sur-reply. Patent Owner makes arguments related to the motivation to combine Lamont and Wolfe, which we address below in Section IV.E.5.d.(5), and which do not undermine Petitioner's showing of a rationale to combine the references.

We have reviewed the evidence and argument and on this record we determine that Facebook has demonstrated that the combination of Lamont and Wolfe teaches limitation 1[b] and sufficient rationale to combine the references has been demonstrated.

### *(3) Limitations 1[c]–1[e]*

#### *(a) Petitioner's Assertions*

For limitation 1[c], Petitioner asserts that Lamont discloses components that receive notifications of changes to the location, velocity, and time with respect to users as the claimed "receiving . . . contextual information." Facebook Pet. 24–26.

For limitation 1[d], Petitioner argues that the "current context for the first user" is the current activity or status of a user based on processing the

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

contextual information of a user relating to location, speed, or time.
Facebook Pet. 27 (citing Facebook IPR, Ex. 1002 ¶ 106). Petitioner refers to
Lamont's disclosure that "[w]hen the condition monitor 220 detects that
conditions 330 relevant to a tour have changed, it sends a signal containing
an indication of the type of condition and a measurement of that condition to
each of the elements of the relevant tour." *Id*. at 27 (citing Facebook IPR,
Ex. 1003, 15:1–23). Petitioner asserts that processing of contextual
information may describe an activity in which a user may be engaged like
"IF T1 Speed>30 mph AND T2 Direction is North Easterly OR T3 Direction
is North westerly." *Id*. at 28 (citing Facebook IPR, Ex. 1003, 4:4–13).
Petitioner contends that the claimed context could be an event where the
user travels in a particular direction at a certain time and speed. *Id*. at 28–
29. Petitioner additionally refers to other exemplary conditions disclosed in
Lamont, such as "traveling over 35 miles per hour," or "between 10 am and
11:30 am," or "heading within 30 degrees of due east." *Id*. at 29 (citing
Facebook IPR, Ex. 1003, 17:18–21). Petitioner asserts that Lamont
discloses determining a current context for a user as part of a process where
the software evaluates whether the individual trigger point conditions are
satisfied. *Id*. at 28. Petitioner additionally relies upon Wang, which
discloses details of software evaluation using Boolean operations, such as
those in Lamont. *Id*. at 30–33.

   Petitioner contends that Lamont discloses determining whether a
current context satisfies a trigger condition as recited in limitation 1[e].
Facebook Pet. 35–36 (citing Facebook IPR, Ex. 1002 ¶ 121). Petitioner
argues that Lamont discloses comparing the current activity or status of a
user "against preset conditions 330 associated with various trigger points
100," to determine "what conditions 330, as may be required by the trigger

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

point 100, are satisfied." *Id*. at 35 (citing Facebook IPR, Ex. 1003, 14:29–37).

### (b) Patent Owner's Assertions

Patent Owner argues that Petitioner has not sufficiently demonstrated that the prior art teaches "current context" as claimed.  Facebook PO Resp. 27–32.  Patent Owner asserts that the '599 patent uses "context" differently than "contextual information." *Id*. at 28.  Patent Owner contends that the claims and the Specification differentiate between the terms. *Id*. at 28–32. Patent Owner argues that the Specification defines "context" by stating that "A context is a set of data that describes an event or environmental factor associated with a user or the operational environment of content management system 100." *Id*. at 29 (citing Facebook IPR, Ex. 1001, 7:29–39).  Patent Owner asserts that it applies the plain meaning of the terms. *Id*. at 28 n.7, *see also id.* at 32.

Patent Owner argues that Facebook "wrongly treats 'context' and 'contextual information' as the same thing."  Facebook PO Resp. 33 (citing Facebook IPR, Ex. 2010 ¶ 103).  Patent Owner asserts that this is contrary to Facebook's expert's admission "that 'some sort of processing' must be done on 'contextual information' to determine 'context.'" *Id*. (citing Facebook IPR, Ex. 2017, 33:4–8).  Patent Owner contends that "Facebook compares Lamont's conditions (what Facebook points to as 'contextual information') to Lamont's trigger points (what Facebook points to as 'trigger conditions') and reads out the use of the claimed "context" in these limitation[s]." *Id*. (citing Facebook IPR, Ex. 1002 ¶ 112).  Patent Owner also asserts that Facebook fails to show that Lamont teaches a set of data for the claimed context that is determined from contextual information, and the claimed

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

context is used in determining whether a trigger condition is met. *Id*. at 34
(citing Facebook IPR, Ex. 2010 ¶¶ 107–109).

　　Patent Owner asserts that Facebook "point[s] to a Lamont event—
such as going in a specific direction at a specific speed—as the 'context,' but
the 'event' they describe is the circumstance where a set of conditions has
been detected." Facebook PO Resp. 35 (citing Facebook IPR, Ex. 2010
¶ 109 (citing Facebook Pet. 28; Facebook IPR, Ex. 1002 ¶ 111)). Patent
Owner argues that this conflates "context" and "contextual information." *Id*.
Patent Owner also contends that this does not show that Lamont determines
a set of data that describes an event or environmental factor, but instead
relates to the use of Boolean operators for conditions that are not the set of
data aspect of the context. *Id*. Patent Owner asserts that Lamont's trigger
points are configured in terms of basic conditions that activate when basic
information satisfies a constraint or when a string of conditions that are met.
*Id*. at 36–37. Patent Owner argues that this does not "result in 'a set of data
that describes an event or environmental factor associated with a user or the
operational environment of.'" *Id*. at 37 (citing Facebook IPR, Ex. 2010
¶ 106). Patent Owner contends that "Lamont . . . instead directly compares
its own trigger points (what Facebook alleges are 'trigger conditions,'
Petition at 35–36) to conditions (what Facebook alleges is 'contextual
information,' Petition at 25–26)." *Id*. at 38 (citing Facebook IPR, Ex. 2010
¶ 107).

　　Patent Owner further argues that Facebook's use of Wang to imply
that Lamont's Boolean expressions involve creating a set of data is wrong.
Facebook PO Resp. 39. Patent Owner contends that Petitioner asserts that
Lamont's Boolean expressions produce true or false values, but Dr. Martin
testifies that "[w]hile a single bit of information is enough information for

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Lamont to decide whether to 'trigger now' or 'don't trigger now', it is not a set of data that describes an event or environmental factor associated with a user or operational environment as used in the '599 Patent." *Id*. at 40–41; Facebook IPR, Ex. 2010 ¶ 114. Patent Owner also asserts that Wang does not support Facebook's positions because it discloses that a value may be stored in a variable, but the creation of a value is not automatic, and a person of ordinary skill in art would only require a comparison, and not the creation of a value. Facebook PO Resp. 40–45 (citing Facebook IPR, Ex. 2010 ¶ 124).

In Sur-reply, Patent Owner asserts that the '599 patent claims a tripartite structure: 1) receiving a set of contextual information; 2) processing the contextual information to determine a current context; and 3) determining whether the current context satisfies the trigger condition. Facebook PO Sur-reply 3. Patent Owner argues that Lamont uses only two steps, "receiving data and comparing that data to a trigger point condition," and does not use the "intermediate 'current context.'" *Id*. Patent Owner argues that in Facebook's analysis and its expert's testimony, "[t]here is no processing of any data into an intermediate 'current context,' or any explanation of what the results of that processing would be." *Id*. at 3–6. Patent Owner asserts that "Facebook points to nothing from Lamont or Wang describing any single bit that does 'characterize an event or environmental factor associated with a user.'" *Id*. at 8. Patent Owner further contends that Facebook does not show that a single bit of data can be a "set" of data that can be used to identify the user's current context. *Id*. at 8–9. Patent Owner disputes Petitioner's contention that a collection of true and false values in compound Boolean expressions is a current context because the value is only a single bit of information. *Id*. at 10. Patent

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Owner also does not agree with Petitioner's comparison with Table 2 of the '599 patent because Table 2 does not show context or current context. *Id.* at 11. Patent Owner additionally argues that Petitioner presents new impermissible arguments in its Reply such as "each of the 'true' or 'false' values obtained from evaluation of the individual Boolean expressions within in a multipart Boolean expression in Lamont could have been stored in program variables" and "Lamont discloses a logging subsystem" that would allegedly "store the results of individual Boolean expressions in variables." *Id.* at 13–14.

*(c) Analysis*

As the Petition states, and we agree, Lamont teaches that its components receive notifications of changes to the location, velocity, and time with respect to users, which is the claimed "receiving a set of contextual information with respect to a first user." Facebook Pet. 24–26 (citing Facebook IPR, Ex. 1003, 14:32–35, 14:64–67, 13:61–64, 15:1–10, Fig. 2).

As the Petition states, and we agree, Lamont teaches that the received contextual information is processed. Facebook Pet. 26–35. Lamont states that

> [t]he tour script may operate as follows: IF T1 Speed>30 mph AND T2 Direction is North Easterly OR T3 Direction is North westerly, THEN Trigger "You may be going to[o] fast to make the right turn on Acacia Avenue (T2), so you may want to take right on Beverly Blvd (T3)."

Facebook IPR, Ex. 1003, 4:5–10. Petitioner asserts, and we agree, that the processing of contextual information includes an activity in which a user may be engaged like "IF T1 Speed>30 mph AND T2 Direction is North Easterly OR T3 Direction is North westerly." Facebook Pet. 28 (citing

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Facebook IPR, Ex. 1003, 4:4–13).  Petitioner contends, and we agree, that in this instance, the claimed context is an event where the user travels in a particular direction at a certain time and speed.  *Id*. at 28–29.  Petitioner additionally relies upon Wang, which discloses details of software evaluation using Boolean operations, such as those described in Lamont, to demonstrate that the prior art performs processing on the contextual information to determine the current context of a user.  *Id*. at 30–33. Referring to Wang, and using Lamont as an example, Petitioner asserts, and we agree, that as an example, "'T1 Speed>30 mph' is an example of a Boolean expression that compares a variable ('T1 Speed') against a fixed value ('30 mph') [and] [t]his expression will generate a Boolean value of 'true' if T1 Speed is above 30 mph, and a value of 'false' otherwise."  *Id*. at 30–31 (citing Facebook IPR, Ex. 1006 ¶¶ 24–25, Table 9-1; Facebook IPR, Ex. 1002 ¶ 113).  Petitioner refers to Lamont's string of conditions and asserts, and we agree, that under Wang, "the computer will first obtain a 'true' or 'false' value with respect to the three component Boolean expressions (such as whether 'T1 Speed > 30 mph') and will then obtain a 'true' or 'false' value for the larger expression that includes the connecting Boolean AND/OR operators."  *Id*. at 32 (citing Facebook IPR, Ex. 1002 ¶ 115).  Mr. Schmandt testifies that "[t]he collection of these 'true' or 'false' values provides specific information generated by the computer that defines 'a current context for the first user,' because these 'true' and 'false' values describe the presence (or absence) of a current activity or event associated with that user."  Facebook IPR, Ex. 1002 ¶ 116.

We do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitations 1[c] and 1[d].  We agree with Patent Owner that the terms "contextual information" and "context" for a user are

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

different, but we also find that Petitioner has demonstrated that the prior art teaches both "contextual information" and "context." Petitioner asserts that in Lamont, user contextual information, such as location, speed, or time, is received, with the "condition monitor . . . send[ing] a signal containing an indication of the type of condition and a measurement of that condition." Facebook Pet. 26 (citing Ex. 1003, 15:1–4). Petitioner contends that the "current context" is the user's "current activity or status, e.g. whether the first user is traveling in a particular area, at a particular speed, in a particular direction, at a particular time, etc." *Id*. at 28. Petitioner also contends the contextual information is processed in Lamont to determine whether certain conditions are satisfied, such as determining whether the user is traveling faster than 30 mph and is travelling in one of two directions. *Id*. We agree with Petitioner that in Lamont a user "context" is, for instance, an event in which user travels in a particular direction, at a certain rate of speed, and at a particular time. *Id*. at 28–29.

Although Patent Owner argues that Facebook's arguments that a Lamont event, such as going in a specific direction at a specific speed, is the context, and the event is the circumstance where a set of conditions has been detected, conflate the terms "context" and "contextual information," we do not agree. *See* Facebook PO Resp. 35. As discussed, Facebook asserts that Lamont teaches that by parameters like changes to the location, velocity, and time, the user "contextual information," are received. Further, Petitioner contends that, and Lamont's disclosures show, that this contextual information is *processed* by one or more operations to determine the user "context," that is, to determine a user's location and velocity at some time, for instance. Although Patent Owner makes several arguments, which we discuss below, as to why Lamont does not teach a "set of data" that

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

conforms with the meaning of "context," we find that the evidence supports that Lamont's determinations fall within the '599 patent Specification's description of "context" as "a set of data that describes an event or environmental factor associated with a user." Facebook IPR, Ex. 1001, 7:36–39.

Patent Owner argues that the '599 patent requires "context" to "describe an event or environmental factor" and are not just "GPS coordinates or other 'basic information associated with the user' (as for 'contextual information'), but instead 'characterizations of events or environments of the user or operational environment as a whole,'" such as, for example, "sitting down, watching TV, asleep, alert, talking, typing at the computer in the home study or at the office, walking around the house," etc. Facebook IPR, PO Resp. 29–31. Patent Owner requires too much. The '599 patent Specification's description, however, identifies context as a set of data that describes an environmental factor associated with a user, so Facebook's evidence in Lamont of processing contextual information with a determination of a user's location and velocity supports the teaching of the limitation.

Further, although Patent Owner argues, with Dr. Martin's supporting testimony, that "a set of data" has to be more than a single value in order to "describe an event or environmental factor," the evidence indicates that the term should not be so restricted. Facebook PO Resp. 31; Facebook IPR, Ex. 2010 ¶ 101. As Petitioner points out, claim 6, which depends from claim 1, recites "context . . . defined as . . . a high-level abstraction which corresponds to *one* or more low-level contextual information values." Facebook Pet. 45; Facebook IPR, Ex. 1001, 24:15–19 (emphasis added). Accordingly, as Petitioner argues, context may correspond to one contextual

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

information value.  *See* Facebook Pet. Reply 9.  Dr. Martin also testifies that he thinks "of a context as being a set of data, so it[']s a collection of zero or more unordered elements."  Facebook IPR, Ex. 1017, 26:25–27:4.  Dr. Martin further testifies, albeit stating that it is dependent on the details of the system, that "[i]t seems possible to me that you could have a system where a *single piece of data would be adequate to characterize an event or environmental factor associated with a user*."  *Id*. at 62:16–2 (emphasis added).  Accordingly, we credit Mr. Schmandt's testimony in view of this evidence, as well as other disclosures in the Specification directed to a context based on single or limited data.  Facebook IPR, Ex. 1016 ¶¶ 25–26 (citing Facebook IPR, Ex. 1001, 4:11–12 ("context can be based on or include *one* or more user activities"), *id*. at 4:22–26 (context based on "walking to work," "walking around the mall").

Patent Owner further argues, with Dr. Martin testifying, that "[e]ven though the system described in Lamont does monitor conditions and activate triggers, these logic steps do not determine a 'set of data' that 'describes an event or environmental factor.'"  Facebook PO Resp. 37; Facebook IPR, Ex. 2010 ¶ 106.  Patent Owner argues, with Dr. Martin's supporting testimony, that "the Lamont system mechanically applies the expressly configured logic, and fires appropriate trigger actions when necessary," and is limited to comparing its own trigger points to conditions.  Facebook PO Resp. 37 (citing Facebook IPR, Ex. 2010 ¶ 106).  Patent Owner's arguments attempt to miscast Lamont's teachings to suggest more is required in the claim than what is recited.  As discussed above, limitations 1[c] and [d] merely require that there is a *receipt* of user contextual information and that information is *processed* to determine user context, which Petitioner has demonstrated.

73

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Whether Lamont's system employ expressly configured logic is not relevant to the teaching of the claim limitations.

Similarly, Patent Owner asserts that "Lamont includes no processing of 'contextual information' to determine 'context' such that the 'context' can be used to see if a 'trigger condition' is satisfied, but instead directly compares its own trigger points." Facebook PO Resp. 38. We do not agree. As discussed above, Lamont discloses the use of Boolean operators to determine the context of a user's relative speed and direction of travel. Further, as discussed below, Lamont also determines whether this context satisfies the trigger condition.

Patent Owner additionally argues that in Lamont the single bit of information indicating whether a value is true or false is not a "set of data that describes an event or environmental factor associated with a user or operational environment as used in the '599 Patent." Facebook PO Resp. 40–41 (citing Facebook IPR, Ex. 2010 ¶ 114). Further, Patent Owner asserts, computers evaluating multi-part Boolean expressions do not keep records of operations over time. *Id.* at 41 (citing Facebook IPR, Ex. 2010 ¶¶ 114–115). Patent Owner discusses Wang and its operation to argue that there is no value produced, but even if there is a value in a variable, the creation of the value is not automatic, and a person of ordinary skill in the art would write programs to minimize the use of needless variables. *Id.* at 41–45.

Patent Owner's argument on the single bit of information again argues limitations that do not appear in the claim limitations. Limitation 1[d] requires processing the contextual information to determine a current context. As Petitioner asserts, Lamont receives contextual information, such as the speed a user is travelling, and processes the information to *make a*

74

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

*determination* that a user, for instance, is travelling at or not travelling at a rate over 30 miles per hour, as well as making determinations on user travel direction. Facebook IPR, Ex. 1003, 4:4–13. Lamont's determination falls within Dr. Martin's testimony that a single piece of data (the bit of information indicating true or false in specific programming) would be adequate to characterize an event or environmental factors associated with a user, which includes determinations in Lamont such as whether a user is traveling faster or slower than some speed which is used in the determination of context, with Mr. Schmandt providing supporting testimony. Facebook IPR, Ex. 1017, 62:16–2; Facebook IPR, Ex. 1002 ¶ 70 ("the computer first obtains a 'True' or 'False' value with respect to the three component Boolean expressions (such as whether 'T1 Speed > 30 mph')"), ¶ 116 ("if the Boolean expression 'T1 Speed > 30 mph' produces a value of 'true,' that value reflects the fact that the system processed the contextual information relating to the user's velocity and now knows that the user has entered trigger point T1 at a speed exceeding 30 miles per hour"), ¶ 111 ("in the context of Lamont, an exemplary 'context' could be an event in which the user travels in a particular direction and/or at a particular rate of speed at a particular time."). Additionally, in Lamont, the results of the three component Boolean expressions are further processed using the AND/OR operators to determine user context, that is, the user is travelling slower or faster than 30 miles per hour and is or is not travelling in a certain direction. Facebook Pet. 32–33 (citing Facebook IPR, Ex. 1005 ¶¶ 115–116). Moreover, the claim does not require that the data from the evaluation multi-part Boolean expressions be stored and logged over time; instead the claim limitation requires only that the contextual information be processed

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

to determine user context, and, as discussed, Lamont's disclosures provide support of this teaching.

Patent Owner additionally asserts that the claims require a tripartite structure: 1) receiving a set of contextual information; 2) processing the contextual information to determine a current context; and 3) determining whether the current context satisfies the trigger condition. Facebook PO Sur-reply 3. Patent Owner argues that in Facebook's analysis and its expert's testimony, "[t]here is no processing of any data into an intermediate 'current context,' or any explanation of what the results of that processing would be." *Id*. at 3–6. Patent Owner asserts that Facebook contends that "Lamont's raw location, time, and direction data is compared to Lamont's 'trigger point conditions.'" *Id*. at 4. Patent Owner points to Mr. Schmandt's testimony that

> I explained that in Lamont, <u>location, speed and time information</u> ("**contextual information**") is processed by condition monitor **220** in order to determine the current activity or status of the user ("**context**") as part of the process of evaluating whether or not <u>trigger point conditions</u> are satisfied—for example, that the user is in fact currently <u>traveling at speed above 30mph and in one of two</u> <u>directions</u>.

Facebook PO Sur-reply 5 (quoting Ex. 1016 ¶ 22). Based on this testimony, Patent Owner argues that "[a]s Facebook's expert admits, Lamont evaluates whether a trigger (e.g., 'traveling at a speed above 30mph and in one of two directions') is met by what he calls contextual information ('location, speed and time information')." Facebook PO Sur-reply 5–6.

We do not agree with Patent Owner's argument. As Mr. Schmandt's testimony explains: "[t]he step of determining 'a current context for the first user' in Lamont occurs when the system evaluates whether the individual Boolean conditions within this IF-THEN statement are satisfied," and

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

"'determining whether the current context satisfies the trigger condition' occurs when the system determines *whether or not all* of the Boolean conditions for the trigger point have been satisfied." Facebook IPR, Ex. 1002 ¶ 121 (emphasis added). That is, Lamont determines context by Boolean operations, which is that the user is or is not travelling at some speed and direction, but there is also a determination as to whether a trigger condition is met. We credit this testimony because it is supported by Lamont's disclosures of the determination of speed and direction, which is the context, and a check is performed on the context to determine "IF" the context meets the conditions, "THEN" if the conditions are met, there is a trigger. Facebook IPR, Ex. 1003, 4:6–10.

Accordingly, we determine that Facebook has demonstrated that the combination of Lamont, Wolfe, and Wang teaches limitations 1[c]–1[e] and sufficient rationale to combine the references has been demonstrated.

### *(4) Limitation 1[f]*

Petitioner contends that Lamont discloses that, in response to the trigger condition being satisfied, the content piece is presented to a user, as recited in limitation 1[f]. Facebook Pet. 37–38. Petitioner refers to Lamont's disclosure that "IF T1 Speed>30 mph AND T2 Direction is North Easterly OR T3 Direction is Northwesterly, THEN Trigger 'You may be going to [sic; too] fast to make the right turn on Acacia Avenue (T2), so you may want to take right on Beverly Blvd (T3).'" *Id.* at 37 (citing Facebook IPR, Ex. 1003, 4:6–10). Petitioner asserts that this is an example of the presentation of content in response to a trigger condition being satisfied. *Id.*

Patent Owner presents no arguments specifically related to limitation 1[f]. *See generally* Facebook PO Resp.; Facebook PO Sur-reply.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

We have reviewed the evidence and argument and on this record we determine that Facebook has demonstrated that Lamont teaches limitation 1[f] of claim 1.

### (5) Limitations 1[g]–1[i]

Petitioner contends that the combination of Lamont and Wolfe teaches receiving a response from a user corresponding to the presented content piece as recited in limitation 1[g]. Facebook Pet. 39–41. Petitioner argues that Lamont discloses a user feedback monitor that receives input from a user with respect to the presented content piece, such as the content specified in a media list. *Id*. at 39 (citing Facebook IPR, Ex. 1003, 20:56–59). Petitioner further refers to the proposed combination with Wolfe, where under the proposed combination, Lamont's client device is adapted to receive an answer to a puzzle or question from a user presented during a treasure hunt, and then determines if the answer was correct. *Id*. (citing Facebook IPR, Ex. 1004, 5:47–58).

Petitioner asserts that Wolfe discloses determining whether the received response matches the expected response as recited in limitation 1[h]. Facebook Pet. 41. Petitioner contends that step 311 of Figure 3 of Wolfe is the step "Correct input?" *Id*. (citing Facebook IPR, Ex. 1004, Fig. 3). Petitioner further contends that in Wolfe, "[i]f the answer is correct, the user may receive text feedback (step 311–313)," and "may also receive multimedia feedback that relates to the puzzle (i.e. sound, images, video, etc[.])." *Id*. (citing Facebook IPR, Ex. 1004, 5:55–58).

Petitioner argues that the combination of Lamont and Wolfe teaches performing an action based on an outcome of the determination as recited in limitation 1[i]. Facebook Pet. 41–42 (citing Facebook IPR, Ex. 1002 ¶¶ 101–106). Petitioner asserts that under the combination, "a

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

treasure hunt implemented as a guided tour would perform the action of allowing the user to proceed to the next step in the tour upon determining that the user provided the correct answer (the 'expected response')." *Id*. at 42 (citing Facebook IPR, Ex. 1002 ¶ 130).

Patent Owner argues that Facebook's assertions fail for limitations 1[g]–[i] for the following reasons: (a) the claim requires the ability to provide an unexpected response; (b) a person of ordinary skill in the art would not have been motivated to modify Lamont with Wolf; and (c) Facebook uses differing evidence for the required "content piece" in different limitations.   Facebook PO Resp. 46–61.   We do not find that Patent Owner's arguments undermine Facebook's showing of the teaching of limitations 1[g]–[i].

As to the first issue, that is, that the claim requires the ability to provide an unexpected response.   Facebook PO Resp. 46.   We do not agree with Patent Owner's argument because it relies on Patent Owner's proposed claim construction for limitation 1[h] (*supra* Section IV.E.3), and we have not adopted that proposed construction.

Moreover, Petitioner asserts that, even under Patent Owner's proposed claim construction, Wolfe discloses not only determining whether a correct response has been received, but also determining whether an incorrect answer has been received.   *See* Facebook Pet. Reply 2–3.   We agree.   As discussed in the Petition, consistent with Figure 3 of Wolfe, "if a user does not provide the correct response, it may be asked again to provide input and prevented from proceeding to the next listing until the user provides the correct response."   Facebook Pet. 20 (citing Facebook IPR, Ex. 1004, Fig. 3, step 311).   Petitioner's annotated portion of Wolfe's Figure 3 is reproduced below.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2



As depicted in Petitioner's annotated version of Wolfe's Figure 3, above, the step of "determining whether the received response matches the expected response" is reflected in step 311, but if it that response is not received, the action shown in on the "NO" pathway.  Facebook Pet. Reply 2–3; Facebook Pet. 20.

As to the second issue, Patent Owner asserts that Lamont's disclosure on its user feedback is limited, and Petitioner never addresses its limited disclosure.  Facebook PO Resp. 47–48.  Patent Owner also contends that Facebook's rationale for combining Wolfe with Lamont lacks merit.  *Id*. at 48–57.  More specifically, Patent Owner asserts that Petitioner's rationale that Lamont provides express motivation to combine with Wolfe because of a common treasure hunt is flawed because the treasure hunt in each reference are not the same.  *Id*. at 48–49.  Patent Owner argues that "Lamont teaches a treasure hunt as a mandatory sequence of trigger points" ("hunt for the required locations," "but Wolfe's 'treasure hunt game' consists of 'puzzles solved at specific physical locations'" ("a series of separate puzzles at the physical locations").  *Id*. at 49 (emphasis omitted).  Patent Owner asserts that a person of ordinary skill in the art would not understand either

80

references' "notion" of treasure hunt to be superior to the other.  *Id*. (citing Facebook IPR, Ex. 2010 ¶ 141).  Patent Owner contends that Facebook's alleged motivation to adopt Wolfe in combination because "a response provided directly from a user would have provided a clear and unequivocal indication that the user has reached a particular point in the tour—and that the user is aware of this fact," disregards Lamont's purpose to deliver location-specific content and a person of ordinary skill in the art "would not be motivated to transform a system designed to deliver locationally-specific information to a user into one that instead quizzes the user."  *Id*. at 51–52 (citing Facebook IPR, Ex. 2010 ¶ 142).  Patent Owner argues that because "Lamont and Wolfe provide complete and fully independent disclosures of their own different systems," a person of ordinary skill in the art would not be motivated to combine the references.  *Id*. at 52 (citing Facebook IPR, Ex. 2010 ¶ 140).

Patent Owner additionally asserts that even if Lamont and Wolfe were combined, Facebook does not provide details on how the combination would receive user input.  Facebook PO Resp. 53 (citing Facebook IPR, Ex. 2010 ¶ 155).  Patent Owner refers to Lamont's limited user feedback, and "Facebook never identifies any Lamont/Wolfe combination component that receives Wolfe-style user input feedback."  *Id*. (citing Facebook IPR, Ex. 2010 ¶ 157).  Patent Owner argues that it is not arguing bodily incorporation and is instead arguing that Facebook has "left a meaningful — and fatal — gap in their analysis" in view of the differences in the prior art references.  *Id*. at 56 (citing Facebook IPR, Ex. 2010 ¶ 163).  Patent Owner also argues that Dr. Martin has provided rebuttal evidence on the reasonable expectation of success of the combination, with Dr. Martin testifying "that the user input components identified in Lamont and Wolfe are substantially

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

different," and Petitioner does not reconcile these "into a coherent system" and avoided related analysis.  *Id*. at 56–57; Facebook IPR, Ex. 2010 ¶ 163.

        We do not find that Patent Owner's arguments undermine Petitioner's persuasive showing of rationale to combine Lamont and Wolfe, as well as the demonstration of reasonable expectation of success of the combination. On the issue of the rationale to combine based on the treasure hunt, although Patent Owner argues that differences in the prior art makes the art uncombinable, the evidence supports otherwise.  Lamont discloses that its system can be used in location-based treasure hunts (Facebook IPR, Ex. 1003, 2:24–28, 15:56–59), and Wolfe is directed to treasure hunt games with puzzles presented specific physical locations (Facebook IPR, Ex. 1004, 1:14–16).  The evidence supports that there are advantages associated with the combination.  As Mr. Schmandt testifies, the enhancement of game play of Lamont in Wolfe would provide greater enjoyment to tour customers. Facebook IPR, Ex. 1002 ¶ 99.  Dr. Martin does not rebut that Lamont offers the potential for enhancement of game play.  Facebook IPR, Ex. 2010 ¶¶ 136–145.  Also, Lamont offers that advantage of an "indication that the user has reached a particular point in the tour – and that the user is aware of this fact," as Mr. Schmandt testifies.  Facebook IPR, Ex. 1002 ¶ 99.  Dr. Martin argues that Mr. Schmandt offers no need in Lamont for to confirm that a "user is aware" that they have reached a location, but even if this was a need, this could be accomplished by Lamont's GPS-driven system triggering a display of content and receiving a response leading to the next stop.  Facebook IPR, Ex. 2010 ¶¶ 142–143.  We agree with Mr. Schmandt that a direct indication from a user that they have reached a particular point in a tour and the user has awareness of that fact offers the potential advantage of specific user knowledge to a tour operator.  Facebook IPR, Ex.

82

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

1002 ¶ 99.  As Petitioner points out, GPS information alone may not be indicative of user awareness, as a user may be facing away from a landmark or may not have noticed it.  Facebook Pet. Reply 22.  These advantages offered by Wolfe to Lamont support the rationale to combine the references. *See KSR,* 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

The evidence also supports Petitioner's showing that the prior references are combinable with advantages and a reasonable expectation of success.  Rather than having limited user feedback as Patent Owner argues, the Petition indicates, and the reference supports, that Lamont discloses that its client device may be a mobile phone or a mobile PC client device 200. Facebook Pet. 51 (citing Facebook IPR, Ex. 1003, 8:54–55; Facebook IPR, Ex. 1002 ¶ 159).  Wolfe also discloses the use of mobile phones that "include[e] a display or graphical user interface and internet accessibility." Facebook Pet. Reply 18–19 (citing Facebook IPR, Ex. 1004, 3:4–7; Facebook IPR, Ex. 1002 ¶ 57).  Contrary to Patent Owner's arguments, the evidence thus indicates that the prior art references use similar devices.  So although Patent Owner argues that under an embodiment in Lamont there is only limited user feedback provided (*see* Facebook PO Resp. 47–48 (citing Facebook IPR, Ex. 1003, 20:55–62), this argument does not take into account Lamont's enhanced user capabilities with a mobile phone.  Patent Owner does not point to evidence that the techniques of Wolfe could not have been incorporated into Lamont, and Mr. Schmandt provides testimony that the incorporation would have offered advantages, as discussed above, and would have been implementable.  Facebook IPR, Ex. 1002 ¶¶ 99, 101.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Further, we credit the testimony of Mr. Schmandt that a skilled artisan would have had a reasonable expectation of success of the combination of Lamont and Wolfe where "[f]rom an implementation standpoint, [Wolfe's] functionality could have been readily incorporated into the 'tour scripts' executed at the client device in Lamont," in view of the similarity of the user devices.  Facebook IPR, Ex. 1002 ¶ 101.

As to the third issue, Patent Owner alleges that Facebook uses differing evidence for the required "content piece" in different limitations. Facebook PO Resp. 57–61.  Patent Owner contends that Petitioner relies on Lamont's "media clip" for its assertions of a "content piece" for its assertions for part of limitations 1[b] and 1[f].  *Id*. at 58 (citing Facebook Pet. 14–15, 37).  Patent Owner argues that Facebook then refers to Wolfe's disclosures for some of the language of limitations 1[b] and 1[g].  *Id*. at 58–59 (citing Facebook Pet. 18; Facebook IPR, Ex. 2010 ¶ 149).  Patent Owner contends that although Petitioner discusses Lamont, Petitioner discusses the "expected response" "in the context of Wolfe's treasure hunt games with a 'content piece' presented by a 'trigger condition' in a 'set of rules' and a 'content package' that all come from one of Wolfe's treasure hunt games." *Id*. at 59 (citing Facebook Pet. 18–20; Facebook IPR, Ex. 2010 ¶ 150). Patent Owner argues that "Lamont's treasure hunts (hunts for the required locations) are not the same as Wolfe's treasure hunt games (puzzles at physical locations), so any such alleged 'content packages'—including the constituent 'content piece'—would not be identical."  *Id*.

The evidence supports that Facebook consistently relies on the "media clip" of Lamont as the claimed "content piece."  Facebook Pet. 14, 15, 17, 18, 37, 38, 41.  Moreover, Facebook relies on Wolfe to teach the "expected response" in the claim limitations.  *See id*. at 18.  We do not discern

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

inconsistencies in the Petition on this issue; instead Patent Owner is relying on an incorrect assumption that Facebook's argument relies on bodily incorporating Wolf into Lamont's disclosure.

Accordingly, we determine that Facebook has demonstrated that the combination of Lamont, Wolfe, and Wang teaches limitations 1[g]–1[i] and sufficient rationale to combine the references has been demonstrated.

### (6) Conclusion

Having considered the arguments and evidence, we determine that Facebook has shown by a preponderance of the evidence that the combination of Lamont, Wang, and Wolfe renders obvious claim 1 of the '599 patent.

### ii. Independent Claims 12 and 19

For the challenges to claims 12 and 19, Facebook relies on similar evidence and argument to that presented for claim 1. Facebook Pet. 49, 50–55. Patent Owner presents the same arguments for these claims as those presented for claim 1, which we address above. *See* Facebook PO Resp. 27–61.

We have reviewed the evidence and argument and on this record we determine that Facebook has shown by a preponderance of the evidence that the combination of Lamont, Wang, and Wolfe renders obvious claims 12 and 19 of the '599 patent.

### iii. Dependent Claims 4, 6, 7, 10, 11, 15, 17, 18, 22, 24, and 25

Facebook presents evidence and argument in support of its contentions that dependent claims 4, 6, 7, 10, 11, 15, 17, 18, 22, 24, and 25 are rendered obvious by Lamont, Wolfe, and Wang. Facebook Pet. 42–56. For claim 4, Facebook asserts that Lamont discloses "how a tour designer

85

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

can create a guided tour specifying content that to present based on certain conditions relating to contextual information." *Id.* at 42. Facebook further contends that "[t]he step of 'creating one or more context entries in a context manager,' occurs in Lamont when the tour designer uses the tour script software to create a tour script trigger point that specifies conditions." *Id.* at 43. For claim 6, Facebook argues that Lamont teaches a "high-level abstraction" by two pieces of information that are contained in a trigger point. *Id.* at 45. For claim 7, Facebook asserts that Lamont teaches that rules determine the tour which include a trigger component associated with a high-level abstraction. *Id.* at 48. For claim 10, Facebook contends that in Lamont "contextual information" can include time information, velocity, direction and other parameters. *Id.* For claim 11, as asserted for claim 1, Facebook contends that in Lamont the "content piece" can be a video or audio clip. *Id.* at 49. For claims 15, 17, 18, and 22, Facebook asserts that these claims are not materially different than claim 4, and are obvious for the same reasons. *Id.* at 50, 55–56. For claims 24 and 25, Facebook asserts that these claims are not materially different than claim 10, and are obvious for the same reasons. *Id.* at 56.

Patent Owner presents no arguments specific to these claims. *See* Facebook PO Resp. 27–61.

We have reviewed the evidence and argument and on this record we determine that Facebook has shown by a preponderance of the evidence that the combination of Lamont, Wang, and Wolfe renders obvious claims 4, 6, 7, 10, 11, 15, 17, 18, 22, 24, and 25 of the '599 patent.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> 6. *Asserted Obviousness of Claim 9 Over Lamont, Wolfe,*
> *Wang, and Belimpasakis*

Petitioner contends that claim 9 is unpatentable under 35 U.S.C.
§ 103(a) as obvious over Lamont, Wolfe, Wang, and Belimpasakis.
Facebook Pet. 56–61. In support, Petitioner also relies upon the Schmandt
Declarations. Facebook IPR, Ex. 1002, 1016.

We begin our discussion with a brief summary of Belimpasakis and
then address the evidence and arguments presented.

> *a. Belimpasakis (Facebook IPR, Ex. 1007)*

Belimpasakis is generally directed to methods and systems for content
sharing. Facebook IPR, Ex. 1007, code (57). In particular, Belimpasakis
describes a method of a user sharing content by the user selecting one to
share the content with and the device will determine all necessary protocols
and configuration for sharing the content. *Id*. at code (57), 4:56–5:1.

> *b. Analysis*

Claim 9 recites the method of claim 1, "wherein presenting the
content piece comprises sharing the content piece with a remote device."
Facebook IPR, Ex. 1001, 24:26–28. Facebook contends that claim 9 would
have been obvious over the combination of Lamont, Wolfe, and Wang in
further view of Belimpasakis. Facebook Pet. 56–61. Facebook asserts that
Belimpasakis describes several techniques for sharing content with a remote
device, including sending content through email or instant messaging using a
mobile phone. *Id*. at 57 (citing Facebook IPR, Ex. 1002 ¶ 176, n.6;
Facebook IPR, Ex. 1007, 1:27–50). Facebook also refers to Belimpasakis's
disclosure of content sharing using a personal resource file that allows a
sender to share content by selecting a recipient and the device obtains the
content and sends it. *Id*. (citing Facebook IPR, Ex. 1007, 4:34–55, 7:22–28,

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

7:37–39).  Facebook asserts that a person of ordinary skill in the art would have been motivated to combine Belimpasakis with Lamont, Wolfe, and Wang because Belimpasakis provides an express motivation, stating, "[p]eople want to be able to share their content on many different levels with others including, for example, their family, friends and colleagues."  *Id*. at 59 (citing Facebook IPR, Ex. 1007, 1:19–23).  Facebook asserts that a person of ordinary skill would have been motivated "to allow guided tour users to share the content with which they are presented during a tour."  *Id*. (citing Facebook IPR, Ex. 1002 ¶ 181).

Patent Owner presents no arguments specifically related to this claim. *See generally* Facebook PO Resp.; Facebook PO Sur-reply.

We have reviewed the evidence and argument and on this record we determine that Facebook has shown by a preponderance of the evidence that the combination of Lamont, Wang, Wolfe, and Belimpasakis renders obvious claim 9 of the '599 patent.

### 7. *Asserted Obviousness Grounds With Meyers*

Petitioner contends that claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 are unpatentable under 35 U.S.C. § 103(a) as obvious over Lamont, Wolfe, Wang, and Meyers and claim 9 as obvious over Lamont, Wolfe, Wang, Belimpasakis, and Meyers.  Facebook Pet. 61–66.  Petitioner relies on Meyers as an additional ground for the teaching of the "content package" recited in the independent claims.  *Id*. at 61.

Because we have determined that claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 are rendered obvious over Lamont, Wolfe, Wang, and Meyers and claim 9 is rendered obvious over Lamont, Wolfe, Wang, and Belimpasakis, we need not reach these other grounds for unpatentability of these claims.  *See SAS,* 138 S. Ct. at 1359.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> *F. Conclusion As To Facebook's Challenges To Claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 of the '599 Patent*

For the foregoing reasons, we conclude that Facebook has shown by a preponderance of the evidence that claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 of the '599 patent are unpatentable.  In summary:

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | 103(a) | Lamont, Wolfe, Wang | 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | |
| 9 | 103(a) | Lamont, Wolfe, Wang, Belimpasakis | 9 | |
| 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | 103(a) | Lamont, Wolfe, Wang, Meyers[20] | | |
| 9 | 103(a) | Lamont, Wolfe, Wang, Belimpasakis, Meyers[21] | | |
| **Overall Outcome** | | | 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | |

---

[20] As explained above, because we determine challenged claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 are rendered obvious by Lamont, Wolfe, and Wang, we need not address the obviousness ground for these claims.

[21] As explained above, because we determine challenged claim 9 is rendered obvious by Lamont, Wolfe, Wang, and Belimpasakis, we need not address the obviousness ground for this claim.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

## V. TWITTER'S CHALLENGES TO CLAIMS 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, AND 25 OF THE '599 PATENT

### A. Procedural Background

Twitter filed two petitions challenging claims of the '599 patent; one in IPR2021-01458 ("Twitter IPR" or "1458 IPR"), and one in IPR2021-01459 ("1459 IPR"). The Petition in the 1458 IPR (1458 IPR, Paper 3, "Twitter Pet.") challenges claims 1, 4, 6, 7, 9–12, 15, 17, and 18 of the '599 patent, and the Petition in the 1459 IPR (1459 IPR, Paper 3, "Twitter2 Pet.") challenges claims 19, 22, 24, and 25 of the '599 patent. The 1459 IPR was consolidated with the 1458 IPR. *See* Twitter IPR, Papers 11, 12, 14.

Pursuant to 35 U.S.C. § 314(a), on April 6, 2022, in the consolidated case, we instituted *inter partes* review on the following grounds:

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

| Claim(s) Challenged | 35 U.S.C § | Reference(s)/Basis |
|---|---|---|
| 1, 6, 7, 9–12, 17–19, 24, 25 | 103(a)[22] | PALLAS[23] |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Yau[24] |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Kim[25] |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Yau, Kim |

Twitter Pet. 12; Twitter2 Pet. 12; Twitter IPR, Paper 11 ("Twitter Inst. Dec."); Paper 14 (Twitter2 Inst. Dec.").

Patent Owner filed a Patent Owner Response ("Facebook PO Resp."). Twitter IPR, Paper 25. Patent Owner also filed a Declaration of David Martin, Ph.D. with the Response to support its positions. Twitter IPR, Ex. 2013. Twitter filed a Reply ("Twitter Pet. Reply") to the Patent Owner Response. Twitter IPR, Paper 28. Twitter also filed a Declaration and Reply Declaration of Dr. Don Turnbull. Twitter IPR, Ex. 1003, Ex. 1025.

---

[22] 35 U.S.C. § 103 (2006), amended by Leahy–Smith America Invents Act, Pub. L. No. 112-29 § 103, sec. (n)(1), 125 Stat. 284, 287, 293 (2011) (effective Mar. 16, 2013). This version of § 103 applies because the effective priority date of the '599 patent is before the effective date of the AIA amendments. *See* Twitter, Ex. 1001, code (22) (filing date of December 2, 2008).

[23] Sobah Abbas Petersen & Jan-Kristian Markiewicz, *PALLAS: Personalized Language Learning on Mobile Devices*, 5th IEEE Int'l Conf. Wireless, Mobile & Ubiquitous Tech. Educ. 52 (Mar. 23–26, 2008) (Twitter, Ex. 1004).

[24] Jane Yau & Mike Joy, *A Context-aware and Adaptive Learning Schedule Framework for Supporting Learners' Daily Routines*, 2d Int'l Conf. Sys. (2007) (Twitter, Ex. 1005).

[25] InSu Kim et al., *CAST$_{middleware}$, Security Middleware of Context-Awareness Simulation Toolkit for Ubiquitous Computing Research Environment*, 344 Lecture Notes Control & Info. Sci. 506 (2006) (Ex. 1006).

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Patent Owner filed a Sur-reply to Petitioner's Reply ("Twitter PO Sur-reply"). Twitter IPR, Paper 36.

An oral hearing was held on January 11, 2023. A transcript of the hearing is included in the record. Twitter IPR, Paper 49 ("Twitter Tr.").

### B. Related Matters

Both parties are involved in the following related U.S. district court case that involves the '599 patent: *Palo Alto Research Center Inc. v. Twitter, Inc.*, No. 2-20-cv-10754-AB (C.D. Cal. filed Nov. 25, 2020). Twitter Pet. 10; Twitter IPR, Paper 4, 2. The parties also identify the following related matters: *Palo Alto Research Center Inc. v. Facebook, Inc.,* No. 2:20-cv-10753-AB (C.D. Cal. filed Nov. 25, 2020); *Palo Alto Research Center Inc. v. Snap Inc.*, No. 2:20-cv-10755-AB (C.D. Cal. filed Nov. 25, 2020). Twitter Pet. 10–11; Twitter IPR, Paper 4, 2–3.

As discussed above, claims of the '599 patent are also challenged in the Snap and Facebook IPRs.

### C. The '599 Patent

The '599 patent is titled "Context And Activity-Driven Content Delivery And Interaction" and issued on July 16, 2013, from an application filed on December 2, 2008. Twitter IPR, Ex. 1001, codes (22), (45), (54).

As indicated above, the '599 patent is directed to "a computing device that delivers personally-defined context-based content to a user." Twitter IPR, Ex. 1001, code (57). The '599 patent states that

> [t]his computing device receives a set of contextual
> information with respect to the user, and processes
> the contextual information to determine whether
> some aspect of the current context can be associated
> with a probable activity being performed by the

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> user.    The computing device then determines
> whether either or both the context and current
> activity of the user satisfy a trigger condition which
> has been previously defined by the user.  If so, the
> computing device selects content from a content
> database, based on the context or activity, to present
> to the user, and presents the selected content.

Facebook IPR, Ex. 1001, 1:52–62.  Figure 1, reproduced below, illustrates a

content management system in accordance with the invention.  *Id*. at 2:54–

55.



**FIG. 1**

As depicted in Figure 1, above, content management system 100 presents

content 112 to a user.  Twitter IPR, Ex. 1001, 5:18–19.  Content 112 can be

presented in response to actions being performed by the user, or in

accordance with other information associated with the user.  *Id*. at 5:18–21.

Content management system 100 allows a user to create and store content,

and associate the content with a given user-defined context.  *Id*. at 5:21–23.

For instance, content management system 100 can remind a user to buy

groceries as the user is driving past a grocery store after work or can read

specific items on a grocery list to a user when walking across a specific

grocery store aisle.  *Id*. at 5:28–32.  Input mechanism 102 receives user input

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

101, content manager 104 controls how content 112 is stored in content database 106 and how it is selected for playback, and content delivery mechanism 108 controls how content 112 is presented to a user. *Id.* at 5:36–57.

### D. Illustrative Claim

Twitter challenges claims 1, 4, 6, 7, 9–12, 15, 17, 18, 19, 22, 24, and 25 of the '599 patent. Claims 1, 12, and 19 are the only independent claims, and claim 12 is reproduced below, with bracketed reference notations added to the limitations for reference purposes.[26]

12. A computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method for delivering context-based content to a first user, the method comprising:

[12.1] receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;

[12.2] receiving a set of contextual information with respect to the first user;

[12.3] processing the contextual information to determine a current context for the first user;

[12.4] determining whether the current context satisfies the trigger condition;

[12.5] in response to the trigger condition being satisfied, presenting the content piece to the first user;

[12.6] receiving a response from the first user corresponding to the presented content piece;

[12.7] determining whether the received response matches the expected response; and

---

[26] We use Twitter's reference notations.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> [12.8] performing an action based on an outcome of the
> determination.

Twitter IPR, Ex. 1001, 24:40–63.

### E. Analysis

#### 1. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and
evidence advanced by Twitter demonstrated a reasonable likelihood that
claims 1, 4, 6, 7, 9–12, 15, 17, 18, 19, 22, 24, and 25 of the '599 patent
would have been unpatentable as obvious under 35 U.S.C. § 103.  Twitter
Inst. Dec. 14–30; Twitter2 Inst. Dec. 15–30.  Here, we determine whether
Twitter has established by a preponderance of the evidence that the
challenged claims are obvious.  35 U.S.C. § 316(e).  We previously
instructed Patent Owner that "Patent Owner is cautioned that any arguments
not raised in the response may be deemed waived."  Twitter IPR, Paper 13, 8
see also 37 C.F.R. § 42.23(a) ("Any material fact not specifically denied
may be considered admitted."); In re NuVasive, Inc., 842 F.3d 1376, 1379–
82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in
the preliminary response by not raising the same argument in the patent
owner response).  Additionally, the Board's Trial Practice Guide states that
the patent owner response "should identify all the involved claims that are
believed to be patentable and state the basis for that belief."  Consolidated
Trial Practice Guide, 66 (November, 2019).[27]

On the record before us, we note that we have reviewed arguments
and evidence advanced by Twitter to support its unpatentability contentions,

---

[27] Available at https://www.uspto.gov/sites/default/files/documents/
tpgnov.pdf.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

where Patent Owner chose not to address certain limitations in its Patent Owner Response. In this regard, the record contains persuasive arguments and evidence presented by Twitter regarding the manner in which the prior art teaches the corresponding limitations of claims 1, 4, 6, 7, 9–12, 15, 17, 18, 19, 22, 24, and 25 of the '599 patent, as well as a rationale to combine the prior art references.

### 2. Level of Ordinary Skill in the Art

Relying on Dr. Turnbull's testimony, Twitter argues that a person of ordinary skill in the art "would at minimum have a bachelor's in software, computer, or electrical engineering or computer science with at least two years' experience in software development, including with respect to context-aware devices and systems, or the equivalent." Twitter Pet. 13–14 (citing Twitter IPR, Ex. 1003 ¶ 24). Twitter also contends that "[a]dditional graduate education could substitute for professional experience, or significant experience in electronic messaging could substitute for formal education." *Id*. at 14 (citing Twitter IPR, Ex. 1003 ¶ 24).

For this proceeding, Patent Owner and Dr. Martin apply this level of skill in the art. Twitter PO Resp. 12; Twitter IPR, Ex. 2013 ¶ 25. Because it is consistent with the '599 patent and the asserted prior art, we adopt Twitter's proposed level of ordinary skill in the art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### 3. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

principles set forth by our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Patent Owner makes similar arguments to those made in the Snap and Facebook cases, discussed above. More specifically, Patent Owner asserts that the limitation "determin[ing/e] whether the received response matches the expected response," recited in independent claims 1, 12, and 19, requires the possibility of expected and unexpected responses in view of the claim terms, Specification, and prosecution history. Twitter PO Resp. 16–27. Patent Owner asserts that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to content must be possible." *Id.* at 17. Patent Owner argues that the Board's determination in the Decision on Institution was in error, and "[t]he 'determin[ing/e]'" limitation requires the possibility of an unexpected response (and the final 'perform[ing]' limitation relies on the result of the 'determin[ing/e] limitation." *Id.* at 15 (citing Twitter Inst. Dec. 26).

Patent Owner relies on the claim language itself and, more specifically, limitations 12.1 and 12.6–12.8, stating that these recitations mean that "a content package must include content and a set of rules, and the

97

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

set of rules must include at least one expected response related to the content," and "requires receiving a response to presented content, determining [] that [the] response matches at least one expected response, and then performing some action based on the determination." Twitter PO Resp. 17. Patent Owner argues that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to content must be possible. There would be no need for the determination limitation if no unexpected responses were possible; the claim would simply require performing an action associated with the received (and expected) response." *Id*. at 17. Patent Owner cites to case law in support of its assertion that interpretation of terms that render parts of claims superfluous is disfavored. *Id*. at 17–18 (citing e.g., *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1375 (Fed. Cir. 2005)). Patent Owner further contends that the claim language dictates that the determining step "requires the possibility of an unexpected (e.g., incorrect or undesired) response being received—to give meaning to the 'determin[e/ing] whether' language." *Id*. at 18 (citing Twitter IPR, Ex. 2013 ¶¶ 116–122). Dr. Martin testifies that "the system must determine whether the received response matches the expected response, or as the alternative demanded by the 'determining whether' claim, that the received response is unexpected" (Twitter IPR, Ex. 2013 ¶ 119).

Patent Owner asserts that the Specification of the '599 patent requires the possibility of expected and unexpected responses. Twitter IPR, PO Resp. 19–22. Patent Owner refers to Tables 1 and 2 of the Specification in support of the contention that there are actions specified "when a user

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

response is expected or correct" or "when a user response is unexpected or incorrect." *Id*. at 19–20 (citing Twitter IPR, Ex. 1001, 13:1–7, Tables 1, 2).

Patent Owner additionally refers to the prosecution file history of the '599 patent. Twitter PO Resp. 22–27. Patent Owner contends that the original claims do not refer to expected responses, determining if responses matched expected responses, or performing actions based on that determination. *Id.* at 23 (citing Twitter IPR, Ex. 1002, 56–64). After continued prosecution, including further amendments, a May 23, 2012, amendment was submitted that included limitations directed to determining if responses matched expected responses, or performing actions based on that determination, which are the same as those in the issued '599 patent. *Id.* at 23–25 (citing Twitter IPR, Ex. 1002, 348–362). Patent Owner refers to an agenda for applicant's May 9, 2012, interview with the examiner that states:

> the system receives a response from the user corresponding to the presented content, determines whether the response matches the defined expected response, and performs an action based on the outcome of the determination (see instant application, pars. [0062]- [0064]). For example, ***if the user fails to mimic the played audio signal correctly***, the system replays the audio file for the user (see instant application, par. [0056]).

Twitter IPR, Ex. 1002, 346 (quoted at Twitter PO Resp. 26). Patent Owner contends that because the "applicant called out handling unexpected responses (failure to mimic an audio signal) when discussing the relevance of the determination limitation," that a person of skill in the art would have understood this to require the possibility of both expected and unexpected responses. Twitter PO Resp. 26–27 (citing Twitter IPR, Ex. 2014 ¶¶ 131–135).

We do not agree with Patent Owner's assertion that the claim language requires an ability to determine whether a received response is an

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

expected response or an unexpected response. Limitation 12.7 does not recite this limitation, nor is the limitation required to give meaning to the claim. Patent Owner's view is inconsistent with limitation 12.1, which recites that the content package with a set of rules includes "an expected response," but there is no mention that an unexpected response is part of the content package. Although Patent Owner asserts that the claim requires the inclusion of a determination of whether a received response matches an unexpected response, that is not recited or suggested by the claim language itself. *See* Twitter PO Resp. 17–18; Twitter IPR, Ex. 2013 ¶¶ 116–122. In sum, the claim language indicates it determines whether there is a match of a received response with the expected response; however, the claim does not require determining whether there is a match of a received response with an unexpected response.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Turning to the Specification, Table 1 of the '599 patent is instructive and is reproduced below.

### TABLE 1

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpI.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHello.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHowDoYouDo.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |

### TABLE 1-continued

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpGoodnight.mp3 | >21:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpGoodmorning.mp3 | <10:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |

Twitter IPR, Ex. 1001, 10:57–11:9. The '599 patent explains that Table 1, above, presents an exemplary set of rules that correspond to a number of audio clips in Japanese for practicing pronunciations to a number of words. *Id*. at 11:11–15. The time column allows a user for specifying a time of day when content can be presented, the location column is for specifying a location for where content can be presented, and the state column is for specifying an action that the user can be performing when content is presented. *Id*. at 11:15–21. As an example, a user learning Japanese can program the content management system 240 to play "good morning" in Japanese when the user is moving around the bedroom before 10 AM, and to

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

play "goodnight" in Japanese when the user is entering or moving around
the bedroom after 9 PM.  Of note, the '599 patent explains that

> [t]he response column *allows a user to specify an expected
> response* to the presentation of content 253.  The action correct
> column allows a user to specify actions that content management
> system 240 can perform if the user provides a correct response.
> The action incorrect column allows a user to specify actions that
> content management system 240 can perform if the user does not
> provide a correct response (Ex. 1001, 11:27–33 (emphasis
> added)).

> An *action correct column entry* can obtain a value that specifies
> an action to be performed by content management system 240 in
> the event that the *user provides an expected response.*
> Furthermore, an *action incorrect column entry* can obtain a value
> that specifies an action to be performed by content management
> system 240 on the occasion that t*he user does not provide an
> expected response* (*id*. at 13:1–7 (emphasis added)).

These descriptions are consistent with the language of limitations 12.1
and 12.7 as recited, and as discussed above.  We further note that the
Specification only discloses determining whether a received response is
*expected* — and the received response may or may not be the expected
response.  *See* Twitter IPR, Ex. 1001, 11:27–33; 12:50–13:10; 13:67–14:11.
Patent Owner does not identify in the Specification, nor do we discern, any
disclosure of determining whether a received response is an "*unexpected*
response." *See generally* Twitter PO Resp.;  Twitter PO Sur-Reply.

Although Patent Owner asserts that there is support in the
Specification for its interpretation of the "determining" limitation, we are not
persuaded.  More specifically, Patent Owner contends that Tables 1 and 2 of
the Specification "show actions to be taken when a user response is
correct/expected and incorrect/unexpected." Twitter PO Resp. 19–21.  Dr.
Martin testifies that "references to 'action correct' and 'action incorrect'

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

indicate that the system being described will determine whether the received response is correct or incorrect." Twitter IPR, Ex. 2013 ¶ 124. We do not agree with Patent Owner's assertions because they are premised on the characterization of the claimed "received response" as either "expected response" or "unexpected" which is "considered incorrect." This is not what the Specification discloses and what is claimed—instead, as discussed above, the "*received response*" is checked to determine if it matches the "*expected response*," and an action is performed based upon that determination.

Patent Owner also asserts that "[f]or the determination limitation to have any meaning, both expected and unexpected user responses to content must be possible," otherwise, "[t]here would be no need for the determination limitation if no unexpected responses were possible." Twitter PO Resp. 17. We agree with Twitter, however, that even if Patent Owner were correct that "the claims could have accomplished the same ultimate results in a different way this does not change that, as drafted, the claims do not require unexpected responses." Twitter Pet. Reply 4. As discussed above, the claim and Specification only require a determination of whether a received response matches an *expected response*.

Patent Owner additionally argues that the prosecution history supports the inclusion of "unexpected response" into the claim. We do not agree. During prosecution of the '599 patent, the independent claims were amended to add "determining whether the received message matches the expected response." *See* Twitter IPR, Ex. 1002, 349. The amendments are directed to matching the "expected response" — there is no mention or suggestion of an "unexpected response" that is considered or determined. Patent Owner also refers to a statement made by the applicant that states that "the system

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

receives a response from the user corresponding to the presented content,
[and] determines whether the response matches the *defined expected
response*," and then "if the user fails to mimic the played audio signal
correctly, the system replays the audio file for the user." Twitter IPR,
Ex.1002, 346. This discussion does not mention any consideration or
determination of an unexpected response, but rather only identifies an action
taken based only on the determination of whether there is a match of the
received response and the expected response. *See id.* ("the system receives a
response from the user corresponding to the presented content, determines
whether the response matches the predefined expected response, and
performs an action based on the outcome of the determination.").

In view of the evidence and argument as discussed above, our view is
that Patent Owner's assertions that "unexpected response" should be
included in the clam term amounts to impermissibly attempting to write a
limitation into the claim. Accordingly, we decline to adopt Patent Owner's
proposed interpretation of the "determin[e/ing ] whether the received
response matches the expected response " to require the possibility of
expected and unexpected response and instead adopt the plain meaning of
the claim term.

We determine that we need not expressly construe any other claim
terms to resolve the parties' disputes on the current record. *See Nidec Motor
Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed.
Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999))).

### 4. Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness.[28] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 5. Asserted Obviousness of Claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 Over PALLAS and Yau

Twitter contends that claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 are unpatentable under 35 U.S.C. § 103 as obvious over PALLAS and Yau. Twitter Pet. 14–100; Twitter2 Pet. 18–98. In support, Twitter also relies upon the Turnbull Declarations. *See* Twitter IPR, Ex. 1003; Twitter IPR, Ex. 1025. Patent Owner argues that the prior art does not teach all the limitations of the claims and hindsight has been employed in combining the prior art. *See* Twitter PO Resp. 27–49. In support, Patent Owner also relies on the Martin Declaration. Twitter IPR, Ex. 2013.

---

[28] The parties present no evidence relating to objective indicia of nonobviousness.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

We begin our discussion with brief summaries of PALLAS and Yau, and then address the evidence and arguments presented.

### a. PALLAS (Twitter IPR, Ex. 1004)

PALLAS is an article associated with the Fifth IEEE International Conference on Wireless, Mobile, and Ubiquitous Technology in Education, held from March 23–26, 2008.  Twitter IPR, Ex. 1003 ¶ 70; Twitter IPR, Ex. 1004, 52; Twitter IPR, Ex. 1014 ¶ 11.  According to Mr. MacPherson's testimony, copies of the article were "made available no later than the last day of the conference."  Twitter IPR, Ex. 1014 ¶ 11.  The article bears a copyright notice dated 2008 (Twitter IPR, Ex. 1004, 52) and Twitter argues that the article was available and searchable on the IEEE Xplore website on April 15, 2008.  Twitter Pet. 14.

PALLAS describes a system that "enables real life language learning scenarios by providing personalized and contextualised access to learning resources via a mobile device."  Twitter IPR, Ex. 1004, 52.  The system includes a central server that communicates with students' mobile devices and with various providers of language-learning content (such as teachers or publishing houses).  *Id.* at 55, 58, Fig. 2.  The mobile device includes a "mobile smart client" that is responsible for presenting the learning content to the student.  *Id.* at 56.  Content modules for the mobile client may include "[Point of Interest] Info," "Task," "MP Quiz," "Word Fill-in," "Glossary Training," and "Text."  *See id.* at Fig. 3. An example of the mobile client application is reproduced below in PALLAS's Figure 4:

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2



## Figure 4. Mobile client: activities for the learner

Figure 4 of PALLAS, above, "shows the main window of the PALLAS mobile client." Twitter IPR, Ex. 1004, 57. It shows a menu with the following content items: "Perform Query," "Tasks," "Exercises," "Texts," "Results," and "Dictionary." Also, "[a] context bar is displayed on the top of the window, which displays the current learner." *Id.* Immediately to the right of the context bar is a world icon that "indicates if the current location is known" (shown here with a cross indicating that the location is unknown). *Id.*

The system allows the learning experience to be personalized based on the learner's context, "using the profile of the learner and environmental parameters." Twitter IPR, Ex. 1004, 54. "Environmental parameters include location, time and day and the mobile device that is used by the learner." *Id.*; *see also id.*, Fig. 1 (including weather as an environmental parameter). "The mobile client also displays triggers that are fired based on the context information." *Id.* at 57. For example, the system can include

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

"[c]ontext triggers [that] provide automatic notifications to the learner if the learner is in the vicinity of a point of interest." *Id*. This is illustrated below in Figure 6 of PALLAS, reproduced below:



**Figure 6. Mobile client: context trigger**

The illustration in reproduced Figure 6, above, shows an example mobile client screen in which "the learner is in the vicinity of an exhibition that fits the profile of the learner." Twitter IPR, Ex. 1004, 57. The world symbol next to the context bar is marked to indicate "that the location is known." *Id*. A notice on the screen tells the learner that they are "in the vicinity of the French art exhibition held at the ArtIt Gallery," and provides the address of the exhibit. *Id*. The notice also provides a "Read more" button and states, "Press 'Read More' for information about French artists." *Id*.

>    b. *Yau (Twitter IPR, Ex. 1005)*

Yau is entitled "A Context-aware and Adaptive Learning Schedule Framework for Supporting Learners' Daily Routines." Twitter IPR, Ex. 1005, 1. Twitter contends that the authors presented Yau to the Second

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

International Conference on Systems of IEEE in 2007, and that the article
was published and searchable on the IEEE Xplore website on May 7, 2007.
Twitter Pet. 19 (citing Twitter IPR, Ex. 1003 ¶¶ 78–82; Twitter IPR,
Ex. 1016 (stating that the article was added to IEEE Xplore on May 7,
2007); Twitter IPR, Ex. 1017, 8, 24).

Yau's learning system "makes use of a learning schedule to support
the students' daily routines, adapts the activities to the student's learning
styles and then selects the appropriate activity for the learner based on their
current learning context." Twitter IPR, Ex. 1005, 1. Learning activities may
include "[f]ormal assessments" which Yau describes as a type of
"compulsory activit[y]." *Id.* at 4.

In Yau, the contextual information comes from a "scheduled events
database (such as the time available for learning and the type of location),
and two sensors, namely GPS for location detection and a microphone for
noise detection." Twitter IPR, Ex. 1005, 3, Fig. 1; *see also id.* at 5
(suggesting the use of other sensors to detect light levels and temperature).
From this contextual information, Yau's system determines "the current
context that the learner is situated in," such as "the actual physical address of
the location," the type or category of location, the time available for learning
based on the student's schedule, and the noise level. *Id.* at 5.

Yau's system also includes "context-triggered actions," in which
actions are "invoked automatically when a contextual element or a mixture
of contextual elements are fulfilled." Twitter IPR, Ex. 1005, 3.

### c. Discussion

#### i. Claim 12

The Petition asserts that PALLAS and Yau render claim 12 obvious. Twitter Pet. 25–74. Below we consider the claim 12 limitations in turn.

#### (1) Preamble

The preamble of claim 12 recites "[a] computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method for delivering context-based content to a first user." Twitter IPR, Ex. 1001, 24:40–43. Twitter contends that PALLAS discloses a computer-readable storage medium as recited, either as part of its server or its mobile device. *See* Twitter Pet. 25–30, n.7 (citing Twitter IPR, Ex. 1001, 3:24–33, 3:42–49; Twitter IPR, Ex. 1003 ¶¶ 78, 94–121; Twitter IPR, Ex. 1004, 52, 55–58, Figs. 1–6).

Patent Owner presents no arguments specifically related to the preamble. *See generally* Twitter PO Resp.; Twitter PO Sur-reply.

We have reviewed the evidence and argument and on this record we determine that Twitter has demonstrated that PALLAS teaches the preamble of claim 12.[29]

#### (2) Limitation 12.1

Limitation 12.1 recites the step of "receiving at least one content package." Twitter IPR, Ex. 1001, 24:44. The content package must include "at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an

---

[29] We need not determine whether the preamble of claim 12 is limiting because Twitter has shown that PALLAS discloses the preamble. *See Nidec*, 868 F.3d at 1017.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece." *Id*. at 24:44–49. Twitter contends that PALLAS discloses this limitation, at least in combination with Yau. *See* Twitter Pet. 31–45, nn.8–10 (citing Twitter IPR, Ex. 1001, 4:61–5:8, 5:57–58, 10:8–9; Twitter IPR, Ex. 1003 ¶¶ 122–186; Twitter IPR, Ex. 1004, 53–58, Figs. 1–4, 6; Twitter IPR, Ex. 1005, 2–5).

In PALLAS, Twitter contends that the recited "content package" is the "set of 'data' including, e.g., (a) 'context trigger,' (b) 'exercise,' 'test,' 'MP Quiz,' and (c) answers to 'exercise,' 'test,' or 'MP Quiz.'" Twitter Pet. 31. Twitter identifies exercises, tests, or quizzes as the recited "content piece," and identifies the recited "expected response" as the correct answers in response to an exercise, test, or quiz. Twitter Pet. 31, 38–39, 44–45.

Twitter also argues that Yau discloses a trigger condition with respect to its learning content (e.g., its formal assessments), and that such triggering occurs when the system presents the content "automatically when a contextual element . . . [is] fulfilled." Twitter Pet. 37 (alterations in original) (quoting Ex. 1005, 5) (citing Ex. 1003 ¶¶ 153–164; Ex. 1005, 2–5). Twitter contends that "Yau explicitly discloses displaying 'formal assessments' based on user context" citing Yau's disclosure that "Sarah is in the library whilst Amy is in the computer lab. They would all like to undertake . . . learning activities based on their current learning situation . . . [Formal assessments] has been selected for Sarah and Amy." *Id*. at 43 (citing Twitter IPR, Ex. 1005, 4). According to Twitter, a person of ordinary skill in the art "would have understood [Yau's disclosure of formal assessments] as a disclosure of tests with answers for comparing against learner's responses to assess knowledge/performance/skill (contrasting 'un-assessed' exercises whose responses are unchecked)." *Id*. at 43. Twitter argues that an

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

ordinarily skilled artisan would have had reason "to implement PALLAS's context-trigger based content display using Yau's beneficial teachings of displaying assessments/questions based on context, and of particular context pattern triggers advantageously optimized for, e.g., quiz taking." *Id.* According to Twitter, this modification "would have been a routine implementation choice" for which there would have been a reasonable expectation of success. *Id.* (citing Twitter IPR, Ex. 1003 ¶¶ 178–180).

Patent Owner presents several arguments related to this limitation, which we discuss below. Twitter PO Resp. 28–49. We do not find that Patent Owner's arguments undermine Petitioner's showing of the teaching of limitation 12.1 by the prior art with articulated reasoning with rational underpinning to support the combination of prior art.

*(a) Combination of PALLAS and Yau*

We begin with Patent Owner's argument that the combination of PALLAS and Yau does not teach triggering exercises/tests/quizzes based on context. Twitter PO Resp. 39–44. Patent Owner argues that neither PALLAS nor Yau "trigger[s] (or render[s] obvious triggering) an exercise/test/quiz based on context." *Id.* at 39 (citing Twitter IPR, Ex. 2013 ¶¶ 82–83, 88, 142–151). Patent Owner asserts that "Yau discloses that the student indicates a desire to undertake a learning activity, but does not teach directly presenting anything like Yau's 'formal assessment.'" *Id.* at 39–40 (citing Twitter IPR, Ex. 1005, 4; Twitter IPR, Ex. 2013 ¶ 165). Patent Owner argues that "[o]nce the student decides to participate in a learning activity, Yau considers the student's learning style . . . and environment in order to determine what content to present to that student." *Id.* at 40 (citing Twitter IPR, Ex. 1005, 3; Twitter IPR, Ex. 2013 ¶¶ 161–162). Patent Owner also contends that Yau does not teach triggering the display of formal

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

assessments, nor triggering the display of PALLAS's exercises/tests/quizzes. *Id*. at 40 (citing Twitter IPR, Ex. 2013 ¶¶ 163–165). Dr. Martin testifies that "Yau only provides recommendations after a user has expressed interest in engaging in activity," and "Yau has no discussion of a contextual scenario that causes . . . a recommendation without being prompted by a user." Twitter IPR, Ex. 2013 ¶ 166 (citing Twitter Pet. 43; Twitter IPR, Ex. 1003 ¶ 178).

Patent Owner further asserts that "[t]he 'IF-THEN' and 'context-triggered approach'" "are not mentioned in the context of Yau's 'formal assessment[s],' but instead in the context of generic attributes Yau's designers wanted for their 'proposed system.'" Twitter PO Resp. 41 (citing Twitter IPR, Ex. 1005, 3, 5; Twitter IPR, Ex. 2013 ¶¶ 97–100).

We do not agree with Patent Owner's arguments. Yau discloses the following:

> Four users are considered in our sample scenario to illustrate our adaptation process: John – an active learner, Peter – a reflective
> learner, Sarah – a visual learner and Amy – a verbal learner. The activities will be adapted to the different learning styles, where appropriate. Some of the activities defined in our system are as follows –
>
> > A. Formal assessments
> > B. Un-assessed exercises
> > C. Pre-lecture notes
> > D. Learning from examples
> > E. Review activity
> > F. Discussion about work
>
> It is an hour prior to their lecture. John is commuting on a quiet train for an hour; Peter is commuting on a noisy bus also for an hour; Sarah is in the library whilst Amy is in the computer lab. They all would like to undertake some learning activities based on their current learning situation. B has been selected for

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> John as it is considered quiet enough for John to concentrate on
> the quiet train; C has been selected for Peter; and A has been
> selected for Sarah and Amy. In addition, a visual version of A
> has been selected for Sarah whereas a verbal version has been
> selected for Amy.

Twitter IPR, Ex. 1005, 3–4. We agree with Petitioner that Yau discloses that the presentation of exercises/tests/quizzes, such as Yau's formal assessments, are triggered based on context. We do not discern any disclosure in Yau that the display of a learning exercise is only prompted by the student indication of a desire to undertake a learning activity, as Patent Owner argues. Although Yau makes the general statement that "[t]hey [Peter, Sarah, Amy, John] all would like to undertake some learning activities based on their current learning situation" (Twitter IPR, Ex. 1005, 4), Yau's discussion above indicates that the presentation of the learning exercise is prompted by the student's context, that is, where they are at a certain time such as Amy being in the computer lab in the hour prior to a lecture. In further support, Yau discloses that "[w]hen the context has been identified and a context pattern is inferred, this information is combined with the filtered learning activities according to the learner's preferred learning styles, ***and context-aware learning activities <u>are output</u>***." Twitter Pet. Reply 17 (quoting Twitter IPR, Ex. 1005, 5; citing Twitter Pet. 22; Twitter IPR, Ex. 1003 ¶¶ 162, 465). This supports Twitter's assertion that there is presentation of a "context-aware learning activity" when a certain context has been identified, such as the presentation of a formal assessment to Amy, as Yau describes above, and Twitter relies upon. Twitter IPR, Ex. 1005, 4–5.

Thus, as Twitter asserts and in view of these disclosures, we agree with Twitter that "Yau accounts for 'learner's schedule[d] events,' 'available

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

time,' 'type of location,' and other contextual information to ***automatically determine*** whether users would like to undertake learning activities."
Twitter Pet. Reply 18 (citing Twitter IPR, Ex. 1005, 2 3, 5 ("A check . . . to see if the information from the database corresponds with the location sensor (i.e. a check on whether the learner is really keeping his/her schedule)."), Fig. 1; Twitter IPR, Ex. 1025 ¶ 49; Twitter IPR, Ex. 1003 ¶¶ 85, 157–162, 238, 435, 451, 517; Twitter Pet. 20–21). Accordingly, the evidence of record support that Yau teaches that context triggers the display of a content piece, such as an exercise/test/quiz.

Patent Owner also argues that Twitter asserts that PALLES' content piece is "'exercise[s],' 'test[s],' and/or 'MP Quiz[zes],'" but also contends that Yau's "formal assessment" is the claimed content piece. Twitter PO Resp. 32. Patent Owner argues that "Twitter points back to its limitation 12.1 PALLAS evidence for the purported 'content piece'" and also does not mention Yau for limitation 12.5 and 12.6 and "only conclusorily states that 'PALLAS in view of Yau renders obvious triggering an exercise/test/quiz.'" *Id*.

Patent Owner's arguments overlook Twitter's assertion, with Dr. Turnbull's supporting testimony, that a person of ordinary skill in the art would have understood that Yau's formal assessments are "tests with answers for comparing against learner's responses to assess knowledge/performance/skill (contrasting with 'un-assessed' exercises whose responses are unchecked)." Twitter Pet. 43; Twitter IPR, Ex. 1003 ¶ 154. Further, Patent Owner overlooks Petitioner's assertion that it is implementing PALLAS's context-triggerbased content display using Yau's teachings of displaying assessments/questions based on context. Twitter Pet. 43.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Patent Owner also asserts that in the PALLAS-Yau combination, Twitter does not explain how a person of ordinary skill in the art would have combined the prior art in the manner Petitioner alleges. Twitter PO Resp. 42. Patent Owner argues that "PALLAS says nothing about forcing quizzes, tests, or exercises on its users without the users asking for such exercises," and a person of skill would understand that the combined system still requires that a student select a learning activity and that PALLAS's system should be unobtrusive because learners "may have small time slots to engage in learning." *Id*. (citing Twitter IPR, Ex. 2013 ¶ 168; Twitter IPR, Ex. 1004, 54). Patent Owner further contends that "Twitter's conclusory, hindsight-driven statements" do not suffice and PALLAS teaches away from the modifications suggested by Twitter. *Id*. at 42–43 (citing Twitter IPR, Ex. 2013 ¶ 144). Patent Owner argues that because a learner may not have time to complete a test, a person of ordinary skill in the art would not be motivated to change PALLAS to trigger exercises/tests/quizzes based on location or time. *Id*. at 43 (citing Twitter IPR, Ex. 2013 ¶¶ 142–144).

The evidence of record does not support Patent Owner's arguments. As discussed, Petitioner relies PALLAS's content display using Yau's teachings of display of the content piece based on context, and, in particular, context pattern triggering of the display. Twitter Pet. 43. Petitioner asserts, with Dr. Turnbull presenting supporting testimony, that the combination offers advantages that would have motivated a person of ordinary skill in the art to use PALLAS's context-trigger-based content display with Yau's teachings of displaying assessments/questions based on context pattern triggers because of its advantageous optimization for quiz taking. Twitter Pet. 43; Twitter IPR, Ex. 1003 ¶ 179. Dr. Martin concurs, testifying that "[a]

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

person of ordinary skill in the art combining PALLAS with Yau would see that Yau allows for a more informed decision as to what to recommend to a user than PALLAS alone." Twitter IPR, Ex. 2013 ¶ 161.  Accordingly, Petitioner has presented articulated reasoning with rational underpinning to support the combination of prior art and the legal conclusion of obviousness. *KSR*, 550 U.S. at 418; *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

As to the alleged obtrusive nature of the Yau combination, Dr. Turnbull testifies that presenting learning resources in certain contexts is not obtrusive; rather it would allow "tailoring presentation of learning content to a user's context, including 'location,' 'date and time,' and 'leisure time,' by, e.g., only presenting content when the learner has sufficient 'time' to engage with it." Twitter IPR, Ex. 1025 ¶ 38.  Dr. Martin concurs that the combination allows recognition of a user's schedule, testifying that "the person of skill in the art would understand that PALLAS + Yau may send different or *improved* notifications than PALLAS alone, as the choice of notification would consider aspects such as the user's learning style or *schedule*." Twitter IPR, Ex. 2013 ¶ 162 (emphasis added).  As for Patent Owner's argument that Twitter does not explain how a person of ordinary skill in the art would have combined PALLAS and Yau, as Dr. Turnbull testifies, the combination is PALLAS's disclosure of triggering display of content based on context using Yau's teachings of particular context pattern, where it would be routine to do this implementation.  Twitter IPR, Ex. 1003 ¶ 179.  As Dr. Turnbull testifies, both PALLAS and Yau disclose such as environmental parameters such as "location, time and day" for PALLAS and GPS location detection and user time availability for Yau, and both systems use mobile user devices, so in view of the similarities of the prior art, we

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

credit Dr. Turnbull's testimony on implementation.  Twitter IPR, Ex. 1003
¶¶ 73, 76, 85; Twitter IPR, Ex. 1004, 57; Twitter IPR, Ex. 1005, 1.

Accordingly, the evidence of record supports that the combination of
PALLAS and Yau teaches triggering an exercise/test/quiz based on context.
The evidence further supports the rationale to combine the references.

*(b) Teaching of "Set of Rules" With
"Expected Response"*

Patent Owner asserts that Twitter fails to show that the prior art
teaches the limitation "receiv[ing/e] at least one content package" limitations
because it points to no "set of rules" that "includes a trigger condition and an
expected response."  Twitter PO Resp. 28–32.  Patent Owner argues that this
is not taught by the prior art because the limitation requires "a set of rules"
with both "a trigger condition" and "an expected response," and Twitter
points to nothing in Yau related to an "expected response," and instead
focuses on Yau's alleged teachings related to a "trigger condition" in a "set
of rules."  *Id*. at 30.  Patent Owner also asserts that Twitter does not identify
any PALLAS disclosure of receiving a "correct answer" or "correct
response," and not one as part of a "content package."  *Id*.

Patent Owner's arguments are premised on Yau teaching the
"expected response" in the claim, but the Petition relies on PALLAS for
disclosure of expected responses.  *See* Twitter Pet. 44 ("Regarding 'expected
response' in the content package received by PALLAS's mobile device, as
discussed PALLAS discloses the importance of responding and updating
skill levels when learner provides responses.").  The Petition further states
that PALLAS discloses "at least one content package (e.g., set of 'data'
including, e.g., (a) 'context trigger,' (b) 'exercise,' 'test,' 'MP Quiz,' and (c)
answers to 'exercise,' 'test,' or 'MP Quiz');" "a set of rules associated with

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

the content package, wherein the set of rules includes a trigger condition
(e.g., show content depending on package's 'context triggers'". . ." "and an
expected response (e.g., correct answers when user 'do[es] some tests or
exercises'; correct 'learner response')." *Id.* at 31–32 (citing Twitter IPR,
Ex. 1003 ¶¶ 122–133).

On the issue of whether the "expected response" includes a "correct
response," the Petition explains that "[r]egarding 'expected response' in the
content package . . . as discussed PALLAS discloses the importance of
responding and updating skill levels when learner provides responses."
Twitter Pet. 44. Dr. Turnbull identifies in PALLAS's disclosures that "[t]he
PALLAS system is designed to provide active personalisation where
personalisation is an ongoing process" and "the learner's skill level is
automatically updated every time the learner completes an exercise and the
learning content delivered to a learner at any time is matched against the
learner's current personal data." Twitter IPR, Ex. 1003 ¶ 151 (citing
Ex. 1004 ¶ 80). Dr. Turnbull refers to Figure 1 of PALLAS, reproduced
below.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2



Figure 1. Dynamic personalisation and
contextualisation parameters in PALLAS

Figure 1 of PALLAS, reproduced above, depicts a learner's profile including
the skill level of a learner. Twitter IPR, Ex. 1004, 54–55.

Dr. Turnbull testifies that a person of ordinary skill in the art would
have had knowledge that PALLAS's logging the results of completed
exercises/tests and updating the learner's skill level is important. Twitter
IPR Ex. 1003, 382. In the assessment, Dr. Turnbull testifies that PALLAS
discloses that a student is notified to "practice more" if they score poorly.
*Id.*, n.6 (referring to Twitter IPR, Ex. 1004, 54).

The evidence supports Petitioner's assertion that person of ordinary
skill in the art would find that PALLAS teaches that the set of rules includes
*expected responses* associated with a content package. PALLAS discloses,
for instance, that when a student is at a farmer's market the student may
select a "Glossary Test" on French names on vegetables in a mobile setting.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Twitter IPR, Ex. 1004, 53–54. After the test is completed the student may access the program via a desktop computer later in the day, and the student would be notified that "she should practice more on the vegetable glossary," which was the subject of the test. This notification indicates that PALLAS's program evaluated the expected responses compared to the answers provided and presents the assessment of the test to the student, therefore "expected responses" would be part of the set of rules.[30]

Moreover, we do not agree with Patent Owner that Twitter fails to show that in PALLAS the content package including a set of rules with an expected response is *received*. Twitter PO Sur-reply 1. PALLAS discloses that "[t]he learner's skill level is automatically updated every time the learner completes an exercise and the learning content delivered to a learner at any time is matched against the learner's current personal data" and "mobile learners engage in small chunks of learning and are likely to do this often, it is important that the personalisation data is updated after every time." Twitter IPR, Ex. 1004, 55. PALLAS discloses "[t]he mobile client also has local storage where data that is downloaded when a network connection is available can be cached." *Id*. at 56–57. Given the need for caching and importance of providing data updates, we agree that a person of ordinary skill in the art would have found it obvious to "combine and send the content piece (exercise/test/quiz, etc.), expected responses (correct answers), and set of rules (including the trigger condition) together to the mobile device as a content package." Twitter IPR, Ex. 1003, 381–382. Further, we agree with Dr. Turnbull's testimony that a mobile device would

---

[30] Note that, as discussed above, Twitter relies on Yau for the teaching of the context trigger for presentation of the test, in combination with PALLAS. *See* Twitter Pet. 37.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

necessarily "receive[] correct answers in order to be able to, *e.g.*, respond to learner responses to exercises/tests/quizzes and update skill levels . . ." *See* Twitter Pet. Reply 10 (citing Twitter IPR, Ex. 1003 ¶¶ 166, 167, 172, 460, 465).

Accordingly, we agree that the evidence of record supports that the combination of PALLAS and Yau teaches receiving a content package that includes a set of rules that includes an expected response.

### (c) Triggering the Presenting of the "Content Piece"

Patent Owner asserts that for limitation 12.1, Petitioner argues that the "content piece" is "exercise[s], test[s], and/or MP Quiz[zes]" of PALLAS, but then in response to the trigger condition being met, in limitations 12.5 and 12.6 a different "content piece" is presented. Twitter PO Resp. 22–23. We address this issue below in the discussion of limitation 12.5. As discussed below, we do not agree with Patent Owner's arguments on this issue.

### (d) Conclusion

We have reviewed the evidence and argument and on this record we determine that Twitter has demonstrated that the combination of PALLAS and Yau teaches limitation 12.1 and has presented articulated reasoning with rational underpinning for the combination.

### (3)     Limitation 12.2

Limitation 12.2 recites "receiving a set of contextual information with respect to the first user." Twitter IPR, Ex. 1001, 24:50–51. Twitter contends that both PALLAS and Yau teach this limitation because both references disclose receiving GPS and other contextual data to determine the student's location. *See* Twitter Pet. 45–51 (citing Twitter IPR, Ex. 1003

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

¶¶ 187–213; Twitter IPR, Ex. 1004, 54–58, Figs. 1–3, 6; Twitter IPR, Ex. 1005, 2–5). Twitter also argues that a person of ordinary skill in the art would "have found it at minimum obvious to implement PALLAS's system using further contextual information including information about noise levels surrounding the first user, based on PALLAS in view of Yau." Twitter Pet. 51.

According to Twitter, this combination "would advantageously permit PALLAS's smartphone and server to additionally receive contextual information regarding user/learner's environmental noise level, and available learning time, enabling further-customized content most appropriate to learner's context." Twitter Pet. 51–52 (citing Twitter IPR, Ex. 1003 ¶¶ 214–218; Twitter IPR, Ex. 1005, 3, 4, Fig. 1).

Patent Owner presents no arguments specifically related to limitation 12.2. *See generally* Twitter PO Resp.; Twitter PO Sur-reply.

We have reviewed the evidence and argument and on this record we determine that Twitter has demonstrated that the combination of PALLAS and Yau teaches limitation 12.2 and has presented articulated reasoning with rational underpinning for the combination.

### (4)    Limitations 12.3 and 12.4

Limitation 12.3 recites "processing the contextual information to determine a current context for the first user; [and] determining whether the current context satisfies the trigger condition." Twitter IPR, Ex. 1001, 24:52–55. Twitter alleges that PALLAS and Yau each disclose contextual information such as GPS location data, and that Yau discloses processing this data to "identif[y] the current context that the learner is situated in." Twitter Pet. 52–57 (quoting Twitter IPR, Ex. 1005, 5) (citing Twitter IPR,

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Ex. 1003 ¶¶ 225–239; Twitter IPR, Ex. 1004, 54–58, Figs. 1–3; Twitter IPR, Ex. 1005, 2–3, 5, Fig. 1).

According to Twitter, a person of ordinary skill in the art would have had reason "to implement PALLAS's functions . . . using Yau's advantageous teachings of receiving additional contextual information (beyond that described in PALLAS), such as noise level, and using it in determining a current context." Twitter Pet. 63. Twitter argues that this would "permit PALLAS to determine more details (beyond those PALLAS already collects) about [the] learner's current context . . . and whether that context matches the specified trigger conditions to present, *e.g.*, tests/exercises/quizzes most relevant/appropriate for [the] learner's context." *Id.* (citing Twitter IPR, Ex. 1004, 54).

Patent Owner presents no arguments specifically related to limitations 12.3 and 12.4. *See generally* Twitter PO Resp.; Twitter PO Sur-reply.

We have reviewed the evidence and argument and on this record we determine that Twitter has demonstrated that the combination of PALLAS and Yau teaches limitations 12.3 and 12.4 and has presented articulated reasoning with rational underpinning for the combination.

### (5)     Limitation 12.5

Limitation 12.5 recites the step of, "in response to the trigger condition being satisfied, presenting the content piece to the first user." Twitter IPR, Ex. 1001, 24:56–57. Twitter's arguments for this limitation mirror its arguments for limitation 12.1, which we discuss above. *See* Twitter Pet. 66–71 (citing Twitter IPR, Ex. 1003 ¶¶ 262–279; Twitter IPR, Ex. 1004, 55–57, Figs. 2, 3, 6). More specifically, Twitter asserts that "PALLAS discloses that in response to the trigger condition being satisfied

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

. . . presenting (*e.g.,* sending to be displayed/presented an 'exercise,' 'test,' or 'MP Quiz'; *see* cl. 12.1) the content piece." *Id*. at 66.

Patent Owner asserts that the "content piece" of PALLAS relied upon by Twitter for the teaching of limitation 12.1 is not the same as that relied upon in this limitation. Twitter PO Resp. 32–33. More specifically, Dr. Martin testifies that for limitation 12.1, Petitioner points to PALLAS's "'exercise[s],' 'test[s],' and/or 'MP Quiz[zes]'" as the "content piece." Twitter IPR, Ex. 2013 ¶ 139. Dr. Martin testifies that a problem is that "the only thing resembling a trigger condition disclosed in PALLAS is its 'context trigger' that leads to its Figure 6 notification," which is a notification that a learner is in the vicinity of an exhibit. *Id*. ¶ 140. As discussed above for limitation 12.1, however, the Petition explains that Yau considers the student's environment in order to determine what content to present to that student and "context-aware learning activities are output," including formal assessments. *See* Twitter Pet. 22; Twitter IPR, Ex. 1005, 4–5. Also as discussed for limitation 12.1, we agree with Petitioner's assertion that Yau's formal assessments are student tests. Accordingly, we do not discern an inconsistency in Petitioner's assertions.

Patent Owner presents no additional arguments specifically related to limitation 12.5. *See generally* Twitter PO Resp.; Twitter PO Sur-reply.

We have reviewed the evidence and argument and, for the reasons discussed above in the context of limitation 12.1, we determine that Twitter has demonstrated that the combination of PALLAS and Yau teaches limitation 12.5 and has presented articulated reasoning with rational underpinning for the combination.

### (6)    *Limitations 12.6–12.8*

Limitations 12.6–12.8 recite the following steps: "receiving a

125

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

response from the first user corresponding to the presented content piece; determining whether the received response matches the expected response; and performing an action based on an outcome of the determination." Twitter IPR, Ex. 1001, 24:58–63. Twitter contends that PALLAS discloses these limitations in light of the teachings of Yau, and in particular that PALLAS presents a test, exercise, or quiz to the learner and receives and determines whether the learner responses matches the expected responses, ultimately performing follow-up actions based on the results of the text, exercise, or quiz. *See* Twitter Pet. 66–74, n.12 (citing Twitter IPR, Ex. 1003 ¶¶ 280–294, 297; Twitter IPR, Ex. 1002, 360, 414, 450; Twitter IPR, Ex. 1004, 53–55, 57).

Patent Owner argues that the claims require the possibility of expected and unexpected results and Petitioner does not demonstrate that there is an unexpected response taught in PALLAS. Twitter PO Rep. 45–49. This argument fails because, as discussed *supra* Section V.E.3, we have not adopted Patent Owner's proposed claim construction requiring that the limitation requires both expected and unexpected responses. Moreover, we agree with Petitioner that, as discussed above in Section V.E.5.c.i.(b), PALLAS discloses that a learner's skill level will be updated every time a learner completes an exercise. Twitter Pet. 39–40; Twitter IPR, Ex. 1003 ¶ 290. Accordingly, we agree with Petitioner that a learner would respond with both expected responses (determined to be correct) and unexpected responses (determined to be incorrect). Twitter Pet. Reply 26–27; Twitter IPR, Ex. 1003 ¶¶ 30, 77, 151, 289–291, 445, 565–568; Twitter IPR, Ex. 1025 ¶ 58; Twitter IPR, Ex. 1004, 53–55 (disclosure of skill level determination and automatic updates, direction to learner to "practice more").

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Accordingly, we agree that the evidence of record supports that the combination of PALLAS and Yau teaches limitations 12.6–12.8 and Petitioner has presented articulated reasoning with rational underpinning to support the combination of prior art.

### (7) Conclusion

Having considered the arguments and evidence, we determine that Twitter has shown by a preponderance of the evidence that the combination of PALLAS and Yau renders obvious claim 12 of the '599 patent.

### ii. Independent Claims 1 and 19

For the challenges to claims 1 and 19, Twitter relies on similar evidence and argument to that presented for claim 12. Twitter Pet. 84; Twitter2 Pet 29–89. Patent Owner presents the same arguments for these claims as those presented for claim 12, which we address above. *See* Twitter PO Resp. 27–49.

We have reviewed the evidence and argument and on this record we determine that Twitter has shown by a preponderance of the evidence that the combination of PALLAS and Yau renders obvious claims 1 and 19 of the '599 patent.

### iii. Dependent Claims 4, 6, 7, 9–11, 15, 17, 18, 22, 24, and 25

Petitioner presents evidence and argument in support of its contentions that dependent claims 4, 6, 7, 9–11, 15, 17, 18, 22, 24, and 25 are rendered obvious by PALLAS and Yau. Twitter Pet. 42–56; Twitter2 Pet. 89–98.

Claims 15, 17, and 18 depend from independent claim 12. Claim 15 further recites "defining a context by: creating one or more context entries in a context manager; and associating a respective context entry with a set of

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

contextual information." Twitter IPR, Ex. 1001, 25:29–34. Twitter contends that PALLAS and Yau each teach creating a context entry in a context manager and associating it with contextual information. *See* Twitter Pet. 74–83, nn.13–15 (citing Twitter IPR, Ex. 1001, 7:30–58, 10:26–41, 11:11–26; Twitter IPR, Ex. 1002, 23–24, 415; Twitter IPR, Ex. 1003 ¶¶ 295–333; Ex. 1004, 54–58, Figs. 1–3; Ex. 1005, 4–5). This showing is similar to that discussed above for limitations 12.3 and 12.4. In particular, Twitter identifies the recited "context manager" in each of the three references as the "Context Engine" and "Adaptivity Engine" (Twitter IPR, Ex. 1004, Fig. 3) in PALLAS, and as the "Context Adaptation Module" (Twitter IPR, Ex. 1005, Fig. 1) in Yau. *See* Twitter Pet. 75–78. Twitter also argues that it would have been obvious to perform the functions of PALLAS's context and activity engine "using Yau's beneficial teachings of assigning context patterns, including ones appropriate for test-taking, to associate context with particular contextual information." Twitter Pet. 80. According to Twitter, this combination "would beneficially allow reuse of patterns for different content." *Id*. at 80–81 (citing Twitter IPR, Ex. 1003 ¶¶ 323–324).

Claim 17 recites "wherein the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream." Twitter IPR, Ex. 1001, 25:40–45. Twitter contends that PALLAS discloses that contextual information may include time, date, location, distance, temperature, and humidity. *See* Twitter Pet. 83 (citing Twitter IPR, Ex. 1003 ¶¶ 334–343).

Claim 18 recites "wherein the content piece includes one or more of: audio clip, image, video stream, language lesson, e-mail, weather report,

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

calendar reminder, news feed, rich site summary (RSS) feed, information
update from a Web 2.0 application, and Internet blog." Twitter IPR,
Ex. 1001, 25:46–51. Twitter contends that PALLAS discloses that a content
piece may include a language lesson in the form of a language-related
exercise. *See* Twitter Pet. 83–84 (citing Twitter IPR, Ex. 1003 ¶¶ 344–352;
Twitter IPR, Ex. 1004, 53–58, Fig. 4).

For claims 4, 10, and 11, Twitter relies on its showing for claims 15,
17, and 18, respectively. Twitter Pet. 84.

Claim 6 depends from claim 1 and further recites "wherein the context
is defined as a combination of at least a high-level abstraction which
corresponds to one or more low-level contextual information values,
wherein the low-level contextual information values can correspond to one
or more measurable parameters." Twitter IPR, Ex. 1001, 24:15–19.
Similarly, claim 7 depends from claim 1 and further recites "wherein a
respective rule is defined with one or more high-level abstractions." *Id.* at
24:20–21. For the recited "high-level abstraction," Twitter identifies the
parameter of "Leisure Time" in PALLAS and the context pattern of "learner
is at the university's computer lab, has 30 minutes, and is quiet" in Yau. *See*
Twitter Pet. 84–95, nn. 16–20 (citing Twitter IPR, Ex. 1001, 6:26–57,
10:41–55; Twitter IPR, Ex. 1002, 30, 416; Twitter IPR, Ex. 1003 ¶¶ 660–
700; Twitter IPR, Ex. 1004, 53–58, Figs. 1, 6; Twitter IPR, Ex. 1005, 3–5).

Claim 9 depends from claim 1 and further recites "wherein presenting
the context piece comprises sharing the content piece with a remote device."
Twitter IPR, Ex. 1001, 24:26–28. Twitter contends that PALLAS discloses
this limitation because its server communicates with mobile devices. *See*
Twitter Pet. 95–100 (citing Twitter IPR, Ex. 1003 ¶¶ 701–720; Twitter IPR,
Ex. 1004, 53–58, Figs. 2, 4, 6).

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Claims 22, 24, and 25 depend from independent claim 19.  Claim 22 recites similar limitations to that of claim 15.  Twitter relies on similar evidence to that of claim 15 for the teaching of the claim 22 limitations.  *See* Twitter2 Pet. 89–97.  Claim 24 recites similar limitations to that of claim 17.  Petitioner relies on similar evidence to that of claim 17 for the teaching of the claim 24 limitations.  *See id.* at 97.  Claim 25 recites similar limitations to that of claim 18.  Twitter relies on similar evidence to that of claim 18 for the teaching of the claim 25 limitations.  *See id*. at 97–98.

Patent Owner presents no arguments specifically related to these claims.  *See generally* Facebook PO Resp.; Facebook PO Sur-reply.

We have reviewed the evidence and argument and on this record we determine that Twitter has shown by a preponderance of the evidence that the combination of PALLAS and Yau renders obvious claims 4, 6, 7, 9–11, 15, 17, 18, 22, 24, and 25 of the '599 patent.

> *6.  Asserted Obviousness of Claims Over PALLAS, Over the Combination of PALLAS and Kim, and Over the Combination of PALLAS, Yau, and Kim*

Petitioner contends that claims 1, 6, 7, 9–12, 17–19, 24, and 25 are unpatentable under 35 U.S.C. § 103(a) as obvious over PALLAS alone; claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 are unpatentable as obvious over PALLAS and Kim; and claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 are unpatentable as obvious over PALLAS, Yau, and Kim.  Twitter Pet. 12; Twitter2 Pet. 12.

Because we have determined that claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25 are rendered obvious over PALLAS and Yau, we need not reach these other grounds for unpatentability of these claims.  *See SAS,* 138 S. Ct. at 1359.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

   *F. Conclusion As To Twitter's Challenges To Claims 1, 4, 6, 7, 9–12,
   15, 17–19, 22, 24, and 25 of the '599 Patent*

   For the foregoing reasons, we conclude that Twitter has shown by a

preponderance of the evidence that claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24,

and 25 of the '599 patent are unpatentable.  In summary:

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 9–12, 17–19, 24, 25 | 103(a) | PALLAS[31] | | |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Yau | 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Kim[32] | | |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Yau, Kim[33] | | |
| **Overall Outcome** | | | 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | |

---

[31] As explained above, because we determine that these challenged claims are rendered obvious by PALLAS and Yau, we need not address this obviousness ground for these claims.

[32] As explained above, because we determine that these challenged claims are rendered obvious by PALLAS and Yau, we need not address this obviousness ground for these claims.

[33] As explained above, because we determine that these challenged claims are rendered obvious by PALLAS and Yau, we need not address this obviousness ground for these claims.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

## VI. CONTINGENT MOTIONS TO AMEND

As discussed *supra* Section II, in view of the overlap of issues, we will address Patent Owner's Contingent Motions to Amend in a combined manner. Patent Owner proposes the same substitute claims in all the cases.

### A. Background

In the Snap IPR, Patent Owner filed a Contingent Motion to Amend (Snap IPR, Paper 22, "Snap Mot."), which was opposed by Snap (Snap IPR, Paper 24, "Snap Pet. Mot. Opp.").   In the Snap Motion, Patent Owner proposes substitute claims 26–40 to replace original claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25.  *See* Snap Mot.  At the request of Patent Owner (*id.* at 1), we issued Preliminary Guidance to Patent Owner's Motion to Amend (Snap IPR, Paper 32, "Snap Preliminary Guidance").  Patent Owner submitted a Reply in Support of its Motion to Amend (Snap IPR, Paper 33, "Snap PO Mot. Reply").  Snap filed a Sur-reply supporting its Opposition (Snap IPR, Paper 39, "Snap Pet. Mot. Sur-reply").

In the Facebook IPR, Patent Owner filed a Contingent Motion to Amend (Facebook IPR, Paper 20, "Facebook Mot."), which was opposed by Facebook (Facebook IPR, Paper 26, "Facebook Pet. Mot. Opp.").  In the Facebook Motion, Patent Owner proposes substitute claims 26–40 to replace original claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25.  *See* Snap Mot. At the request of Patent Owner (*id.* at 1), we issued Preliminary Guidance to Patent Owner's Motion to Amend (Facebook IPR, Paper 29, "Facebook Preliminary Guidance").  Patent Owner submitted a Reply in Support of its Motion to Amend (Snap IPR, Paper 30, "Facebook PO Mot. Reply").  Facebook filed a Sur-reply supporting its Opposition (Facebook IPR, Paper 34, Facebook Pet. Mot. Sur-reply").

132

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

In the Twitter IPR, Patent Owner filed a Contingent Motion to Amend (Twitter IPR, Paper 24, "Twitter Mot."), which was opposed by Twitter (Twitter IPR, Paper 30, "Twitter Pet. Mot. Opp."). In the Twitter Motion, Patent Owner proposes substitute claims 26–40 to replace original claims 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, and 25. *See* Twitter Mot. At the request of Patent Owner (*id.* at 1), we issued Preliminary Guidance to Patent Owner's Motion to Amend (Twitter IPR, Paper 33, "Twitter Preliminary Guidance"). Patent Owner submitted a Reply in Support of its Motion to Amend (Twitter IPR, Paper 35, "Twitter PO Mot. Reply"). Twitter filed a Sur-reply supporting its Opposition (Twitter IPR, Paper 41, Twitter Pet. Mot. Sur-reply").

Although the proposed substitute claims must meet the requirements of 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121, Petitioner "bears the burden of persuasion to show, by a preponderance of the evidence, that any proposed substitute claims are unpatentable." 35 U.S.C. § 316(d); 37 C.F.R. § 42.121(d)(2); *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 15 at 4 (PTAB Feb. 25, 2019) (precedential) (citing *Aqua Prods. Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017); *Bosch Auto. Serv. Sols. LLC v. Iancu*, 878 F.3d 1027 (Fed. Cir. 2017)).

Before considering the patentability of any substitute claims, we first determine whether the motion to amend meets the statutory and regulatory requirements set forth in 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121. Patent Owner is required to show that: (1) the amendment responds to a ground of unpatentability involved in the trial; (2) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter; (3) the amendment proposes a reasonable number of substitute claims; and

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

(4) the proposed claims are supported in the original disclosure.  37 C.F.R.

§ 42.121; *Lectrosonics*, Paper 15.

Patent Owner proposes amendments to claim 1 by substitute claim 26,
which is representative, which recites as follows, with underlining
designating added text and strikethrough indicating deleted text, and with
letters in single brackets added to the limitations of proposed substitute
claim 26 for reference purposes:

26. [a] A method for delivering context-based content to a first user <u>of</u>
<u>a first device</u>, the method comprising:

> [b] receiving at least one content package, wherein the content
> package includes at least one content piece and a set of rules
> associated with the content package ,wherein the set of rules
> includes a trigger condition and ~~an expected response~~ <u>at least</u>
> <u>one predefined response</u>, and wherein the trigger condition
> specifies a context that triggers a presentation of the content
> piece;

> [c] receiving a set of contextual information with respect to the
> first user <u>and the first device, wherein the set of contextual</u>
> <u>information includes contextual information from two or more</u>
> <u>different types of input sources</u>;

> [d] processing the contextual information to determine a current
> context for the first user <u>and the first device</u>;

> [e] determining whether the current context satisfies the trigger
> condition;

> [f] in response to the trigger condition being satisfied,
> presenting the content piece to the first user;

> [g] receiving a response from the first user corresponding to the
> presented content piece;

> [h] determining whether the received response ~~matches the~~
> ~~expected response~~ <u>is expected or unexpected, wherein the</u>
> <u>received response is expected if the received response matches</u>
> <u>one or more of the at least one predefined response, and</u>
> <u>wherein the received response is unexpected if the received</u>

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

> response does not match any of the at least one predefined
> response; and
>
> [i] performing an action based on an outcome of the
> determination.

*See* Snap Mot., Appendix A, 1–2.

### B. Requirements Under 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121

#### 1. Reasonable Number of Substitute Claims; Responsive to Ground of Unpatentability

In the Snap, Facebook, and Twitter proceedings, Patent Owner asserts that its Motion to Amend proposes a reasonable number of substitute claims and is responsive to the grounds of unpatentability involved in the proceeding. *See, e.g.*, Snap Mot. 1–14. Patent Owner proposes one substitute claim for each of fifteen challenged claims and, therefore, meets the requirement for a reasonable number of proposed substitute claims because it is a reasonable number of substitute claims and there is a one-to-one relationship with the fifteen substitute claims. *See* 37 C.F.R. § 42.121(a)(3); *see also Lectrosonics*, Paper 15 at 4 ("There is a rebuttable presumption that a reasonable number of substitute claims per challenged claim is one (1) substitute claim.").

Patent Owner contends "this [M]otion conditionally seeks to amend those claims to address Petitioner's arguments," in order to overcome the grounds of unpatentability raised in the Petition. *See, e.g.*, Snap Mot. 3.

Snap and Facebook do not dispute Patent Owner's contentions as to these statutory and regulatory requirements. *See generally* Snap Pet. Mot. Opp.; Facebook Pet. Mot. Opp. Twitter contends the "Motion does not even attempt [to] assert that Petitioner's prior art does not disclose or render

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

obvious this proposed limitation, and should be denied." Twitter Pet. Opp.
7–8 (citing Twitter Mot. 19–23).

Under our rules, the requirement is for the amendment to be responsive
to "a ground of unpatentability involved in the trial." 37 C.F.R.
§ 42.121(a)(2)(i). Patent Owner has met this requirement by proposing an
amendment responding to Twitter's arguments in the Petition. For example,
Patent Owner contends that "[e]ach substitute independent claim . . . requires
an ability to determine whether the response to the presented content piece is
an unexpected (e.g., incorrect or undesired) response. [Petitioner's] prior art
fails as to these limitations." Twitter Mot. 21.

We determine that Patent Owner has met the statutory and regulatory
requirements of proposing a reasonable number of substitute claims and
responsiveness to the grounds of unpatentability for a motion to amend.

### 2. Enlarging Scope of Claims

Patent Owner asserts that it proposes narrowing limitations in direct
response to the grounds of unpatentability involved in this proceeding. *See,
e.g.*, Snap Mot. 3–4.

Facebook argues Patent Owner is "improperly attempting to enlarge
the scope of the original claims." Facebook Pet. Opp. 1. Facebook asserts,
"[i]f 'an expected response' means one or more expected responses,
therefore, determining whether the received response 'matches the expected
response' means that the received response must match [all of] the one or
more previously-recited expected responses in the content package." *Id.* at 3
(emphasis omitted). Facebook then argues "the term 'predefined response'
is broader than 'expected response,'" because "an 'expected response' does
not include any conceivable or possible response; it is a response that is
expected." *Id.* at 4–5 (emphasis omitted).

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Twitter argues that "'predefined response' is broader than 'expected response' because a 'predefined response' can include any possible response as long as that response has been somehow defined in advance." Twitter Pet. Opp. 2.

We consider the amendments in view of the claim as a whole. Although the term "one predefined response" may be broader than "an expected response," we also consider the amended portion "wherein the received response is *expected* if the received response *matches* one or more of the at least *one predefined response*," and "the received response is *unexpected* if the received response *does not match* any of the at least *one predefined response.*" Unless the response had been predefined within the content package, any "received response" could not be considered "expected" under the claims, and the additional clause requires a match of the response with the predefined response to be deemed "expected." This equates to an equivalent scope to the original claim. This is consistent with Dr. Martin's testimony, which we credit, that he is not aware of a situation where the substitute but not original claims are infringed because "[t]he substitute claims would only be satisfied when a 'predefined response' in the substitute claims is an 'expected response' in the original claims." Facebook IPR, Ex. 2023 ¶ 59.

Facebook also argues that Patent Owner is seeking broader coverage of the claim by replacing "matches the expected response" with "matches one or more of the at least one predefined response" by the introduction of "one or more of." Facebook Pet. Mot. Sur-reply 2. Although the substitute claim recites "one of more," the original claim recites "an expected response," which may be construed as "one or more," so the use of "one or more" for the predefined response is not broadening. *See Baldwin Graphic*

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

*Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1360 (Fed. Cir. 2008). Further, a predefined response would nevertheless have to be in a content package with a content piece and a set of rules.

Facebook further refers to a statement in the prosecution history distinguishing the Brandenberg reference, which has several possible rating responses, to support the argument that a predefined response is broader than an expected response. Facebook Pet. Mot. Sur-reply 4–5. We do not agree with Facebook's argument on this reference because, as Dr. Martin testifies, Bradenberg is soliciting an opinion, not whether a response that would be "expected" or "unexpected." *See* Facebook IPR, Ex. 2023 ¶ 73.

Twitter additionally argues that the '599 patent describes the "expected response" as a "correct" response, so while an "expected response" on a multiple choice test may be "predefined," it would not be "correct." Twitter Pet. Mot. Opp. 2. Here, Twitter asks too much of the substitute claim. As discussed above, the substitute claim requires a determination if a received response is "expected" by checking for a match with the predetermined response in a content package. And the original claim requires only that an expected response be a part of set of rules for a content package, that it be checked for a match with a received response, and then an action be performed based on the outcome of that determination — but there is no recited requirement that the expected response has to be a "correct" response. Because the original claim did not include this requirement, a more limited interpretation on the amended claim should not be imposed.

Twitter also asserts that the '599 patent does not use the term "predetermined response," but uses the term "predetermined" in different contexts that are limited to the meaning "defined in advance." Twitter Pet.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Mot. Opp. 3–5. This argument does not apply because, as discussed above, we consider the term "predefined response" in the context of the claim where it may be determined to be "expected" or "unexpected." Twitter has similar arguments to Facebook, which we do not agree with for the reasons discussed above.

Accordingly, we determine that Patent Owner has met its burden to demonstrate that the proposed substitute claims do not broaden the scope of the original claims.[34]

### 3. Adding New Subject Matter

As to whether the proposed substitute claims are supported by the original disclosure, Patent Owner asserts that several portions of Application Ser. No. 12/326,457 ("the '457 application") disclose the limitation "determining whether the received response is expected or unexpected . . . wherein the received response is unexpected if the received response does not match any of the at least one predefined response" of limitation 26[h]. Snap Mot. 6 (citing Ex. 1004).

Snap contends that the cited portions of the '457 application that are identified by Patent Owner do not mention "unexpected" responses, nor is there a description of features for determining whether the received user response to the presented content piece matches one or *more* of the one predefined response in the set of rules or whether it does not match *any* of

---

[34] The Preliminary Guidance provided in the Snap and Facebook cases preliminarily indicated that, at that stage of the trial, Patent Owner had not sufficiently established that the proposed claim language did not broaden the claim scope. *See* Snap Preliminary Guidance 5; Facebook Preliminary Guidance 5. Our determination here is based on the full record, and upon further consideration of the issues in view of the full view of the context of the language of the substitute claims.

the at least one predefined responses in the set of rules.  *See* Snap Pet. Mot. Opp. 2.  More specifically, Snap contends that the cited portions of the specification describe evaluating a response generally or in the context of a correct or incorrect response.  *Id*.  Snap asserts that there are no disclosed features for determining whether a received response to a presented content piece (e.g., "JpI.mp3") does not match a predefined response for any other of the content pieces of in the set of rules ((e.g., "JpHello.mp3" through "JpGoodmorning.mp3").  *Id*. at 4 (citing Snap IPR, Ex. 1022 ¶ 73).  Further, Snap argues that the match of "any of the at least one predetermined response" requires a comparison of the received responses to *each* of the predetermined responses before concluding that there is no match, which is contrary to the '457 application's disclosures.  *Id*. at 3 (citing Snap IPR, Ex. 1022 ¶¶ 71–72).  Similarly, Snap asserts that the application does not provide support for a determination that a presented content piece matches more than one predefined responses in a set of rules, as the amendments claim.  *Id*. at 4 (citing Ex. Snap IPR, 1022 ¶¶ 74–75).

Snap also asserts that the proposed substitute claims lack support under their plain language because the content includes "at least one content piece" and a set of rules associated with the content package, so the "at least one predefined response" must be for the entire content package and not the "at least one content piece."  Snap Pet. Mot. Sur-reply 9.  As such, Snap argues, the determining limitation requires that the received response be compared to "one or more of the at least predefined response," which encompasses every "predefined response" in the content package, which include predefined responses for each content piece in the content package.  *Id*. at 9–10.  Snap contends that the claim language requires a comparison of

all predetermined responses in the content package, which is not disclosed in the specification of the application. *Id*. at 10–11.

Snap also asserts that, even if the claims were interpreted in the manner that Patent Owner argues, the claimed "one or more" is unsupported because the specification of the application consistently describes a content piece having a single expected response. Snap Pet. Mot. Sur-reply 11 (citing Snap IPR, Ex. 1004 ¶¶ 56, 62–63, Tables 1, 2). Snap argues that the '457 application disclosure of a list of allowable values for entries of a given column in Table 1, which includes "response columns," (Snap IPR, Ex. 1004 ¶ 59), fails to explain how this feature is implemented. Snap Pet. Mot. Sur-reply 11–12. Snap contends that this disclosure "at best discloses that a single expected response can be described or otherwise defined by 'a list of allowable values,'" so an entry in the response column corresponds to a particular content piece which has a list of values as described, but which "remains a single predefined response for that particular content piece." *Id*. at 12.

As discussed above, although the '457 application does not use the term "expected response," the proposed substitute claim language for limitations 1[b] and 1[h] essentially conforms with its description, with some recasting of the language. That is, the '457 application discloses a "received response" is checked to determine if it matches a predetermined response (which includes an expected response) and an action is performed based upon that determination, with a received response being expected (action correct) if there is a match and being unexpected (action incorrect) if there is no match. *See* Snap IPR, Ex. 1004 ¶¶ 56, 63, Tables 1, 2. Exact claim terms need not be used "in *haec verba* . . . [but] the specification must contain an equivalent description of the claimed subject matter"—and here we find that

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

the description is equivalent to the language of the proposed substitute claim. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

As to the issue of whether there is support for the limitation "determining whether the received response is expected or unexpected . . . wherein the received response is unexpected if the received response does not match any of the at least one predefined response," we agree with Patent Owner that there is. Snap's arguments are premised on the position that the claim language requires that the received response be compared with every one of the predetermined responses in the content package, which is not disclosed in the specification of the application. Limitation 26[b] states that the content package(s) include content piece(s) and a set of rules, with the set of rules including a trigger condition. As the claim limitation recites, however, "the trigger condition specifies a context that triggers a presentation of the content piece." Accordingly, in context, this indicates that the set of rules includes the trigger condition and the at least one predetermined response associated with a content piece; that is, the conditions of the trigger conditions associated with predetermined response apply.

Additionally, the '457 application supports that there may be more than one predefined response for a single content piece. It states that "[t]he *response* column allows a user to specify an expected response to the presentation of content 253" and that "a user can provide content management system 240 with a *list of allowable values* (e.g., names or tags, and corresponding 20 contextual information) for the entries of a given column (e.g., the time, location, state, or *response* columns presented in Table 1)." Snap IPR, Ex. 1004 ¶¶ 56, 59 (emphasis added). We agree with

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Dr. Martin that this disclosure would reasonably inform one of ordinary skill in the art that more than one predefined response for a content piece is permissible.  Snap IPR, Ex. 2008 ¶ 51.  Snap's arguments that the disclosure does not explain how this feature is implemented and that the response column "remains a single predefined response for that particular content piece" ignore the express disclosure that there can be a *list* of values set in the response column.

Twitter additionally argues that none of the disclosures identified by Patent Owner show possession of the "predefined response" language. Twitter Pet. Opp. 6–7.  As discussed above, the substitute claims have an equivalent scope to the original claims when the use of the term "predetermined response" is considered in context.  Further, as also discussed, exact claim terms need not be used in *haec verba*, and the '457 application provides sufficient support for the substitute claim limitations.

Accordingly, having considered the arguments and evidence, we determine that there is sufficient written description support for the proposed substitute claims.

### B. Patentability

#### 1. § 103

Snap, Facebook, and Twitter all challenge the substitute amended claims on obviousness grounds.  We address these challenges in turn.

##### a. Snap

Snap asserts that the proposed substitute claims are unpatentable as obvious under 35 U.S.C. § 103 in view of Rosenberg, Buck, and Suzuki. Snap Pet. Opp. 7–25.  More specifically, Snap contends the combination of Rosenberg and Buck teaches limitation 26[h], "determining whether the received response is expected or unexpected, wherein the received response

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

is expected if the received response matches one or more of the at least one predefined response, and wherein the received response is unexpected if the received response does not match any of the at least one predefined response." *Id.* at 13–20 (emphasis omitted).

Buck discloses "a system and method . . . for a context menu interface," its "context menu pop-up interface . . . offers a plurality of selection choices, all of which can be selected by a user," and where its "client terminal 400 can be a computer, such as a . . . handheld device." Snap IPR, Ex. 1023, 4:34–37, 5:40–43, Fig. 5. Buck discloses that its "trading application 402 may also receive input signals from traders [i.e., users] via input device 412" and "a user can activate the context menu interface by simply pressing an input choice of an input means." *Id.* at 6:17–20, 8:1–3. Buck further discloses that "a user could define a number of desired actions to be taken in response to detecting an invalid selection" and "when an invalid selection choice is made, an audible or a visual warning may be triggered, and a user may be given an opportunity to select the intended item." *Id.* at 14:32–44.

Snap asserts that a person of ordinary skill in the art would have been motivated to implement Rosenberg in view of Buck's teaching of an invalid selection response, that is, an "unexpected result." Snap Pet. Opp. 16. Snap contends that "*Buck's* teachings/suggestions concerning techniques/technologies for handling unexpected user responses to defined options in a user interface are consistent with the knowledge in the art" of a person of skill at the time. *Id.* Snap argues that a person of skill would have appreciated potential operational issues could occur without

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

error/exception handling features and there would have been motivation to include a determination whether a user response match or do not match Rosenberg's presented reminder options. *Id*. at 17–18.

In its Sur-reply, Snap contends that the user input mechanisms in Rosenberg's device, such as "multiple buttons and/or touchscreen portions that do not correspond to the four displayed reminder options," should be considered in the combination. Snap Pet. Mot. Sur-reply 1–2. Snap refers to Rosenberg's disclosure of "multiple 'buttons,' and may include, e.g., 'a pointing device . . . such as a mouse, thumbwheel or trackball,' 'an optional touch screen,' 'one or more pushbuttons,' and/or 'one or more switches.'" *Id*. at 2. Snap also refers to Rosenberg's reset button 502 that can be pressed to engage reminder reset. *Id*. at 3. Snap argues that "*Rosenberg* discloses various ways a user may provide input, including selecting a button (or an area on the touchscreen) that does not correspond to any depicted functionality, or is otherwise unrecognized by the system," and a person of ordinary skill in the art "would have been motivated to implement functionality to handle such an occurrence." *Id*. at 3–4.

As discussed in the Snap Preliminary Guidance, Rosenberg discloses it presents a menu of four choices a user can select from: terminate 505, defer 506, last change 507, or edit 508. Ex. 1005, 19:34–38; *see* Snap Preliminary Guidance 7. There appears to be no "unexpected" or "invalid" responses displayed for selection in Rosenberg, so a user would not provide an invalid input to options presented on the user interface. Although Snap argues in its Opposition that a person of skill would have looked to Buck to handle "invalid/unrecognized" input, in the Preliminary Guidance, we did

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

not find that persuasive because there is no invalid responses displayed for selection in Rosenberg. *See* Snap Preliminary Guidance 8.

Snap's Sur-reply arguments concerning other buttons and other input methods that could be chosen constitute new arguments that proceed in a new direction with a new approach from that presented in the Opposition, which only discussed "the possibility of users providing incorrect/invalid/unrecognized input(s) to options presented on a user interface," with only four options presented on the interface. 37 C.F.R. § 42.23; Consolidated Trial Practice Guide, 74 (November, 2019); *see also* Snap Pet. Mot. 15. Even if we were to consider Snap's arguments made in the Sur-reply, we would not be persuaded by Snap's assertion that there would be motivation to combine the references because it appears that hindsight has been employed. Although Petitioner argues that potential operational issues could occur without error handling features, Petitioner does not identify the potential issues that could occur in Rosenberg, and Rosenberg does not identify that pressing another button would be considered incorrect or unexpected.

The other independent substitute claims, claims 33 and 37, require the determination of whether a received response is unexpected. Accordingly, we do not find that obviousness has been demonstrated by Snap for these proposed substitute claims. Additionally, the challenge to the dependent substitute claims fails by virtue of dependency on claims 26, 33, and 37, respectively.

In view of the foregoing, we conclude that Snap has not established by a preponderance of the evidence that proposed substitute claims 26–40 would have been unpatentable as obvious in view of Rosenberg, Buck, and Suzuki.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

### b. Facebook

Facebook asserts that the proposed substitute claims are unpatentable as obvious under 35 U.S.C. § 103 in view of Lamont, Wolfe, Wang, with or without Lynch or Wehrenberg.  Facebook Pet. Opp. 14–25.

Facebook relies on the obviousness assertions presented in the Petition for the obviousness of the unmodified claim limitations.  Facebook Pet. Opp. 14–25.  For newly-added limitations in substitute claim 26, Facebook contends that Lamont discloses a "first device" corresponding to the new claim language, and "receiving a set of contextual information with respect to the first user and the first device," "[b]ecause the contextual information in Lamont is received while the first user is in physical possession of the client device, that information pertains to the 'first user and the first device.'"  *Id.* at 15–16 (citing Facebook Pet. 24–35; Facebook IPR, Ex. 1002 ¶¶ 103–120).  Petitioner also contends that Lamont discloses a "predetermined response," because Lamont's example answer, "Lincoln," "was defined beforehand and incorporated into the Lamont tour script provided to and executing on the client device."  Facebook Pet. Opp. 16 (citing Facebook Pet. 18–24; Facebook IPR, Ex. 1016 ¶ 72).  Additionally, Facebook contends that Wolfe discloses determining if a response is expected or unexpected, at least as to its Figure 3.  Facebook Pet. Opp. 17–18.

As to "two or more different types of input sources," Facebook contends that "Lamont discloses receiving time information from a clock device and location information from a GPS receiver device."  Facebook Pet. Opp. 18 (citing Facebook Pet. 25–26; Facebook IPR, Ex. 1003, 14:29–37, 14:56–62; Facebook IPR, Ex. 1002 ¶¶ 103, 104, 107).  Facebook contends that the prior art discloses a first input source at either the "network

147

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

interface of the client device in Lamont, alone or in combination with the device's clock," or Lamont's internal clock device, or Lynch's "technique in which a mobile device can receive a signal from cellular base station that the mobile device can use to determine the correct local time." Facebook Pet. Opp. 18–20. Facebook additionally contends the prior art discloses a second input source at either Lamont's GPS component (*id*. at 18), or Wehrenberg's accelerometer (*id*. at 21).

Petitioner asserts that a person of ordinary skill in the art would have been motivated to include Lynch's feature of receiving time as it was a known technique which would have improved Lamont's system by automatically setting correct local times. Facebook Pet. Opp. 19–21. Petitioner also argues that it would have been obvious to combine Lamont with Wehrenberg as accelerometers were well-known in a broad range of applications and would have offered benefits, such as providing additional contextual information for trigger conditions. *Id*. at 21–23.

We have reviewed the evidence and arguments and determine that Facebook has presented persuasive evidence that the combination of Lamont, Wolfe, and Wang, with or without Lynch or Wehrenberg, teaches the limitations of proposed substitute claims 26–40. Facebook also has presented articulated reasoning with rational underpinning to support the combination of prior art.

Patent Owner contends there is no reason to combine Lamont's system "with a different complete system teaching an alternate and inconsistent understanding of 'treasure hunt' (Wolfe)." *See* Facebook Mot. 20; Facebook PO Mot. Reply 6–7. Patent Owner also argues that Lamont's presented media clip content piece would not teach some limitations. *See* Facebook PO Mot. Reply 7. These arguments are the same as those

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

presented for the original claims, which we do not find persuasive for the same reasons. *See* Section IV.E.5.d.i.(5).

Patent Owner also contends Lamont has "extremely limited feedback," and, for the determining and performing limitations, Petitioner relies on Wolfe, but the combination "results in an incomplete system with undescribed (and therefore unknown) input capabilities." *See* Facebook Mot. 17. Patent Owner further argues the Petition "never addresses Lamont's limited disclosure or how the combination would remedy Lamont's input capabilities," which "includes extremely limited feedback, such as just two keys or buttons." *Id*. These arguments are the same as those presented for the original claims, which we do not find persuasive for the same reasons. *See* Section IV.E.5.d.i.

Patent Owner further argues that the prior art does render the claimed tripartite structure obvious. Facebook PO Mot. Reply 4–6. These arguments are the same as those presented for the original claims, which we do not find persuasive for the same reasons. *See* Section IV.E.5.d.i.(5).

In view of the foregoing, we conclude that Facebook has established by a preponderance of the evidence that proposed substitute claims 26–40 would have been unpatentable in view of the combination of Lamont, Wolfe, and Wang, with or without Lynch or Wehrenberg.

### c. Twitter

Twitter asserts that proposed substitute claims 26–40 are unpatentable as obvious under 35 U.S.C. § 103 in view of PALLAS or the combination of PALLAS and Yau. Twitter Pet. Opp. 9–20.

Twitter relies on the obviousness assertions presented in the Petition for the obviousness of the unmodified claim limitations. Twitter Pet. Opp.

149

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

9–20.  As discussed *supra* Section V.E.5, we have determined that the combination of PALLAS and Yau renders obvious the original claims.

As discussed above, Twitter contends combination of PALLAS and Yau teaches the original independent claim limitations, even if an unexpected response is part of the limitations.  Section V.E.  For another newly-added limitation in substitute claim 26, as to the "contextual information" limitation, Twitter contends that PALLAS discloses "using the profile of the learner and environmental parameters," including, e.g., "location, time and day and the mobile device that is used by the learner," and that the "weather is considered as PALLAS is aimed to be used outside of the classroom and may help in suggesting appropriate activities for the learner."  Twitter Pet. Opp. 19.  Twitter also contends that "Yau discloses receiving a set of contextual information with respect to the 'first device' (e.g., 'learner's device') from two or more different types of input sources (e.g., 'Location' and 'Noise Level' from 'two sensors, namely GPS for location detection and a microphone for noise detection')."  *Id.* (citing Twitter IPR, Ex. 1005, 3, 5, Fig. 1).  According to Twitter, using data from a microphone, in addition to the GPS in PALLAS's mobile device, would have "allow[ed] presentation of learning content to be further customized" and it "would have been routine and straightforward to make such an implementation choice."  Twitter Pet. Opp. 20 (citing Twitter IPR, Ex. 1025 ¶¶ 163–165).

We have reviewed the evidence and arguments and determine that Twitter has presented persuasive evidence that the combination of PALLAS and Yau teaches the limitations of proposed substitute claims 26–40. Twitter also has provided a persuasive rationale to combine the references.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Patent Owner argues that the combination of PALLAS and Yau do not teach some of the limitations of representative claim 26. Twitter PO Mot. Reply 4–7. These arguments are the same as those presented for the original claims, which we do not find persuasive for the same reasons. *See* Section V.5.i.(6).

In view of the foregoing, we conclude that Twitter has established by a preponderance of the evidence that proposed substitute claims 26–40 would have been unpatentable in view of the combination of PALLAS and Yau.

### 2. § 101

Facebook and Twitter assert that the substitute claims are unpatentable under 35 U.S.C. § 101. Facebook Pet. Opp. 9–14; Twitter Pet. Opp. 21–25. The issues presented in both cases overlap and we consider Twitter's contentions to be representative.

Twitter contends that the substitute claims fails both steps under the two-step framework of *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014). Twitter Pet. Opp. 21. For the first step, Twitter asserts that the "substitute claims are directed to the abstract idea of presenting content based on a user's context, collecting the user's response to that content, and performing an action based on the response—and provide no 'improvement[s] in computer capabilities.'" *Id.* Twitter argues that "[t]he substitute claims simply recite desired functional results—using "primitive computer operations found in any computer system . . . — for collecting ('receiving'), processing ('determining,' 'processing,' and 'performing') and transmitting information ('presenting'), which the Federal Circuit has repeatedly found are directed to abstract ideas." *Id.* at 22 (citing *In re*

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

*Killian*, 45 F.4th 1373 (Fed. Cir. 2022); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); and *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369-70 (Fed. Cir. 2015)). Twitter asserts that the proposed substitute claims "provide[] no specific technological solution or improvement to computer functioning, instead describing well-known, generic hardware, and merely catalog[] trivial implementation choices well understood by [a person of ordinary skill in the art]." *Id.* at 23.

Twitter also contends that the '599 patent Specification "confirms it provides no specific technological solution or improvement to computer functioning, instead describing well-known, generic hardware, and merely catalogs trivial implementation choices well understood" by a person of ordinary skill in the art. Twitter Pet. Opp. 23 (citing Twitter IPR, Ex. 1001, 3:24–33, 3:42–49; Twitter IPR, Ex. 1003 ¶¶ 29, 33, 53, 78). Twitter argues that "gathering and outputting data are 'insignificant extra-solution activity' insufficient to confer eligibility." *Id.*

Twitter further contends that under step 2 of the *Alice* analysis, "the substitute claims' 'additional features'—alone and as an ordered combination—do not recite an 'inventive concept' that is 'significantly more' than this patent-ineligible idea." Twitter Pet. Opp. 24 (citing *Alice*, 573 U.S. at 221–22). Twitter argues that the proposed substitute claims instead "recite well-known, routine, and conventional data manipulation using a general purpose computer." *Id.* (citing Twitter IPR, Ex. 1003 ¶¶ 29–50; Ex. 1025 ¶¶ 82–30, 132–166; *Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017)). Twitter contends that the '599 patent's "content package," "content piece," "trigger condition," "predefined response," "context," "contextual information from

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

two or more different types of input sources," and expected and unexpected user responses, are not new and rely on conventional, well-known techniques. *Id*. Twitter further enumerates the claimed features and argues that they were "well known, routine, and noninventive." *Id*. at 25.

An invention is patent eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. However, the Supreme Court has long interpreted 35 U.S.C. § 101 to include implicit exceptions: "[l]aws of nature, natural phenomena, and abstract ideas" are not patentable. *E.g., Alice*, 573 U.S. 208, 216 (2014).

In determining whether a claim falls within an excluded category, the guide is the Supreme Court's two-step framework, described in *Mayo* and *Alice*. *Alice*, 573 U.S. at 217–18 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 75–77 (2012)). Under the framework, it is first determined what concept the claim is "directed to." *See Alice*, 573 U.S. at 219 ("On their face, the claims before us are drawn to the concept of intermediated settlement, i.e., the use of a third party to mitigate settlement risk."); *see also Bilski v. Kappos*, 561 U.S. 593, 611 (2010) ("Claims 1 and 4 in petitioners' application explain the basic concept of hedging, or protecting against risk.").

If the claim is "directed to" an abstract idea, the second step of the *Alice* and *Mayo* framework is evaluated, where "the elements of the claim" are evaluated "to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (citation and quotation marks omitted). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id*. (quoting *Mayo*, 566 U.S. at 77).

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

"[M]erely requir[ing] generic computer implementation[] fail[s] to transform that abstract idea into a patent-eligible invention." *Id*.

Additionally, the USPTO has published guidance on the application of 35 U.S.C. § 101. 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50, 57 (Jan. 7, 2019) ("2019 Guidance"). Under 2019 Guidance, a claim is "directed to" an abstract idea if the claim recites any of (1) mathematical concepts, (2) certain methods of organizing human activity, and (3) mental processes—without integrating such abstract idea into a "practical application," i.e., without "apply[ing], rely[ing] on, or us[ing] the judicial exception in a manner that imposes a meaningful limit on the judicial exception, such that the claim is more than a drafting effort designed to monopolize the judicial exception." *Id*. at 52–55. A claim so "directed to" an abstract idea constitutes ineligible subject matter, unless it recites an additional element (or combination of elements) amounting to significantly more than the abstract idea. *Id*. at 56

Twitter asserts that representative claim 26 recites an abstract idea "of presenting content based on a user's context, collecting the user's response to that content, and performing an action based on the response." Twitter Pet. Opp. 21. Considering the steps of proposed substitute independent claim 26, it recites receiving data in a "content package," receiving data in "a set of contextual information . . . from two or more different types of input sources," "determin[ing] a current context for the first user and first device," "determining whether the current context satisfies the trigger condition," if the trigger condition is met, "presenting" content to a user, receiving a response from the user [if the content was presented], "determining" whether the received response "matches one or more of the at least one predefined response" or "does not match," and "performing an

action based on an outcome of the determination." Twitter Mot., App. A, 1–2. In view of the claim limitations, we agree with Twitter's characterization of the abstract idea of the claim. Further, substitute claim 26 involves steps – receiving data, making determinations, and performing an action based on the determinations – that can be performed mentally by a person using observation, evaluation, and judgment. Steps that may be performed in the mind, even if recited as being performed on a computer, are mental processes. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016); 2019 Guidance, 52. Accordingly, we agree that proposed substitute independent claim 26 recites an abstract idea.

Patent Owner argues that the claims "are directed to improving mobile device functions." Twitter PO Mot. Reply 8. Patent Owner asserts that the "tripartite structure" "increase[s] system flexibility and scalability (and make content more shareable/reusable). *Id*. at 8. Patent Owner contends that the claimed features make mobile devices safer; conserve battery power and data resources; and facilitate family communications. *Id*. As an initial matter, we do not agree with Patent Owner's characterization of the claims. Patent Owner's characterization is at such a high level, that is, "improving mobile device functions," that it is dissociated from the claim itself. Instead, when considering what the claims are "directed to" the claim instead aligns with Twitter's characterization as "presenting content based on a user's context, collecting the user's response to that content, and performing an action based on the response." Patent Owner also alleges benefits directed to mobile devices, but these are not claimed. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286–88 (Fed. Cir. 2018) (benefits from "well-known database structure" in its "ordinary capacity" not improvement to database functionality); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

1378, 1383 (Fed. Cir. 2019) ("merely providing a trader with new or different information in an existing trading screen is not a technical solution to a technical problem").

We also consider "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application," in a "search for an 'inventive concept.'" *Alice*, 573 U.S. at 217 (2014). Twitter asserts that the proposed substitute claims "recite well-known, routine, and conventional data manipulation using a general purpose computer." Twitter Pet. Opp. 24.

We determine whether the judicial exception is integrated into a practical application. 2019 Guidance, 54–55. We agree that the steps of substitute claim 26 use generic data manipulation. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314–15 (Fed. Cir. 2016) (distinguishing non-abstract claims from those that "use[] generic computer technology to perform data reception, transmission, and analysis."). Here, the "first device" may include mobile devices and laptop computers, which perform common data processing functions such as receiving, processing, and outputting data. *See* Twitter IPR, Ex. 1002 ¶¶ 2, 36, 37, 42.

We also consider the additional elements of the claim. Specifically, under the operations of an electronic device, data is received data by a first device under limitation 26[b]. According to Patent Owner, this step is described in the original '457 application. Twitter Mot. 9 (citing Twitter IPR, Ex. 1002 ¶¶ 6–8, 26, 27, 52, 54, 55, 67, Table 1, Table 2). This step is described as a computing device recording content and creating "a content entry in the content database for the recorded content, wherein the content entry can be associated with a number of trigger conditions." Twitter IPR,

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Ex. 1002 ¶ 6. Further, "the computing device defines a context by creating a context or activity entry in a context manager, and associates the context or activity entry with a set of contextual information." *Id.* ¶ 8. Thus, this description supports that this step is merely directed to data receipt and data manipulation.

As to step 26[c], the "receiving a set of contextual information with respect to the first user and the first device" limitation, the claims do not specify details on the "input sources" and "contextual information" received. Further, the description in the '599 patent supports that this step relies on nothing more than conventional techniques, such as GPS, detection of motion, or downloaded Internet information. *See* Twitter IPR, Ex. 1001, 6:34–45, 6:58–65. Similarly, steps 26[d]–[h] are directed to data transmission, receipt, and manipulation. As to the last-recited limitation 26[i], "performing an action" is described in the original '457 application, according to Patent Owner. Twitter Mot. 10 (citing Ex. 1002 ¶¶ 9, 46, 48, 56, 62–64, 67, Tables 1, Table 2). There, "performing an action" is described as including "updating the content entries in the content database and updating the context or activity entries in the context manager" (¶ 9), "defin[ing] a delay period" (¶ 46), "present[ing] content" (¶ 48), "repeat[ing]" content (¶ 56), "delet[ing] or alter[ing] . . . the corresponding content entry" (¶ 64), and "delet[ing] the content entry" (¶ 67). These limitations encompass actions that are mere data manipulation or output operations. This is also true for the limitation "in response to the trigger condition being satisfied, presenting the content piece to the first user." We consider these claims as an ordered combination and do not discern that they do anything more collectively than performing the individual steps. Accordingly, these limitations constitute data gathering/receipt steps, data

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

transmission, or data manipulation operations. In view of this, we do not
discern that the steps of substitute claim 26 recite additional elements that
integrate the judicial exception into a practical application, such as an
improvement in the way computers operate or to another technological
improvement.

We now look to whether representative claim 26 contains any
inventive concept or adds anything significantly more to transform the
abstract concept into a patent-eligible application. *Alice*, 573 U.S. at 216;
2019 Guidance, 56. The steps of substitute claim 26 represent "well-known,
routine, and conventional data manipulation using a general purpose
computer," because the first device is a general-purpose computer or
"mobile device," which performs common data processing functions such as
receiving, processing, and outputting data. *See* Twitter Pet. Opp. 24; *see*
Twitter IPR, Ex. 1002 ¶¶ 2, 36, 37, 42. All of these computer functions
recited are generic and routine computer activities that are performed only
for their conventional uses. *See Elec. Power*, 830 F.3d at 1353 (Fed. Cir.
2016); *see also In re Katz Interactive Call Processing Patent Litig.*, 639
F.3d 1303, 1316 (Fed. Cir. 2011) ("Absent a possible narrower construction
of the terms 'processing,' 'receiving,' and 'storing,' . . . those functions can
be achieved by any general purpose computer without special
programming"). There is no evidence that these activities are used in some
unconventional manner or produce some unexpected result. In short, each
step does no more than require a generic computer device to perform generic
computer functions. As to the data operated upon, "even if a process of
collecting and analyzing information is 'limited to particular content' or a
particular 'source,' that limitation does not make the collection and analysis
other than abstract." *SAP America, Inc. v. InvestPic LLC*, 898 F.3d 1161,

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

1168 (Fed. Cir. 2018). The use of conventional computer components to perform conventional steps to implement an abstract idea has repeatedly been found to not make an abstract idea patent eligible. *See Alice*, 573 U.S. at 217–18 (Instructing one to "apply" an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent eligible.).

Patent Owner argues that the claims recite inventive concepts because they "provide for how content should be structured (e.g., 'content package'), how the system should handle presentation (e.g., tripartite structure), and how to handle responses (e.g., final three limitations)." Twitter PO Motion Reply 10 (citing Ex. 2021 ¶ 231). Patent Owner also refers to claims 31, 35, and 39, that are alleged to "deal[] with mobile specific contextual information input sources," and claims 32, 36, and 40, that are alleged to "deal[] with Web- and Internet-specific types of content pieces." *Id.* at 10–11 (citing Twitter IPR, Ex. 2021 ¶¶ 228–229). Patent Owner asserts that the features of the "receiv[ing/e]" a content package limitation, which "includes a detailed explanation of the content package itself: the rules and triggers necessary to invoke the presentation of content, and what kind of responses a user may provide," and which is alleged to not be an "insignificant receiving step." *Id.* at 11 (citing Twitter IPR, Ex. 2021 ¶¶ 226–227). Patent Owner also argues that "[t]he tripartite structure is a fundamental building block advancing the claims over the prior art's two-step processes (i.e., comparing contextual information to trigger conditions)." *Id.* (citing Twitter IPR, Ex. 2021 ¶¶ 211–222). Patent Owner asserts that the use of the tripartite structure allows for flexibility and scalability and adds shareability/reusability of content packages. *Id.* at 12 (citing Twitter IPR, Ex. 2021 ¶¶ 211–222, 225–234). Patent Owner further argues that the

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

Federal Circuit has recognized the patentability of claims despite their recitation of well-know components. *Id*.

We are not persuaded by Patent Owner's arguments. "[T]he relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *Alice*, 573 U.S. at 225. Although the Patent Owner appears to argue that the received content package step and tripartite structure add something more to the claims, we do not agree. As discussed above, we determined that the claims recite an abstract idea. Further, we considered operations of the functions performed by the first device at each step of the process and found them to be generic in nature, and the ordered combination of steps add nothing more than the individual steps. Patent Owner's arguments allege advantages of the claims, but Patent Owner fails to explain how the steps of the claim do anything more than implement the abstract ideas using conventional electronic devices. We have also considered substitute claims 31, 32, 35, 36, 39, and 40, and even if these claims are specific to a certain applications, that does not make the claimed steps performed by a conventional computer anything "other than abstract." *See SAP*, 898 F.3d at 1168 (Fed. Cir. 2018).

In view of the foregoing, we conclude that Twitter and Facebook have established by a preponderance of the evidence that proposed substitute claims 26–40 are unpatentable under 35 U.S.C. § 101.

*3. Conclusion As To Unpatentability*

In view of the foregoing, we conclude that Petitioners collectively have established by a preponderance of the evidence that proposed substitute claims 26–40 are unpatentable. In summary:

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 26–40 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | 26–40 |
| Substitute Claims: Not Reached | |

## VII. ORDER

Accordingly, it is

ORDERED that IPR2021-00987, IPR2021-01294, and IPR2021-01458 are consolidated;

FURTHER ORDERED that claims 1–25 of U.S. Patent 8,489,599 B2 have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motions to Amend are denied as to proposed substitute claims 26–40; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.[35]

---

[35] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

## VIII. CONCLUSION

In summary:[36]

### *Snap's Challenges*

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–7, 10–13, 17–20, 22–25 | 102 | Rosenberg | 1, 2, 4–7, 10–13, 17–20, 22–25 | |
| 4, 5, 15, 16, 19, 20, 22–25 | 103(a) | Rosenberg | 15, 16 | |
| 3, 8, 9, 14, 21 | 103(a) | Rosenberg, Suzuki | 3, 8, 9, 14, 21 | |
| **Overall Outcome** | | | 1–25 | |

### *Facebook's Challenges*

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | 103(a) | Lamont, Wolfe, Wang | 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | |
| 9 | 103(a) | Lamont, Wolfe, Wang, Belimpasakis | 9 | |
| 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, 25 | 103(a) | Lamont , Wolfe, Wang, Meyers[37] | | |

---

[36] Note that these summary tables are separately presented above in each case section.

[37] Because we determine challenged claims 1, 4, 6, 7, 10–12, 15, 17–19, 22, 24, and 25 are rendered obvious by Lamont, Wolfe, and Wang, we need not address the obviousness ground for these claims.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 9 | 103(a) | Lamont, Wolfe, Wang, Belimpasakis, Meyers[38] | | |
| **Overall Outcome** | | | 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | |

**Twitter's Challenges**

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 9–12, 17–19, 24, 25 | 103(a) | PALLAS[39] | | |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Yau | 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, Kim[40] | | |
| 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | 103(a) | PALLAS, | | |

---

[38] Because we determine challenged claim 9 is rendered obvious by Lamont, Wolfe, Wang, and Belimpasakis, we need not address the obviousness ground for this claim.

[39] Because we determine that these challenged claims are rendered obvious by PALLAS and Yau, we need not address this obviousness ground for these claims.

[40] Because we determine that these challenged claims are rendered obvious by PALLAS and Yau, we need not address this obviousness ground for these claims.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| | | Yau, Kim[41] | | |
| **Overall Outcome** | | | 1, 4, 6, 7, 9–12, 15, 17–19, 22, 24, 25 | |

### *Proposed Substitute Claims*

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 26–40 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | 26–40 |
| Substitute Claims: Not Reached | |

---

[41] Because we determine that these challenged claims are rendered obvious by PALLAS and Yau, we need not address this obviousness ground for these claims.

IPR2021-00987, IPR2021-01294, IPR2021-01458
Patent 8,489,599 B2

PETITIONERS:

Naveen Modi
Joseph Palys
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
josephpalys@paulhastings.com

Heidi Keefe
Phillip Morton
Andrew Mace
Mark R. Weinstein
COOLEY LLP
hkeefe@cooley.com
pmorton@cooley.com
amace@cooley.com
mweinstein@cooley.com

J. Steven Baughman
Megan Raymond
Michael F. Milea
GROOMBRIDGE, WU, BAUGHMAN & STONE LLP
steve.baughman@groombridgewu.com
megan.raymond@groombridgewu.com
mike.milea@groombridgewu.com

PATENT OWNER:

James Quigley
Alexandra Easley
MCKOOL SMITH, P.C.
jquigley@mckoolsmith.com
aeasley@mckoolsmith.com



US008489599B2

(12) **United States Patent**
Bellotti

(10) **Patent No.:    US 8,489,599 B2**
(45) **Date of Patent:    Jul. 16, 2013**

(54) **CONTEXT AND ACTIVITY-DRIVEN CONTENT DELIVERY AND INTERACTION**

(75) Inventor: **Victoria M. E. Bellotti**, San Francisco, CA (US)

(73) Assignee: **Palo Alto Research Center Incorporated**, Palo Alto, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 421 days.

(21) Appl. No.: **12/326,457**

(22) Filed: **Dec. 2, 2008**

(65) **Prior Publication Data**
US 2010/0138416 A1    Jun. 3, 2010

(51) **Int. Cl.**
*G06F 17/30*    (2006.01)
(52) **U.S. Cl.**
USPC ........................................... **707/736**
(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,611,050 A | 3/1997 | Theimer | |
| 7,630,986 B1 * | 12/2009 | Herz et al. ........................... | 1/1 |
| 7,631,007 B2 * | 12/2009 | Morris ........................ | 705/7.11 |
| 7,797,306 B1 * | 9/2010 | Pather et al. ................ | 707/714 |
| 2002/0054174 A1 | 5/2002 | Abbott | |
| 2003/0063072 A1 * | 4/2003 | Brandenberg et al. ........ | 345/173 |
| 2007/0038603 A1 * | 2/2007 | Guha ................................ | 707/3 |
| 2007/0055657 A1 * | 3/2007 | Yano ................................ | 707/3 |
| 2007/0250901 A1 * | 10/2007 | McIntire et al. .............. | 725/146 |

| | | | |
|---|---|---|---|
| 2007/0288247 A1 * | 12/2007 | Mackay ........................... | 705/1 |
| 2008/0168135 A1 * | 7/2008 | Redlich et al. ................ | 709/204 |
| 2008/0172261 A1 * | 7/2008 | Albertson et al. .............. | 705/7 |
| 2009/0254971 A1 * | 10/2009 | Herz et al. ...................... | 726/1 |
| 2009/0265764 A1 * | 10/2009 | Schultz et al. .................. | 726/4 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2006111935 A1 | 10/2006 |
| WO | 2007059241 A2 | 5/2007 |

OTHER PUBLICATIONS

Min Hong Yun et al., "Event-based multimedia object scheduling algorithm", Advanced Communication Technology, 2004, The 6th International Conference on Phoenix Park, Korea, Feb. 9-11, 2004, vol. 2, pp. 735-740, ISBN: 89-5519-119-7.
Al-Bin-Ali F: "Design Principles for Inducing Reactivity in Ubiquitous Environments", Pervasive Services, 2004, IEEE/ACS International Conference on Beirut, Lebanon Jul. 19-23, 2004, pp. 131-139, ISBN: 0-7695-2535-0.

* cited by examiner

*Primary Examiner* — Bai D. Vu
(74) *Attorney, Agent, or Firm* — Shun Yao; Park, Vaughan, Fleming & Dowler LLP

(57) **ABSTRACT**

One embodiment of the present invention provides a computing device that delivers personally-defined context-based content to a user. This computing device receives a set of contextual information with respect to the user, and processes the contextual information to determine a context which is associated with an activity being performed by the user. The computing device then determines whether either or both the context and a current activity of the user satisfy a trigger condition which has been previously defined by the user. If so, the computing device selects content from a content database, based on the context, to present to the user, and presents the selected content.

**25 Claims, 4 Drawing Sheets**





*FIG. 1*



**FIG. 2A**



**FIG. 2B**



*FIG. 3*

*FIG. 4*



**FIG. 5**

US 8,489,599 B2

**1**
## CONTEXT AND ACTIVITY-DRIVEN CONTENT DELIVERY AND INTERACTION

### BACKGROUND

1. Field of the Invention

The present invention generally relates to techniques and systems for creating and presenting content to a user. More specifically, the present invention relates to techniques and systems for creating and presenting content based on contextual information.

2. Related Art

Advancements in computing technology continue to improve communication between people and provide versatile ways to deliver information. These advancements have allowed communities around the world to interact and share information with each other. In particular, mobile devices are becoming an integral part of human life, as people often carry a mobile device throughout their day. These mobile devices can include a mobile phone, a personal digital assistant (PDA), an MP3 player, a handheld game console, and a laptop computer. Newer generations of these mobile devices are developed with more computation power and a growing number of communication features.

In effect, many of these mobile devices can perpetuate a fast-paced lifestyle for their users, as they may help users schedule the time around their responsibilities. However, these technological advances do not effectively help their users cope with this increase in pace. Typical working professionals may have a number of communication channels that they monitor, and they often need to remind themselves to monitor these channels. Also, these users typically have a list of errands they need to complete, and this list may grow throughout a work week because they do not remember to complete these errands until the weekend. Furthermore, these users often need to continue advancing their skills, but their work and social schedules do not allow much free time for extended study.

Unfortunately, mobile devices are not effective in helping working professionals accommodate their responsibilities around their busy schedule, because these mobile devices are not capable of learning and understanding the behavior of their users. Furthermore, these mobile devices cannot determine when and how best to provide their users with information or suitable entertainment content, because they do not take into account the activities that their users are involved in.

### SUMMARY

One embodiment of the present invention provides a computing device that delivers personally-defined context-based content to a user. This computing device receives a set of contextual information with respect to the user, and processes the contextual information to determine whether some aspect of the current context can be associated with a probable activity being performed by the user. The computing device then determines whether either or both the context and current activity of the user satisfy a trigger condition which has been previously defined by the user. If so, the computing device selects content from a content database, based on the context or activity, to present to the user, and presents the selected content.

In a variation on this embodiment, the computing device allows the user to create content that is associated with a user-defined contextual or activity-driven trigger condition. To do so, the computing device records the content that is provided by the user, and creates a content entry in the content database for the recorded content, wherein the content entry can be associated with a number of trigger conditions. Then, the computing device associates a trigger condition for the content entry with a user-defined context or activity. The computing device continuously compares previously-defined trigger conditions for the content entry with the ongoing context of the user and/or user activity. When a trigger condition is met, the computing device retrieves the associated content and presents it to the user.

In a further variation, the computing device allows the user to create shareable content. To do so, the computing device records the content that is provided by the user, and creates a content package for the recorded content. This content package can include the recorded content, and can include a number of user-defined trigger conditions. The user is capable of sharing the content package with other users by distributing the content package to other users, and/or by uploading the content package onto a public server. Furthermore, other users that download or receive the content package are allowed to insert, modify, and/or remove content or trigger conditions from the content package.

In a variation on this embodiment, the computing device defines a context by creating a context or activity entry in a context manager, and associates the context or activity entry with a set of contextual information.

In a further variation, the computing device evolves the presentation of content over time by updating the content entries in the content database and updating the context or activity entries in the context manager responsive to actions performed by the user.

In a variation on this embodiment, the computing device presents the selected content by following a number of predefined or user-defined presentation rules associated with the selected content, monitoring actions performed by the user, and presenting the selected content based on the actions performed by the user.

In a variation on this embodiment, the computing device presents the selected content by sharing the selected content with a remote device.

In a variation on this embodiment, the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag (e.g., radio frequency identification (RFID) tag), device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.

In a variation on this embodiment, the content includes at least one or more of: audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, and Internet blog.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** illustrates a content management system in accordance with an embodiment of the present invention.

FIG. **2A** illustrates a data flow for a content management system associated with delivering content to a user in accordance with an embodiment of the present invention.

FIG. **2B** illustrates a data flow for a content management system associated with allowing a user to create content in accordance with an embodiment of the present invention.

FIG. **3** presents a flow chart illustrating a process for delivering context-based content to a user in accordance with an embodiment of the present invention.

FIG. **4** presents a flow chart illustrating a process for creating context-based content in accordance with an embodiment of the present invention.

US 8,489,599 B2

**3**

FIG. **5** illustrates an exemplary computing device that facilitates creating and delivering context-based content in accordance with an embodiment of the present invention.

TABLE 1 illustrates an exemplary set of rules for presenting a content package to a user in accordance with an embodiment of the present invention.

TABLE 2 illustrates an exemplary set of rules for presenting a reminder content package to a user in accordance with an embodiment of the present invention.

DETAILED DESCRIPTION

The following description is presented to enable any person skilled in the art to make and use the invention, and is provided in the context of a particular application and its requirements. Various modifications to the disclosed embodiments will be readily apparent to those skilled in the art, and the general principles defined herein may be applied to other embodiments and applications without departing from the spirit and scope of the present invention. Thus, the present invention is not limited to the embodiments shown, but is to be accorded the widest scope consistent with the principles and features disclosed herein.

The data structures and code described in this detailed description are typically stored on a computer-readable storage medium, which may be any device or medium that can store code and/or data for use by a computer system. The computer-readable storage medium includes, but is not limited to, volatile memory, non-volatile memory, magnetic and optical storage devices such as disk drives, magnetic tape, CDs (compact discs), DVDs (digital versatile discs or digital video discs), or other media capable of storing computer-readable media now known or later developed.

The methods and processes described in the detailed description section can be embodied as code and/or data, which can be stored in a computer-readable storage medium as described above. When a computer system reads and executes the code and/or data stored on the computer-readable storage medium, the computer system performs the methods and processes embodied as data structures and code and stored within the computer-readable storage medium.

Furthermore, the methods and processes described below can be included in hardware modules. For example, the hardware modules can include, but are not limited to, application-specific integrated circuit (ASIC) chips, field-programmable gate arrays (FPGAs), and other programmable-logic devices now known or later developed. When the hardware modules are activated, the hardware modules perform the methods and processes included within the hardware modules.

Overview

Embodiments of the present invention provide a content management system for organizing and delivering packages of audio and visual content to a user in response to activities being performed by the user, and in response to a number of environmental factors associated with the user. The user activities and environmental factors that trigger a response from the content management system are defined by the user prior to enabling a given package of content. This content management system is intended to help a user manage their content and responsibilities around their schedule. Prior to operation, a user can upload or input content into the content management system, which may be music, study material, a to-do list, an RSS feed or any content suitable for delivery in a range of contexts. The user can then specify the conditions under which the content can be presented, in terms of a sensed contextual information (e.g., temperature) or a user-defined context (e.g., a user activity). These conditions

**4**

represent the triggers for presenting content, and are labeled using user-meaningful terms, such as time of day, day of week, a location identifier (e.g., "home") or a transportation modality (e.g., "on the train"), et cetera. The user can also specify a target audience for the content presentation, such as the user and/or other users.

In some embodiments, the user may define contexts or activities in terms of low-level contextual information that is associated with the user. Note that "context" and "activities" are not necessarily mutually exclusive. In one embodiment, a context can be based on or include one or more user activities. For example, if the content management system can sense motion, location, and time of day, then the user can define a context for walking from one location to another at a particular time of day, and label the context using human-meaningful terms (e.g., "walking to work," or "walking around the mall"). In another example, the user can define a context for moving around the yard, and label the context using a human-meaningful term "gardening." In some embodiments, the user may define an activity in terms of a high-level category of conditions, such as "concentrating," "receptive," or "active." For example, the user may define a context labeled "receptive" based on a number of user defined contexts associated with mindless tasks (e.g., "walking to work," "walking around the mall"). On the other hand, the user may define a context labeled "active" based on a number of user-defined contexts associated with physical activities (e.g., "jogging," "gardening"). The user can then define a trigger condition for certain content based on a high-level condition category which includes several low-level contexts.

During operation, the content management system can gather low-level contextual information from a number of input sources (e.g., a global positioning system (GPS) device, or an accelerometer), which reflects basic information associated with the user. Then, the content management system processes this contextual information to determine an inferred context, which has been defined in human-meaningful terms that describe the event or environmental factor associated with the user (e.g., "on the train after 5 P.M."). In some embodiments, the content management system can use this context to identify content that is ready to be presented in response to a user-defined context. In other embodiments, the content management system can use a user-defined context to search for and/or create content that can be presented to a user in a desired context.

The capabilities of the content management system can be applied to a number of applications. In some embodiments, the content management system can present instructional content under a given user-defined context. For example, the content management system can present visual lectures or interactive lessons to a user when the user is commuting to work in a bus or in a train. Similarly, the content management system can present audio-based instructional content to a user when the user is driving to work or is jogging. In other embodiments, the content management system can present entertainment content to the user when the user enters his or her living room after a long day of work.

In some embodiments, a user can create shareable content using the content management system on a mobile device or a personal computer (PC). The shareable content is a content package that a user can download, modify, and share with other content management systems. In some embodiments, a user can upload a content package onto an Internet website to share content the user created or modified using the content management system. In some other embodiments, a user can download a content package from an Internet website, and

**5**

modify the content package to insert, modify, and/or remove content from the content package.

In some embodiments, the content management system can share content with a remote computing device. For example, a user can create an instructional or an entertainment content package on a content management system, specify a user-defined context for when the content can be presented, and share the content package with other content management systems. In other embodiments, the content management system can communicate content to a remote device under a given user-defined context. For example, the content management system can send a text message or an audio stream to the mobile telephone of a user's spouse to alert the spouse that the user is working late.

Content Management System

FIG. **1** illustrates a content management system **100** in accordance with an embodiment of the present invention. In some embodiments, content management system **100** can present content **112** to a user in response to actions being performed by the user, or other information that is associated with the user. In other embodiments, content management system **100** allows a user to create and store content, and associate the content with a given user-defined context. In one example, content management system **100** can present a given class of information to the user when the user is jogging, based on a high-level context labeled "active" which includes the low-level context labeled "jogging." In a second example, content management system **100** can remind the user to buy groceries as the user is driving past a grocery store after work. Furthermore, content management system **100** can read specific items on the grocery list to the user as the user walks across a corresponding aisle of the grocery store.

In some embodiments, content management system **100** includes an input mechanism **102**, a context manager **104**, a content database **106**, and a content delivery mechanism **108**. Input mechanism **102** receives a user input **110**, which can include information provided by the user through an input device (e.g., a keyboard or a touch screen), or can include contextual information gathered from a number of input sources (e.g., a microphone, a camera, a motion sensor, a global positioning mechanism, or an Internet server).

Context manager **104** can control how content **112** is stored in content database **106**, and can control how content **112** is selected from content database **106** for playback. In some embodiments, context manager **104** creates content **112** by providing content database **106** with a content package to be stored, which includes content **112** and a corresponding user-defined context that describes when content **112** can be presented. In response, content database **106** stores content **112**, and associates content **112** with the specified user-defined context. In other embodiments, context manager **104** retrieves content **112** from content database **106** by providing content database **106** with a user-defined context that describes actions being performed by the user, and then receiving a corresponding content from content database **106**.

Content delivery mechanism **108** can control how content **112** is presented to the user. In some embodiments, content delivery mechanism **108** presents content **112** to a user when context manager **104** selects content **112** for playback. In some variations on these embodiments, content delivery mechanism **108** can present content **112** in response to actions performed by the user, or interactions received from the user. For example, content delivery mechanism **108** may provide a user with a sequence of tasks to perform, such that content delivery mechanism **108** monitors the actions performed by the user, and advances to present a subsequent task once the user completes a given task. Context manager **104**

**6**

can be configured to determine when the user completes a task by monitoring the information gathered by input mechanism **102**, such as a microphone that gathers a verbal utterance of the user confirming the completion of a given task. In a second example, content delivery mechanism **108** may react to verbal requests or responses from the user as content delivery mechanism **108** presents content **112**.

Contextual Information

Mobile devices often include a number of information-based capabilities that facilitate integrating these devices into the daily routine of their user. These capabilities can be configured to determine contextual information associated with a user, and the mobile devices can be configured to utilize this contextual information to determine when and how to present information to the user. In one embodiment, "contextual information" can be defined as input data that is gathered by a computing device from a number of input sources, and reflects basic information associated with the user and/or the operating environment of the computing device. In some embodiments of the present invention, contextual information is data that is recorded from a number of input sources without being interpreted by the computing device.

In some embodiments of the present invention, content management system **100** can determine contextual information associated with a user, including:

Time of day—Content management system **100** can keep track of time and date information. In some embodiments, content management system **100** can synchronize its time and date information with a time server (e.g., using the network time protocol (NTP)). In some embodiments, content management system **100** can take advantage of time of day, day of week, date, holidays, etc., as a contextual factor when delivering information.

Geographical location—Location awareness is becoming a prominent feature of mobile devices. In some embodiments, content management system **100** can determine its geographical location by GPS, cellular tower triangulation, Wi-Fi triangulation, or other means now known or later developed.

Motion detection—Some mobile devices are capable of detecting motion (i.e., whether they are moving, shaking, tilting, etc.). Content management system **100** can achieve motion detection by using an accelerometer, a gyroscope, or other means now known or later developed.

Sound detection—Mobile devices often include a microphone for capturing sounds, or can utilize a microphone as a peripheral device. In some embodiments, content management system **100** can use a microphone to capture verbal utterances of the user. In other embodiments, content management system **100** can use a microphone to capture ambient sounds.

Image detection—Mobile devices often include a camera for recording pictures and/or video, or can utilize a peripheral camera. In some embodiments, content management system **100** can use a camera to determine lighting levels.

Internet information—Mobile devices often have access to the Internet, either via a Wi-Fi connection and/or a cellular network. In some embodiments, content management system **100** utilizes an Internet connection to gather public context and content information. This context information can include a weather report, stock report, news event, and any other trigger event that is accessible from the Internet. The content information can include an audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news

US 8,489,599 B2

7

feed, rich site summary (RSS) feed, Internet blog, and any other content that is accessible from the Internet.

In some embodiments of the present invention, content management system **100** is designed to detect basic contextual information on the behavior of the user, including but not limited to: location, movement, sound, verbal utterances (e.g., speech), ambient voices (e.g., from a television or radio), keyboard clacking, lighting, brain activity readings, velocity, walking, driving, user input, routines or patterns in the behavior of the user, and vocal inflections or biometric readings indicating agitation and/or irritation.

In some embodiments, content management system **100** can be kept in continuous operation, and can sustain its awareness of contextual information associated with a user during operation. In some variations on these embodiments, content management system **100** monitors a number of sensors and/or input devices using input mechanism **102** to gather contextual information with respect to the user. In other variations, a sensor or input device can initiate a specific software process of content management system **100** for gathering new contextual information from the sensor or input device. In further embodiments, content management system **100** can awaken from a sleep mode of operation at predetermined time intervals to poll its current context and determine whether the context satisfies trigger conditions which are associated with content in database **106**. If no relevant contextual triggers are satisfied by the context, then content management system **100** can return to the sleep mode of operation.

Context

In some embodiments, content management system **100** can determine a context associated with a user and/or operating conditions of the mobile device based on contextual information. Whenever input mechanism **102** gathers basic contextual information from a number of sources, context manager **104** can interpret the basic contextual information to infer a number of user-defined contexts. A context is a set of data that describes an event or environmental factor associated with a user or the operational environment of content management system **100**. In some variations on these embodiments, a context can be inferred from contextual information gathered by input mechanism **102**. In other variations, a context can be inferred from a number of contexts which have been inferred from contextual information. A context can also be inferred from a combination of contexts and contextual information.

For example, content management system **100** can be programmed to infer specific contexts about the user based on contextual information, including but not limited to whether the user is sitting down, watching TV, asleep, alert, talking, typing at the computer in the home study or at the office, walking around the house, walking outside the house, driving, or performing a household activity (e.g., cooking, or getting ready for work). In other examples, content management system **100** can be programmed to infer user patterns and preferences (e.g., taking the bus rather than walking when the weather is bad), possible hazards (e.g., darkness, weather warnings, proximity to crime zones), and the mental state of the user (e.g., mood, or concentration level).

Content

Mobile devices often include presentation mechanisms for reproducing audio and/or video content. In some embodiments of the present invention, content management system **100** uses these presentation mechanisms to present content that is triggered by a given context. In some variations on these embodiments, content management system **100** presents interactive content to the user, where a user can interact with the interactive content using input mechanism **102** of

8

content management system **100** (e.g., pressing buttons, touching a location of a touch screen, or communicating verbal utterances into a microphone).

When content management system **100** infers a user-defined context that is associated with the user, content management system **100** can use the inferred context to search for content in content database **106**, and retrieve content that can be presented under the given context. In some embodiments, content database **106** stores a set of content packages, where a content package includes a collection of content, and includes a number of contexts that can trigger content management system **100** to present content in the content package. In some variations on these embodiments, a content package can also include a script or executable code that can control how content is presented, and can implement the software mechanisms that interact with the user during presentation of the content.

In some embodiments of the present invention, content delivery mechanism **108** of content management system **100** can present content to a user in response to a context associated with the user. In other embodiments, content management system **100** can transmit content to a remote device in response to a context associated with the user.

In some embodiments of the present invention, content management system **100** can present content that is provided by a central publisher (e.g., a predetermined server). In other embodiments, content management system **100** can present content that is generated by the user. In a variation on these embodiments, content management system **100** can present content that is generated on a remote device, and is shared by the user of the remote device. For example, content management system **100** of a user that is driving toward a grocery store can automatically receive a grocery list that his wife generated for herself earlier that day using her content management system. Once the user enters the grocery store, his content management system **100** can present a combined grocery list that includes his grocery list items and her grocery list items.

In some variations on these embodiments, content management system **100** can be programmed to present content in response to a user-defined context for a number of applications, including: learning during spare time (e.g., a foreign language by listening, repeating, testing, etc.), automatic retrieval of important e-mail (e.g., subject to the user's attention span, and/or the urgency level of the content), receiving reminders (e.g., errands, purchases) at the right time and while in the right place, receiving directions to a desired location, playing music appropriate to the context of the user, and preparing to give a speech or a presentation by producing a section-by-section presentation layout. For example, a teacher can prepare a content package (e.g., a set of "audio study cards") designed to be present study material to a student during mornings, evenings, and weekends when the student is using a public mode of transportation. Furthermore, the teacher can configure the content package to define a timing and pace for the presentation of the content package, define the required responses from the student to given prompts or questions from the content package, and/or define a delay period for when a given prompt or question can be presented after a correct response from the user.

Delivering Content

FIG. **2**A illustrates a data flow for a content management system **200** associated with delivering content to a user in accordance with an embodiment of the present invention. Content management system **200** includes a context manager **201**, an input mechanism **204**, a content database **206**, and a content delivery mechanism **208**. Input mechanism **204** gath-

US 8,489,599 B2

**9**                                                    **10**

ers contextual information **210**, which includes sensed information about the environment and about user activities, and sends contextual information **210** to an analysis mechanism **202** of context manager **201**. Analysis mechanism **202** deduces a context **214** (which may include a user activity) from contextual information **210**, and context manager **201** uses context **214** to retrieve a corresponding content package **216** from content database **206**. Context manager **201** then provides content delivery mechanism **208** with content package **216** for presentation. In some variations on these embodiments, content database **206** can provide content package **216** directly to content delivery mechanism **208**.

Next, content delivery mechanism **208** presents content package **216** to the user. In doing so, content delivery mechanism **208** receives user interactions **212** from the user, and presents content **218-220** from content package **216** in response to user interactions **212**.

It is possible that during operation, context manager **201** may determine that context **214** corresponds to more than one content package. In other words, context **214** satisfies the conditions for presenting more than one content package. In some embodiments of the present invention, context manager **201** prompts a user to select one content package to present from a set when context **214** corresponds to more than one content package. In other embodiments, context manager **201** selects one content package to present from a set based on predefined priorities or evolving weight values for content packages. For example, context manager **201** can select a content package which is the least-recent to be presented (e.g., has the oldest playback time stamp from the set of content packages), or can select a content package which is the most-recent to be presented. In another example, context manager **201** can select a content package from the set which has been presented the least number of times (e.g., has a lowest weight value from the set of content packages, which increments after the content package is presented), or can select a content package which has been presented the most number of times.

Creating Content

FIG. 2B illustrates a data flow for a content management system **240** associated with allowing a user to create content **253** in accordance with an embodiment of the present invention. In some embodiments, a user can create content **253** using content management system **240** on a mobile device or a personal computer (PC). Content management system **240** includes a context manager **241**, an input mechanism **244**, and a content database **246**. Input mechanism **244** gathers a content stream **248** and user interactions **250**, and sends content stream **248** and user interactions **250** to an analysis mechanism **242** of context manager **241**. In some variations on these embodiments, user interactions **250** can be verbal commands uttered by the user to interact with a voice-based user interface (UI) of content management system **240**. In other variations, user interactions **250** can be data provided by the user

through a graphical user interface (GUI), including data entered using a keyboard, a mouse, a touch screen, or any other input device.

Analysis mechanism **242** creates a definition for a context **254**, or selects a predefined context **254**, based on user interactions **250**. Also, analysis mechanism **242** creates a content **253** based on content stream **248** and user interactions **250**. Next, context manager **241** creates a content package **252** that includes content **253** and context **254**, and provides content database **246** with content package **252**. Content database **246** then creates an entry for content package **252**.

In some embodiments, a user can create a content package **252** using content management system **240**, which includes creating a set of rules for presenting content package **252**. In some variations on these embodiments, content management system **240** includes a GUI for creating a content package **252** that resembles a spreadsheet, which includes a number of columns for content, context, or presentation parameters, and a number of rows that allow a user to enter data for the corresponding parameter. In other variations, content management system **240** can achieve a functionality that is equivalent to the spreadsheet GUI described herein while using a different GUI layout. In some variations on these embodiments, content package **252** is created to include the data in a given spreadsheet. In other embodiments, content package **252** is created for a respective row of the spreadsheet.

During operation, a user can insert content **253** into content package **252** by clicking on an entry under the content heading of the GUI. In some variations on these embodiments, clicking on a content column entry enables the user to record a content stream **248**, while in other variations, clicking on a content column entry enables a user to select prerecorded content **253** for the content column entry. Similarly, a user can click on an entry under any of the other column headings in a content package **252** to enter a value for the entry. Column headings for creating content package **252** include, but are not limited to, content, time, location, state, response, action correct, and action incorrect. In some embodiments, the entries under column headings time, location, and state can be used to define contexts for presenting content **253**, and the entries under column headings response, action correct, and action incorrect can be used to define presentation rules.

Note that, in general, a context or activity can be defined in terms of high-level abstractions, such as "commuting to work." A high-level abstraction can corresponds to a combination of multiple low-level contextual information values, such as day of week, time of day, series of GPS traces, or accelerometer readings. In one embodiment, a low-level contextual information value can correspond to one or more measurable physical parameters. Furthermore, a presentation rule can be defined in terms of one or more high-level abstractions, such as "play while commuting to work and while comminuting from work." In addition, a user can share a presentation rule with another user. The second user can redefine the shared rule to accommodate his personal low-level contextual information values for corresponding high-level abstractions.

TABLE 1

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| Jp1.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHello.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpHowDoYouDo.mp3 | Any | Any | Moving | Mimic | 7-day-suspend | 5-min-suspend |

US 8,489,599 B2

| 11 | | | | | | 12 |

TABLE 1-continued

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| JpGoodnight.mp3 | >21:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |
| JpGoodmorning.mp3 | <10:00 | Bedroom | Moving | Mimic | 7-day-suspend | 5-min-suspend |

TABLE 1 illustrates an exemplary set of rules for presenting content package **252** to a user in accordance with an embodiment of the present invention. The entries illustrated by Table 1 correspond to a number of audio clips in Japanese for practicing pronunciations to a number of words. The time column allows a user to specify a time of day when content **253** can be presented, which can be a time instance, or can be a time range. The location column allows a user to specify a location for where content **253** can be presented, and the state column allows a user to specify an action that the user can be performing when content **253** is presented. For example, a user that is learning Japanese can program content management system **240** to play "good morning" in Japanese when the user is moving around the bedroom before 10 AM, and to play "goodnight" in Japanese when the user is entering or moving around the bedroom after 9 PM.

The response column allows a user to specify an expected response to the presentation of content **253**. The action correct column allows a user to specify actions that content management system **240** can perform if the user provides a correct response. The action incorrect column allows a user to specify actions that content management system **240** can perform if the user does not provide a correct response. For the example, the user can program content management system **240** to suspend an audio clip for a given phrase for seven days if the user correctly mimics the phrase in Japanese. The user can also program content management system **240** to repeat the phrase after five minutes if the user does not mimic the phrase with a proper pronunciation, thereby allowing the user to practice the phrase repeatedly until the user achieves a proper pronunciation of the Japanese phrase.

In some embodiments, content management system **240** allows a user to provide a desired name for a content entry. For example, a user may record a phrase in Japanese, and name the file using the English translation to the phrase. In some variations on these embodiments, a user can provide the name to content management system **240** as verbal speech, and content management system **240** produces a text string for the name by converting the speech to text. In other variations, a user can type the name using an input device of content management system **240**. In the event that a user does not provide a name to a recording, content management system **240** can name the recording using a default file name, such as "Note1."

In some embodiments, content management system **240** allows a user to set a value to a column entry by providing a drop-down menu when a user taps or clicks on the column entry. This drop-down menu displays a vertical list of allowable values for the user to select from, and allows the user to select a value by clicking or tapping on the desired value. In other embodiments, content management system **240** allows a user to set a value to a column entry by allowing the user to type the value into the column entry.

In some embodiments, a user can provide content management system **240** with a list of allowable values (e.g., names or tags, and corresponding contextual information) for the entries of a given column (e.g., the time, location, state, or response columns presented in Table 1). For example, a location column entry may obtain an allowable set of values from a database of geographical locations selected by the user. In some embodiments, a user might define a geographical location for current or later use in content management system **240** when the user is at the desired location by notifying content management system **240** to store the current geographical location, and specifying a name for the stored geographical location (e.g., "home" or "bedroom"). In other embodiments, a user can specify a geographical location by selecting the location from a map, providing content management system **240** with the street address of the geographical location, or providing content management system **240** with geographic coordinates of the desired location, and then specifying a name or a tag for the geographical location. In some embodiments, content management system **240** can automatically infer geographic locations that are important to a user, and appropriate names for these locations, based on contextual information and routines performed by the user.

A column entry may also obtain an allowable set of values from a database of predefined names or tags with pre-set values which can be edited by the user. For example, a "moving" value for the state column entry can be an identifier which corresponds to a predefined context **254** that can be triggered by a motion detection mechanism.

In some embodiments, content package **252** can include more than one column of a given type. For example, content package **252** can include a column for Japanese entries and another column for corresponding English translation entries which are to be presented according to predetermined rules. In some embodiments, these predetermined rules can be specified in yet another column, and can define the conditions which cause a corresponding English translation to be presented (e.g., a time delay, a contextual condition, or a user response). In another variation, a user can instantiate more than one state columns to define more precise context trigger conditions for content **253**. For example, a user can instantiate two state columns, and select a predefined or user-defined state for each state column (e.g., walking and shopping).

A response column entry may obtain a value that describes an expected response from the user in the form of an audio stream or a text string. In some embodiments, a response column entry may obtain a value in the same manner that content **253** is provided for a content column entry, where a user can record an expected response or select a prerecorded response. In other embodiments, a response column entry may obtain a value from the user in the form of a text string encapsulated by quotation marks, where the verbal response by the user and the expected response provided in the form of text are compared using text-to-speech and/or speech-to-text technologies. In yet other embodiments, a response column entry with a value mimic notifies content management system **240** that the response provided by the user should mimic the content identified by the corresponding entry under the content column.

Content management system **240** can perform an action responsive to a user response or interaction with the presen-

US 8,489,599 B2

**13**

tation of content **253**. An action correct column entry can obtain a value that specifies an action to be performed by content management system **240** in the event that the user provides an expected response. Furthermore, an action incorrect column entry can obtain a value that specifies an action to be performed by content management system **240** on the occasion that the user does not provide an expected response. For example, content management system **240** can suspend playback of content **253** for a given time period, or can delete the content entry.

In some embodiments, an entry under the action correct column or the action incorrect column is a predefined capability of content management system **240**. In other embodiments, an entry under the action correct column or the action incorrect column is a script or executable program that is provided by the user. A user can create a script or an executable program, which performs a sequence of operations, and can store and access state information gathered from user responses over a period of time. For example, a user can provide an action correct column entry with a script or executable program that deletes or alters (e.g., by changing a timing condition for presenting the content again) the corresponding content entry when the user mimics content **253** accurately on three consecutive attempts.

In some embodiments, an entry for a content column can have text-based content **253**, including but not limited to, e-mail, Internet blog updates, Internet RSS feeds, tweets, text-based notes and reminders, or computer-readable point-

**14**

"OK," content management system **240** deletes the content entry. Otherwise, if the user does not utter "OK," content management system **240** suspends content **253** of the content entry for fifteen minutes.

In a second example, a user can program content management system **240** to present a second reminder after a specific day and time, and while the user is driving. If the user responds to content **253** by uttering "OK," content management system **240** deletes the content entry. Otherwise, if the user does not utter "OK," content management system **240** suspends content **253** for fifteen minutes.

In a third example, a user can program content management system **240** to present a third reminder after a specific day and time, and while the user is stationary at the library (i.e., studying or reading at the library). In some variations on these embodiments, content management system **240** may determine if the user is wearing headphones before reproducing audio content **253** for the user while the user is in the library. If the user does not have headphones plugged into content management system **240**, content management system **240** may flash a visual message to the user that requests the user to plug headphones in to the headphone jack, or to step outside the library. In other variations on these embodiments, content management system **240** may reproduce content **253** as text when the user is in the library. If content **253** contains verbal utterances, content management system **240** may use a speech-to-text mechanism to reproduce the verbal utterances as text.

TABLE 2

| Content | Time | Location | State | Response | Action Correct | Action Incorrect |
|---|---|---|---|---|---|---|
| Note1 text | =20070929:18:00 | Any | Moving | "OK" | Delete | 15-min-suspend |
| Note2 text | >20071001:09:00 | Any | Driving | "OK" | Delete | 15-min-suspend |
| Note3 text | >20071001:12:10 | Library | Stationary | "OK" | Delete | 1-day-suspend |
| Note4 text | =20071002:10:00 | Office | Moving | "OK" | Delete | 15-min-suspend |
| Note5 text | >20071003:18:00 | Office | Moving | "OK" | Delete | 15-min-spend |

ers to content. In some variations on these embodiments, a computer-readable pointer can reference specific content. In other variations, the computer-readable pointer is defined based on metadata (e.g., a date, a geotag, or textual description for a content category), and is used to reference content associated with the metadata which can be gathered from a number of databases.

In some variations on these embodiments, content management system **240** can present the text-based content by displaying it on a screen of content management system **240**. In other variations, content management system **240** can present text-based content **253** by converting content **253** to audio using text-to-speech technologies, and reproducing the audio. Furthermore, content management system **240** can apply a set of rules for presenting the text-based content **253**. For example, content management system **240** can present emails to a user from a predefined set of people at certain times of the day, or under a given context **254**.

TABLE 2 illustrates an exemplary set of rules for presenting a reminder content package **252** to a user in accordance with an embodiment of the present invention. An entry under the content column identifies a reminder in the form of text, and the other columns describe a set of rules for presenting the reminder to the user. For example, a user can program content management system **240** to present a first reminder at a specific day and time if the user is moving (e.g., walking, or jogging). If the user responds to content **253** by uttering

Content management system **240** can include an input mechanism **244** that supports short-range communication protocols such as Near Field Communication (NFC), which can be used to read radio frequency identification (RFID) tags, or to interact with other NFC devices at a short distance. Content management system **240** that supports the NFC protocol can identify physical objects based on RFID tags attached to the objects, and can use the gathered information as contextual information for presenting content **253**, or can use a detected NFC signal as a user interaction **250**.

For example, a user can program content management system **240** to present a notification to the user to carry an umbrella when content management system **240** detects that the user is about to walk outside the house, determines from an Internet forecasting service that it will rain later in the day, and does not detect an RFID tag that identifies the user's umbrella. In another example, a user can program content management system **240** to notify the user's spouse that the user is returning home when the user passes an RFID tag on the doorframe at work or in the car during the evening.

Audio-Based Content Creation

In some embodiments, content management system **240** provides an audio-based user interface (UI). For example, a user can interact with content management system **240** using the audio-based UI when creating a new reminder content while on the move. In some variations on these embodiments, the audio-based UI for content management system **240** fol-

US 8,489,599 B2

15

lows a linguistic scheme that parallels the GUI for content management system **240**. An audio-based UI that resembles a GUI of content management system **240** facilitates a user in becoming acclimated to the audio-based UI when the user is already familiar with the corresponding GUI. For example, an audio-based UI for content management system **240** may interact with a user that is creating a new reminder using the following dialogue:

> User: "To-dos, New Note."
> System: "Begin Recording To-do."
> User: "[verbal utterances] . . . [pause]."
> System: "Recording complete."
> User: "System, continue recording, [more verbal utterances] . . . [pause]."
> System: "Continued recording complete."
> User: "Present to me in time Any, Location Home, State Stationary, Response OK, [pause]."
> System: "Note complete."

In some variations on these embodiments, a user can state a value for a parameter (e.g., "Any time, home, stationary, response OK"). In other variations, content management system **240** can present audio prompt a user to specify a value for each column entry (e.g., "Specify time condition"). In further variations, a user does not have to communicate a value for every entry associated with a column of the content creation GUI. In the event that a user does not provide a value for a given column of the content creation GUI, content management system **240** will fill the corresponding entry with a default value. For example, a user can configure content management system **240** so that the default location is the current location of the user. In a second example, a user can configure content management system **240** so that the default location is the any value. In a further example, the user can set the default time for presenting content **253** to the any value, and can set the default response to content **253** to "OK."

In another example, an audio-based UI for content management system **240** may interact with a user that is creating a presentation layout using the following dialogue:

> User: "Presentation [presentation name], Slide One, [pause]."
> System: "Begin Recording Presentation."
> User: "Slide One, Point One, [speaks remainder of slide content], [pause]."
> System: "Recording complete."
> User: "System, continue recording, Slide Two, [pause]."
> System: "Continue Recording Presentation."
> User: "Slide Two, [speaks remainder of slide content], [pause]."
> System: "Continued recording complete."

Matching Content to Activity

In some embodiments of the present invention, content management system **240** is capable of inferring a context **254** associated with a user from contextual information associated with a user, and is capable of matching content **253** to the inferred context **254** in a number of ways.

In some embodiments, content management system **240** can determine if the user is receptive to a given content **253**, and can give preference to a specific type of content **253** as a result of an activity being performed by the user. For example, a user that has configured content management system **240** to present tutoring content may wish to receive tutoring lessons for learning Japanese when the user is commuting to work. More specifically, content management system **240** may present audio-based Japanese lessons to the user when the user is driving to work, and may present Japanese reading and writing lessons to the user when the user is riding the train to work. In a further example, content management system **240**

16

can provide lessons to the user when the user is walking and is receptive to learning, and can avoid providing lessons when it detects audible speech because the user may be occupied watching television or having a conversation.

In some embodiments, content management system **240** can be programmed with more than one content package **252**. In effect, a user can program content management system **240** to vary the types of content **253** that are presented for different values of context **254**. For example, the user can program content management system **240** to restrict language lessons to a particular geographic or geospatial location, and to restrict technical lessons to weekdays or evenings.

In some embodiments, a user can configure content management system **240** to present content **253** that is relevant to the user's current specific behavior. For example, if the user is walking, content management system **240** can provide a language lesson by describing the action of walking to the user in Japanese, or can provide content **253** in Japanese that is relevant to the location that the user is walking through. In another example, if content management system **240** determines that the user is in the kitchen and it is morning, then content management system **240** can infer that the user is preparing breakfast or having breakfast, and may provide breakfast-related Japanese language lessons. In other examples, content management system **240** can provide other types of content **253** based on an inferred context **254**, including content types such as music, history lessons, Internet blogs, text-to-speech email, etc.

In some embodiments, content management system **240** can provide lessons in anticipation of an action that a user is about to perform. In some variations on these embodiments, content management system **240** can present reminder content **253** to the user in advance so that the user can adjust his or her plans. In other variations, content management system **240** can provide natural grammar lessons to a user by providing language lessons in the appropriate grammatical tense. For example, content management system **240** can teach grammar to a user based on the user performing a given action. As the user changes his or her walking state, content management system **240** may produce a corresponding content **253**, such as: "I will walk," "I am walking," or "I walked." In a further example, content management system **240** can provide Japanese language lessons relevant to greeting people in the future tense to a user when the user enters a bus or train on a weekday morning. That is, content management system **240** can use grammatical rules to present a sequence of content **253** that matches the anticipation, start, continuance and completion of an activity.

Content Sharing and Delivery Infrastructure

In some embodiments, a user can create shareable content using content management system **240** on a mobile device or a PC. The shareable content is a content package **252** that a user can download, modify, and share with other content management systems. Furthermore, a content package **252** can include a number of content entry fields for text, graphics, audio, and/or video content **253**.

Once a user invests the initial effort into creating a content package **252**, content package **252** can be easily shared and modified by other users. In some embodiments, a user can upload a content package **252** onto an Internet website to make content package **252** publicly available. In some other embodiments, a user can download a content package **252** from an Internet website, and modify content package **252** to insert, modify, and/or remove content **253** from content package **252**. In some variations on these embodiments, a user can modify content package **252** to insert, modify, and/or remove presentation rules from content package **252**.

US 8,489,599 B2

17                                                    18

In some embodiments, an abstract name or tag for a contextual condition (e.g., "home" or "shopping") can be recognized by the content management system, and can be easily shared between users without the users having to redefine specific contextual information associated with these names or tags. For example, a first user can define a home location name to refer to a specific street address, and a second user can define the home location name to refer to a different street address. Therefore, when the first user shares a content package 252 with the second user, any reference to the home location name in the content package will be automatically translated to the street address of the second user. The second user does not have to redefine the contextual information associated with the home location name of content package 252.

In some embodiments, a user can share a content package 252 when it is not complete. Content package 252 is not complete when one or more entry fields of content package 252 do not have a corresponding content 253. Sharing an incomplete content package 252 allows for a number of users to cooperate in creating shareable content, and allows a number of users to vary from each other.

For example, a user may invest a significant effort to create a content package 252 for a Japanese language tutorial by creating an extensive list of words and phrases in English, and may even include Japanese translations for some of the corresponding entries. These English and Japanese entries can be audio content 253, or they can be written text. The user can then make content package 252 publicly available, and allow other users to download and improve upon content package 252. Other users can replace the initial Japanese translations with audio recordings that have better pronunciation, and can include Japanese audio recordings for English words and phrases that do not have a corresponding Japanese audio translation. Furthermore, Japanese-speaking users may insert new entries into content package 252 in Japanese for words and/or phrases to which they would like an English translation, thereby allowing an English-speaking user to provide a corresponding audio recording in English.

In some embodiments of the present invention, a content entry or a set of content entries in content package 252 have one or more content type description entries. A content type description can be a text string which describes a characteristic of content 253 of the entry (e.g., "reminder," "tourist information," or "conjugations of the Japanese verb taberu"). In some variations, the content type description for a content entry can be predefined. In some other variations, the content type description can be defined by the content management system based on related contextual information (e.g., time, location, user activity, etc.). In further variations, the content type description can be defined by a user.

In some embodiments, the content type description entries in content package 252 can be used to classify a collection of content packages based on the type of content they contain. The content type descriptions can be used to search for content 253 with a matching or related content type description stored in content database 246 or any other database or source of content. For example, the user can search for content entries defined as "conjugations of the Japanese verb taberu," or "conjugations of Japanese verbs."

In some embodiments of the present invention, content management system 240 can use artificial intelligence to create a content package 252 that is tailored to a user. In one variation on these embodiments, content management system 240 uses natural language processing (NLP) to parse text entered by the user.

For example, content management system 240 can be in the form of an Internet website that has HTML and XML-structured content 253 tied to a database that contains vocabulary and grammatical rules. Content management system 240 can enable a user to interact with a textual UI to generate sentences in which words, tense and other variations can be automatically varied so that the user can practice learning grammatical rules by example. Based on the interactions between content management system 240 and the user, content management system 240 can create a content package 252 that implements a lesson plan that allows the user to practice many variations on a number of rules so that the user can learn the rules through practice.

In a further example, if a user wants to learn how to use passive sentence constructions in Japanese, the user can provide content management system 240 with an exemplar English text entry "Alice was scolded by the teacher." The user can then use a GUI to specify a search for content packages 252 or content entries which contain grammatically similar results in English paired with Japanese translations. In response, content management system 240 can generate grammatically equivalent sentences, perhaps with the option to vary the subject, object, verse, and tense. In some embodiments, content management system 240 can generate grammatically equivalent sentences by first parsing the user-entered English sentence to determine its linguistic deep structure. Then, content management system 240 can generate a system-defined content type description string based on the user-entered English sentence, and can search for English-Japanese content pairs which have content type descriptions that match some user-specified aspect of the phrase's deep structure, while varying any or all of the subject, object, verb, and tense. For example, content management system 240 can generate grammatically similar sentences using the passive construction, including:

"The dog was being scolded by mother;"
"Mary was praised by the professor;"
"Paul is being interviewed by the journalist;"
"John will be called by the department head;"
"The children used to be scolded by father;" and
"The apple will be eaten by Sara."

In some variations on these embodiments, the grammatically equivalent sentences could be audio-based content 253 that was recorded earlier by other users, where a given audio recording is associated with a content type description text string for the recorded content. Content management system 240 can analyze the grammatical deep structure of the sentence entered by the user to find matches in its database for content with an associated content type description text string. Then, content management system 240 can assemble recordings, content entries, and/or entire content packages from the database that match into a new content package 252.

FIG. 3 presents a flow chart illustrating a process for delivering context-based content to a user in accordance with an embodiment of the present invention. The content management system begins by receiving contextual information (operation 310), and processing the contextual information to determine a context (operation 320). Next, the content management system determines whether the context satisfies a trigger condition (operation 330). If so, the content management system selects content from the content database based on the context (operation 340), and presents the selected content to the user (operation 350).

FIG. 4 presents a flow chart illustrating a process for creating context-based content in accordance with an embodiment of the present invention. The content management system begins by recording content provided by the user

US 8,489,599 B2

**19**

(operation **410**). Then, the content management system creates a content entry in the content database for the recorded content (operation **420**). Next, the system associates the content entry with a predefined context by specifying one or more trigger conditions for the content entry (operation **430**). In some variations, a user can manually associate the content entry with a predefined context.

FIG. **5** illustrates an exemplary computing device **502** that facilitates creating and delivering context-based content in accordance with an embodiment of the present invention.

Computing device **502** includes a processor **504**, a memory **506**, and a storage device **508**. Furthermore, computing device **502** comprises a display **510**, a network interface **512**, a vibration mechanism **514**, a number of sensors **516**, an input device **518**, a speaker **520**, a microphone **522**, and a camera **524**. Furthermore, computing device **502** is coupled to a network **526** through network interface **512**. In one embodiment, network **526** includes a cellular network. In a further embodiment, network **526** includes the Internet.

Storage device **508** stores an operating system **528**, a content management system **530**, context definitions **542**, and content **544**. Furthermore, content management system **530** includes a user interface (UI) **532**, an input mechanism **534**, a context manager **536**, a content database **538**, and a content delivery mechanism **540**. In one embodiment, UI **532** is a graphical user interface (GUI). In another embodiment, UI **532** is a voice-based user interface.

During operation, content management system **530** is loaded from storage device **508** into memory **506** and executed by processor **504**. In one embodiment of the present invention, content management system **530** presents content to a user based on a context associated with the user. To do so, input mechanism **534** of content management system **530** gathers contextual information associated with the user from a number of input sources (e.g., network interface **512**, sensors **516**, input device **518**, microphone **522**, and/or camera **524**), and context manager **536** of content management system **530** interprets the basic contextual information to infer a user-defined context from context definitions **542** that describes an event or environmental factor associated with the user. Context manager **536** then searches for a content package in content database **538** that is triggered by a number of inferred contexts, and content delivery mechanism **540** of content management system **530** presents the selected content package.

In another embodiment of the present invention, content management system **530** allows a user to create a content package. To do so, input mechanism **534** gathers a content stream and user interactions from a number of input sources, and sends the content stream and the user interactions to context manager **536**. Context manager **536** creates a context definition, or selects a user-defined context from context definitions **542**, based on the user interactions. Also, context manager **536** creates a content file based on the content stream and the user interactions, and creates a content package that includes the content file and the context. Next, context manager **536** provides content database **538** with the content package, and content database **538** creates an entry for the content package.

*Variations of Embodiments*

Activity-Triggered Grammatical Instruction

In some embodiments, content management system **530** can be configured by a user, based on the mechanisms described above, to teach grammatical rules to the user by example. In doing so, content management system **530**

**20**

detects a context associated with the user (e.g., actions such as going out to dinner or driving a car), and presents audio content that contains expressions in a target language that are appropriate to the context, and at the right time. For example, content management system **530** can present the following audio content under the appropriate context:

When the user enters the garage or opens the car door: "I will drive my car."
When the user begins driving: "I am driving my car."
When the user leaves the car: "I drove my car."

Language in Context

In some embodiments, content management system **530** can retrieve geotagged content from a server to present content that is appropriate to the geographical location to the user. For example, based on the mechanisms described above, users that visit a popular tourist location can create geotagged content that describes information about the location to help others learn more about the location, and upload this content onto a public database. Furthermore, a number of users may upload geotagged content about the location in a number of languages. Then, when another user visits this geographical location, content management system **530** can download content that is geotagged with this location, and can present the content to the user. A user that is learning a new language can configure content management system **530**, based on the mechanisms described above, to retrieve content in that language, thereby listening to language examples that are appropriate to the user's activities.

Collaborative To-Dos

In some embodiments, content management system **530** can create and transmit an electronic message or reminder to a remote device so that the remote device presents the content under a given user-defined context. The electronic messages and reminders can be in the form of text, or audio content. In some variations on these embodiments, content management system **530** can convert text messages and reminders into audio content using text-to-speech technology. These embodiments can provide a user with a new medium for sending important information to a recipient, and can ensure that the recipient will receive the content when the recipient is in a suitable context and activity state, and can complete the task.

Live Connections to Experts

In some embodiments, content management system **530** can communicate content between users that do not know each other personally. For example, content management system **530** can be used to implement a tutoring service, where students can submit a shareable content package to the tutoring service using content management system **530**, and the tutoring service forwards the content package to an appropriate tutor for the given topic. In some variations, the tutoring service can be implemented by a distributed version of content management system **530**, where content management systems for students and teachers forward content requests and content packages to each other. In some other variations, the tutoring service can be implemented as an Internet service, where students and teachers can upload and download content packages and perform requests for relevant content packages.

A tutor can use the tutoring service to subscribe to a process which monitors the content requests and incomplete content packages which are submitted by other users and are related to a given content type description. When a tutor is notified of a content request or an incomplete content package from a student, the tutor can provide feedback to the student by creating a new content package which includes a response to the requests from the tutor, or can modify the content package

US 8,489,599 B2

21

to insert feedback content into the content package. Then, the tutor's content management system **530** can make the new or modified content package available to the student. The tutor's new content can then be retrieved via the tutoring service by the student's personal version of content management system **530**.

Progress Analytics

In some embodiments, content management system **530** can store state information associated with interactions from a user when presenting a content package. For example, a content package that provides interactive lessons to a user may record accuracy information for the user. Content management system **530** can utilize this information to perform progress analytics, and alter the pace and difficulty of the lesson plan in response to the goals and the learning rate for the user. Content management system **530** may provide a user that is having trouble learning a specific sub-topic with more lessons on that sub-topic, and may increase the pace or difficulty for a user that is learning the material relatively easily. Furthermore, if a given user has a fixed deadline for studying a specific topic, and the user is behind on lessons, content management system **530** can increase the pace of the lesson plan to ensure the user is prepared by the deadline.

Context-Dependent Versus Context-Independent Learning

In some embodiments, content management system **530** can strengthen a user's memory on a given lesson plan by alternating between providing lesson content within an appropriate context, and providing the lesson content out of any appropriate context. On some occasions, content management system **530** can present lessons to a user in a context under which the user is most effective at learning. On other occasions, content management system **530** can provide the user with lessons in inappropriate and/or inconvenient contexts to radically separate the lesson content from any contextual cues or reminders the user may be relying on.

Evolution

In some embodiments, content management system **530** can evolve a method for delivering a lesson plan to a user. In some variations on these embodiments, content management system **530** can lengthen the period of time it waits before offering the user a correct response to a question when the user is expected to know the lesson material. In other variations, content management system **530** can allow a user with a decreasing period of time to provide a response to a question. In yet other variations, content management system **530** could decrease the clarity of the questions it asks when the user has reached an advanced level of understanding of the subject.

Context Creation

In some embodiments, publishers could create and publish their content on the Internet as content packages for content management system **530**. A user that is learning a new language may prefer to pay for a professionally created and advanced language lesson, as opposed to spending significant effort in gathering a multitude of content packages that provide language examples.

Constant Audio Feedback

In some embodiments, content management system **530** can use speech recognition to complement an instructional lesson. For example, content management system **530** could use speech recognition to supply a user that is learning a new language with constant feedback on the user's grammar and pronunciation. In another example, content management system **530** could use speech recognition to help a user alter his/her communication style for a target audience. In yet another example, when a user is creating basic second language educational type content for others, content manage-

22

ment system **530** could use speech or text recognition, and deep sentence structure recognition, to provide the user with hints that the user should use language that is simpler for a foreigner to understand. For example, content management system **530** can suggest more common nouns, verbs, and simpler sentence constructions.

Contextual Tagging

In some embodiments, content management system **530** can build context-based inferences for a situation, which can be defined geographically or temporally, based on contextual information that is gathered at a location at a given time, day of week, or day of year. When a user of content management system **530** enters a situation, the user will tend to interact with the environment in a manner that is specific to the situation. Content management system **530** can take advantage of its observations of behaviors aggregated from a number of users in the same situation to infer a context associated with that situation. In some embodiments, content management system **530** does not need to store personal information associated with a specific user, it only needs to store the predefined or user-defined behavior descriptions (e.g., "moving," "walking," "coffee break," etc.) it detects. For example, when a user is sitting at a coffee shop during opening hours while using content management system **530**, the user may have a tendency to utter terms and phrases that are associated with a coffee shop, including "coffee," "beans," "pastry," "Wi-Fi," "hot-spot," "relaxing," "great cup of coffee," "tasty cookies," "Internet access" and "Internet café." Based on predefined or user-defined activities and/or observed words and phrases that are detected, content management system **530** can determine that a user's current situation is associated with the term "coffee" (e.g., the user is currently at a coffee shop).

In some variations on these embodiments, content management system **530** can provide a public context database with a collection of keywords that it gathers from detected user activities or utterances under a given context, thereby contributing to the pool of contextual knowledge of the public context database. The public context database can learn from the keywords provided by a number of content management systems by identifying the terms and phrases that are most common under a given context, and associating these keywords and phrases with the context.

In some other variations, content management system **530** monitors the text and speech communicated by a user as part of its context monitoring capability (receive contextual information **310**), on a number of applications to gather context-specific keywords. For example, the user may communicate information using a number of applications on a mobile device (e.g., e-mail, Internet search engines, text messages, mobile Web 2.0, etc.) These variations allow users to provide context-specific keywords and phrases to a public context database, without having to tag a context with related keywords. In some embodiments, content management system **530** does not save the specific key words captured from a user, but can add a unit of weight to a word entry of a dictionary of known words as words are detected within a given situation. Over time, the public context database will give preference to keywords and phrases that appear most commonly in a given situation, and can include these keywords within a database that associates specific keywords and phrases with corresponding situations.

In some variations on these embodiments, content management system **530** includes a voice-activated keyword lookup mechanism, which uses a speech-to-text mechanism to convert speech to text when it detects verbal utterances. Content management mechanism **530** uses the text generated from these verbal utterances to search in a public context

US 8,489,599 B2

**23**

database to infer a context that can be used to identify the current geographical location of the user. In some variations on these embodiments, the keyword lookup mechanism can gather keywords from the environment using a microphone, and/or can gather keywords from a phone conversation that the user is engaged in. In some other variations, the keyword lookup mechanism can gather keywords from terms and phrases that a user receives or sends using content management system **530**, including words from a text message, e-mail, or any other communication mechanism.

The foregoing descriptions of embodiments of the present invention have been presented only for purposes of illustration and description. They are not intended to be exhaustive or to limit the present invention to the forms disclosed. Accordingly, many modifications and variations will be apparent to practitioners skilled in the art. Additionally, the above disclosure is not intended to limit the present invention. The scope of the present invention is defined by the appended claims.

What is claimed is:

**1**. A method for delivering context-based content to a first user, the method comprising:

receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;

receiving a set of contextual information with respect to the first user;

processing the contextual information to determine a current context for the first user;

determining whether the current context satisfies the trigger condition;

in response to the trigger condition being satisfied, presenting the content piece to the first user;

receiving a response from the first user corresponding to the presented content piece;

determining whether the received response matches the expected response; and

performing an action based on an outcome of the determination.

**2**. The method of claim **1**, wherein the method further comprises creating the content package for the first user, wherein creating the content package involves:

recording the content piece that is provided by the first user;

creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions; and

associating the one or more trigger conditions for the entry with a user-defined context; and

wherein the method further comprises:

continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user; and

in response to the one or more trigger conditions being met, retrieving the content piece, and presenting the retrieved content piece to the first user.

**3**. The method of claim **2**, wherein the method further comprises creating a shareable content piece for the first user, wherein creating the sharable content piece involves:

recording the sharable content piece that is provided by the first user; and

creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;

**24**

wherein the content package allows a recipient of the content package to insert, modify, and/or remove content or trigger conditions from the content package.

**4**. The method of claim **1**, wherein the method further comprises defining a context by:

creating one or more context entries in a context manager; and

associating a respective context entry with a set of contextual information.

**5**. The method of claim **4**, wherein the method further comprises updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user.

**6**. The method of claim **1**, wherein the context is defined as a combination of at least a high-level abstraction which corresponds to one or more low-level contextual information values, wherein the low-level contextual information values can correspond to one or more measurable parameters.

**7**. The method of claim **1**, wherein a respective rule is defined with one or more high-level abstractions.

**8**. The method of claim **7**, further comprising allowing the first user to share the rules with a second user, wherein the second user can redefine the shared rules based on the second user's low-level contextual parameters.

**9**. The method of claim **1**, wherein presenting the content piece comprises sharing the content piece with a remote device.

**10**. The method of claim **1**, wherein the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.

**11**. The method of claim **1**, wherein the content piece includes one or more of: audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

**12**. A computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method for delivering context-based content to a first user, the method comprising:

receiving at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;

receiving a set of contextual information with respect to the first user;

processing the contextual information to determine a current context for the first user;

determining whether the current context satisfies the trigger condition;

in response to the trigger condition being satisfied, presenting the content piece to the first user;

receiving a response from the first user corresponding to the presented content piece;

determining whether the received response matches the expected response; and

performing an action based on an outcome of the determination.

**13**. The computer-readable storage medium of claim **12**, wherein the method further comprises creating the content package for the first user, wherein creating the content package involves:

US 8,489,599 B2

25

recording the content piece that is provided by the first user;

creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions; and

associating the one or more trigger conditions for the entry with a user-defined context;

wherein the method further comprises:

continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user; and

in response to the one or more trigger conditions being met, retrieving the content piece and presenting the retrieved content piece to the first user.

**14**. The computer-readable storage medium of claim **13**, wherein the method further comprises creating a shareable content piece for the first user, wherein creating the sharable content piece involves:

recording the sharable content piece that is provided by the first user; and

creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;

wherein the content package allows a recipient of the content package to insert, modify, and/or remove content and/or trigger conditions from the content package.

**15**. The computer-readable storage medium of claim **12**, wherein the method further comprises defining a context by:

creating one or more context entries in a context manager; and

associating a respective context entry with a set of contextual information.

**16**. The computer-readable storage medium of claim **15**, wherein the method further comprises updating entries in the content database and updating the context entries in the context manager responsive to actions performed by the first user.

**17**. The computer-readable storage medium of claim **12**, wherein the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.

**18**. The computer-readable storage medium of claim **12**, wherein the content piece includes one or more of: audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

**19**. An apparatus for delivering context-based content to a first user, comprising:

a processor;

an input mechanism configured to receive a set of contextual information with respect to the first user;

a receiving mechanism configured to receive at least one content package, wherein the content package includes at least one content piece and a set of rules associated with the content package, wherein the set of rules includes a trigger condition and an expected response, and wherein the trigger condition specifies a context that triggers a presentation of the content piece;

a content delivery mechanism configured to present the context-based content to a first user; and

26

a context manager configured to process the contextual information to determine a current context for the first user, and to determine whether the current context satisfies the trigger condition;

wherein in response to the trigger condition being satisfied, the content delivery mechanism is configured to present the content piece to the first user and

wherein while presenting the content piece to the first user, the content delivery mechanism is further configured to:

receive a response from the first user corresponding to the presented content piece,

determine whether the received response matches the expected response, and

perform an action based on an outcome of the determination.

**20**. The apparatus of claim **19**, wherein the apparatus further comprises a content management mechanism configured to create the content package for the first user, wherein creating the content piece involves:

recording the content piece that is provided by the first user;

creating an entry in a content database for the recorded content piece, wherein the entry includes one or more trigger conditions;

associating the one or more trigger conditions for the entry with a user-defined context;

continuously comparing previously defined trigger conditions for the entry with the ongoing context of the first user; and

in response to the one or more trigger conditions being met, retrieving the content piece and presenting the retrieved content piece to the first user.

**21**. The apparatus of claim **20**, wherein the content management mechanism is further configured to create a shareable content piece for the first user, wherein creating the sharable content piece involves:

recording the sharable content piece that is provided by the first user; and

creating a content package for the recorded sharable content piece, wherein the content package includes the recorded sharable content piece, and wherein the content package includes one or more trigger conditions;

wherein the content package allows a recipient of the content package to insert, modify, and/or remove content or trigger conditions from the content package.

**22**. The apparatus of claim **19**, wherein the context manager defines a context by:

creating one or more context entries for the context; and

associating a respective context entry with a set of contextual information.

**23**. The apparatus of claim **22**, wherein the apparatus is further configured to update entries in the content database and update the user-defined context entries in the context manager responsive to actions performed by the first user.

**24**. The apparatus of claim **19**, wherein the contextual information includes one or more of: time, date, location, proximity to a system-detectable tag, device orientation, velocity, direction, distance, vibration, altitude, temperature, pressure, humidity, sound, luminous intensity, camera image, and video stream.

**25**. The apparatus of claim **19**, wherein the content piece includes one or more of: audio clip, image, video stream, language lesson, e-mail, weather report, calendar reminder, news feed, rich site summary (RSS) feed, information update from a Web 2.0 application, and Internet blog.

* * * * *

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing Brief for Xerox Corporation,

1. Complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B). This brief contains 13,957 words, excluding the parts of the brief exempted by FED. R. APP. P. 5(c), 21(d), 27(d)(2), 32(f), and FED. CIR. R. 32(b). Microsoft Word was used to calculate the word count.

2. Complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman type style.

Dated: November 17, 2023

*/s/ Joel L. Thollander*
Joel L. Thollander